UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 PROCEEDING |
| | ) | |
| | ) | |
| JAMES SAMATAS, | ) | CASE NO. 20-BK-17355 |
| | ) | |
| | ) | |
| DEBTOR. | ) | HON. A. BENJAMIN GOLDGAR |

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on **January 25, 2021, at 10:00 a.m.**, I will appear before the Honorable A. Benjamin Goldgar and present the **MOTION OF CARLYE GOLDBERG SAMATAS TO CONVERT CASE TO CHAPTER 7**, a copy of which is attached.

**This motion will be presented and heard electronically using Zoom for Government**. No personal appearance in court is necessary or permitted. To appear and be heard on the motion, you must do the following:

**To appear by video**, use this link: https://www.zoomgov.com/. Then enter the meeting ID and password. **To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and password. The meeting ID for this hearing is 161 500 0972 and the password is 726993. The meeting ID and password can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

*/s/ Eric Goldberg*
Eric Goldberg, *admitted pro hac vice*
DLA Piper, LLP (US)
2000 Avenue of the Stars, Suite 400N
Los Angeles, CA 90067
Counsel to Creditor
Carlye Goldberg Samatas

# TABLE OF CONTENTS

**Page**

I.     JURISDICTION ....................................................................................................... 1

II.    INTRODUCTION ..................................................................................................... 1

III.   STATEMENT OF FACTS ........................................................................................ 3

       A.    The Debtor Has Failed to Fully & Accurately Disclose His Assets ............. 4

       B.    The Debtor Has Failed to Adequately Explain The Pre-Petition
             Disappearance of Valuable Assets and His Valuation of Numerous
             Significant Assets ........................................................................................ 5

       C.    The Debtor Has Failed to Fully & Accurately Disclose His Liabilities. ........ 6

       D.    The Debtor Failed to Disclose Gifts and Prepetition Property
             Transfers ...................................................................................................... 7

       E.    The Debtor's Pattern of Evasion and Non-disclosure Extends to His
             Income. ........................................................................................................ 9

       F.    The Debtor Has No Intention to File, and No Ability to Confirm, a
             Plan. ........................................................................................................... 10

       G.    The Debtor Has Demonstrated A Complete Lack of Candor and
             Utter Contempt for His Creditors and the Bankruptcy Process. ............... 12

IV.    ARGUMENT ......................................................................................................... 16

       A.    Cause Exists To Convert The Case Because The Estate Is
             Diminishing In Value And There Is No Likelihood Of Rehabilitation
             For This Debtor. ......................................................................................... 17

       B.    Cause Exists To Convert Because The Debtor Is Mismanaging The
             Estate. ........................................................................................................ 18

       C.    Cause Exists To Convert The Case To Chapter 7 Because The
             Debtor Has Failed To Timely File Accurate & Complete Schedules
             And Statements. ........................................................................................ 19

       D.    Cause Exists To Convert The Case Because The Debtor Is Unable
             To Confirm A Plan Of Reorganization. ...................................................... 20

       E.    Cause Exists To Convert The Case Because The Debtor Has
             Failed To Pay His Post-petition Spousal Support Obligations To
             Carlye. ....................................................................................................... 21

       F.    Cause Exists To Convert The Case Because The Debtor Has
             Failed To Provide Information Required By The U.S. Trustee. ................. 21

       G.    Cause Exists To Convert The Case Because The Debtor Has
             Failed To Pay Quarterly US Trustee Fees. ............................................... 22

H.    Cause Exists To Convert The Case Because The Debtor Filed In
Bad Faith. ........................................................................................... 22

I.    The Case Should Be Converted Immediately So That A Trustee
Can Investigate And Take Control Of The Debtor's Substantial
Assets. ............................................................................................... 23

V.    CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Aurora Memory Care, LLC*,
589 B.R. 631 (Bankr.N.D.Ill. 2018)............................................................... 21

*In re Barnes*,
254 B.R. 415 (Bankr. E.D. Mich. 2001)...................................................... 24

*In re Canion*,
129 B.R. 465 (Bank.S.D.Tx. 1989)............................................................ 19

*In re First Connecticut Consulting Group, Inc.*,
579 B.R. 673 (Bankr.D.Ct. 2018) .............................................................. 23

*In re Grasso*,
497 B.R. 448 (Bankr.E.D.Pa. 2013) ........................................................... 17

*In re Kowalski*,
2018 WL 6841355 (Bankr.N.D.Ill. Nov. 30, 2018) .................................... 17

*In re LG Motors, Inc.*,
422 B.R. 110 (Bankr.N.D.Ill. 2009)........................................................... 18

*Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*,
779 F.2d 1068 (5th Cir. 1986) .................................................................. 22

*In re Melendez Concrete, Inc.*,
2009 WL 2997920 (Bankr.D.N.M. 2009) .................................................. 19

*In re Midwest Properties of Shawano, LLC*,
442 B.R. 278 (Bankr.D.De. 2010) ............................................................ 23

*In re Moultrie*,
586 B.R. 498 (Bankr.N.D.Ga. 2018) ........................................................ 19

*In re Original IFPC Shareholders, Inc.*,
317 B.R. 738 (Bankr.N.D.Ill. 2004).......................................................... 20

*In re Sakon*,
617 B.R. 7 (Bankr.D.Conn. 2020) ............................................................ 18

*In re Viscion Shareholders Trust*,
478 B.R. 292 (Bankr.S.D.Oh. 2012)......................................................... 23

*In re West*,
  507 B.R. 252 (Bankr. N.D. Ill. 2014) ..................................................................... 24

*In re Willis Brown, Jr.*,
  109 B.R. 555 (Bankr.D.R.I. 1989) ......................................................................... 23

## Statutes

11 U.S.C. § 101(14A) ......................................................................................... 21

11 U.S.C. § 506(a) ............................................................................................. 17

11 U.S.C. § 541(c)(2) ......................................................................................... 24

11 U.S.C. § 1112(b) ....................................................................................... 1, 16

11 U.S.C. § 1112(b)(1) ....................................................................................... 23

11 U.S.C. § 1112(b)(4)(A) .................................................................................. 17

11 U.S.C. § 1112(b)(4)(B) .................................................................................. 18

11 U.S.C. § 1112(b)(4)(F) ............................................................................. 19, 21

11 U.S.C. § 1112(b)(4)(K) .................................................................................. 22

11 U.S.C. § 1112(b)(4)(M) ................................................................................. 20

11 U.S.C. § 1112(b)(4)(P) .................................................................................. 21

28 U.S.C. § 157(b)(2)(A) ...................................................................................... 1

28 U.S.C. § 1408 ................................................................................................... 1

28 U.S.C. § 1409 ................................................................................................... 1

## Other Authorities

7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] .............................................. 18, 23

## MOTION OF CARLYE GOLDBERG SAMATAS TO CONVERT CASE TO CHAPTER 7

Carlye Goldberg Samatas ("**Carlye**"), a secured creditor, files this Motion to Convert Case to Chapter 7 ("**Motion**").  Pursuant to this Motion, Carlye seeks to have the chapter 11 case of James Samatas, the debtor in possession herein ("**Debtor**") converted to a case under Chapter 7 based on the arguments and authorities set forth below, as well as the evidence in the accompanying Declaration of Eric Goldberg ("**Goldberg Declaration**").  In support of this Motion, Carlye respectfully represents as follows:

## I.
## JURISDICTION

1.   This is a core proceeding concerning the administration of the estate pursuant to 28 U.S.C. § 157(b)(2)(A) which this Court may determine pursuant to IOP 15(A) and LR 40.3.1 of the United States District Court for the Northern District of Illinois.

2.   Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.   Carlye has standing to file this Motion pursuant to 11 U.S.C. § 1112(b).

## II.
## INTRODUCTION

1.   Debtors like James Samatas give the bankruptcy system a bad name.  The Debtor here lives in an Oak Brook, Illinois mansion that he values at $3-4 million.  This mansion is filled with art, furnishings and collectibles that the Debtor valued at more than $4 million during his divorce from Carlye in 2018.  Now, only 2 ½ years later, when the Debtor is in bankruptcy and trying to avoid paying his creditors, he contends those same assets are suddenly worth only $300,000.

2.   The Oak Brook property is only one of two mansions the Debtor owns.  The other is a luxury hillside home in Hollywood, California that the Debtor values at $10 million dollars.  The Debtor filed bankruptcy to stop a foreclosure on this property brought

1

by Carlye, the Debtor's ex-wife.  Carlye commenced the foreclosure to try to collect on the spousal support payments owed to her by the Debtor, which he has not paid in almost a year, including during the pendency of this case.

3.    The wealthy son of wealthy parents, the Debtor's finances remain opaque even after two Section 341a meetings lasting more than four hours.  The Debtor claims to have no income, yet he acknowledges that his living expenses total roughly $57,000 per month, and admits that his tax returns tell a different story than his Schedules of Assets & Liabilities ("**Schedules**").  Meanwhile, through several trusts, the Debtor owns interests in almost a dozen healthcare-related businesses that were started by his late father, but which the Debtor asserts are not part of the bankruptcy estate.

4.    We don't know much about those businesses, or anything else in one of the trusts, because the Debtor during his 341a refused to answer most questions about that trust or its contents.  The Debtor claims this trust is a "spendthrift trust" that his creditors cannot reach, but then later admitted under oath that the trust was merely his "alter ego." Even when the Debtor did answer questions about his assets, his answers were a model of obfuscation and obstinacy, and failed to explain the many omissions and false statements in his Schedules.  Making matters worse is the fact that the Debtor seems to revel in frustrating his creditors, even taunting them during the 341a, and urging them to "give it your best shot" when trying to obtain information about his assets.

5.    Despite all this, the Debtor filed bankruptcy under chapter 11, which exists to give honest debtors a "breathing spell" while they reorganize their financial affairs and negotiate a plan of reorganization to repay their creditors.  But that is not this Debtor's plan.  At his 341a he freely admitted that he had: filed Chapter 11 to stall the foreclosure

2

of his Hollywood mansion; planned to sell that property to pay his secured creditors; intended to use any excess proceeds to cover his personal living expenses; and had no intention to file a plan of reorganization or to pay any of his unsecured creditors.

6.      This case is a poster-child for conversion to Chapter 7.  The Debtor has no intent to reorganize; no intent to pay unsecured creditors; failed to disclose valuable assets; failed to explain the disappearance and devaluation of numerous other assets; failed to close his pre-petition bank accounts; failed to disclose multiple post-petition transfers of money to his adult children; failed to file any monthly operating reports; failed to pay any of his post-petition spousal support obligations to Carlye; and has made a mockery of the bankruptcy system with his pattern of evasion and non-disclosure.

7.      In Chapter 11, a debtor is permitted to remain in possession only so long as that debtor is (a) willing to fully and accurately disclose the full extent of his assets and liabilities, as well as his income and expenses, and (b) actively pursuing a reorganization. The Debtor here has thoroughly abused that privilege and is no longer entitled to continue as a debtor in possession.  A trustee is urgently needed in this case, which should be converted to Chapter 7 immediately.

### III.
### STATEMENT OF FACTS

8.      James Samatas is no ordinary debtor.   He entered Chapter 11 on September 21, 2020 ("**Petition Date**") with a claimed net worth of $16 million, exclusive of the multiple businesses held by one of his trusts ("**Discretionary Trust**"), which he asserts is a valid spendthrift trust, and about which he has refused to make any meaningful disclosures.  See Schedules (copy attached to the Goldberg Declaration as Exhibit A), at Question 63 and Schedules D, E and F.  Inexplicably for a person with a

$16 million net worth, two mansions filled with valuable art, a $2.5 million paperweight collection, and trusts with interests in a dozen or so businesses, *the Debtor here claims to have monthly living expenses of almost $57,000, but no income at all.* Schedules, Ex. A at Schedules I and J. Nothing about this case makes any sense.

### A. The Debtor Has Failed to Fully & Accurately Disclose His Assets

9.      From the get-go, this Debtor has demonstrated a remarkable lack of candor regarding his assets and liabilities. He failed to file his Schedules and Statement of Financial Affairs ("**SoFA**," copy attached as Exhibit B to the Goldberg Declaration) when due and filed them only after the U.S. Trustee filed a motion to dismiss the case for the Debtor's non-compliance. *See* Dkt. #1, 14, 20-22. But even then, the Debtor's Schedules and SoFA are woefully inadequate and replete with demonstrably false statements.

10.      In his Schedules, the Debtor stated under penalty of perjury that he had:

- two cars

- three bank accounts

- no interest in any life insurance policies

- no interest in any trusts

*See* Exhibit A, Schedules, at Questions 3, 17, 31 and 25. At his 341a, however, after being questioned by his creditors, it came out that the Debtor in fact had 3 cars rather than 2; had 8 bank accounts, rather than 3; had interests in at least two trusts holding interests in roughly a dozen businesses; and that one of those trusts had an interest in a life insurance policy on his mother that is believed to be worth millions of dollars. *See* Transcript of Second 341a Meeting ("**Second 341a**," a copy of which is attached to the Goldberg Declaration as Exhibit D) at 17:10-17; 22:18-22; 15:1-9; and pp.56-57. There is no dispute that the Debtor failed to disclose multiple assets worth millions of dollars.

4

11.     The Debtor here lied and failed to disclose his interests in multiple trusts. First, in his Schedules, where Question #25 asked the Debtor whether he "owns or has any equitable interest in" "trusts, equitable or future interests in property," the Debtor responded by checking the "No" box. *See* Exhibit A, Schedules, at p. 7, #25. Later, during his 341a, the Debtor admitted that he had at least two trusts, the Discretionary Trust discussed above, and another one as well ("**Revocable Trust**"). Exhibit D, Second 341a, at 15. Later on, when asked if he had any interest in any *other* trusts, the Debtor, a lawyer, replied dubiously, "I don't recall." *See* Ex. D, Second 341a, at 70:8.

### B. The Debtor Has Failed to Adequately Explain The Pre-Petition Disappearance of Valuable Assets and His Valuation of Numerous Significant Assets.

12.     The Debtor's Schedules indicate that as of the Petition Date he had assets worth more than $26 million. *See* Ex. A, Schedules, at Question 63. That figure, however, includes the Debtor's estimate of $7 million for the value of various early-stage lawsuits where he represents himself against his ex-wife, his brother and sister, and his former counsel. *Ibid.* at Question 33. Subtracting out the highly speculative $7 million figure leaves a still impressive value of over $19 million dollars for the Debtor's assets.

13.     But 2½ years earlier, in connection with his divorce from Carlye, the Debtor signed under penalty of perjury a Financial Disclosure Document ("**FDD,**" copy attached as Exhibit E to the Goldberg Declaration) where he valued these very same assets at roughly $26 million, a difference of $7 million dollars! *See* Ex. E, the FDD, at p.5, Item 11.[1] While the Debtor was questioned extensively about this decline in value at each of his 341a sessions, his explanations were incomplete, incredible, and at times, absurd.

---

[1] The difference of $7 million is after taking into account the assets that Carlye received in the divorce.

14.     In his Schedules, the Debtor valued his art, his paperweight collection and the furnishings at his Oak Brook mansion at a total of $300,000.  *See* Ex. A, Schedules, at Questions 6 & 8.  But 2½ years earlier, in his FDD, the Debtor valued those same assets at $4.3 million.  *See* Ex. E, FDD, at Items 2 and 3.  When asked at his 341a to explain this dramatic decline, the Debtor proffered a host of far-fetched stories:  The Baccarat chandelier had been sold, although he could not remember when, or to whom.  The furnishings in the Oak Brook mansion, which furnishings he valued at $1.4 million in 2018, had been transferred to one of his trusts as an "in-kind" repayment of a loan, although he was unable to say how he had determined the value of this "in-kind" payment, or the amount of the debt repaid, and he acknowledged that those furnishings were still located within his home.  *See* Ex. D, Second 341a, at pp. 48-50.

15.     Similarly, in 2018 the Debtor declared that his collection of rare paperweights had a value of $2.5 million.  Ex. E, FDD at Item 3.  Now, however, he says that the collection is worth less than $200,000.  *See* Ex. A, Schedules, at Question 8.  When asked to explain the more than 90% decline in value, the Debtor testified that the loss was attributable to "the market," despite being unable to point to any valuations or appraisals to support that contention.  *See* Ex. D, Second 341a at 50:18-26.

**C.  The Debtor Has Failed to Fully & Accurately Disclose His Liabilities.**

16.     With regard to his liabilities, the Debtor has been just as evasive and dishonest as he has been with respect to his assets.  For example:

- · Carlye, the Debtor's ex-wife, is owed almost $1.9 million for spousal support payments (secured by a trust deed against the Hollywood property); insurance payments; and tax payment reimbursement obligations, and legal and professional fees.  *See* Goldberg Declaration at ¶8.  Yet the Debtor did not even list her as a creditor.

6

- John Samatas and Cynthia Thiem, the Debtor's brother and sister, respectively, assert millions of dollars in claims against the Debtor through multiple lawsuits that have been pending for years. But the Debtor failed to list either one of them as a creditor.

- Cohen & Lord, the Debtor's former legal counsel, is owed almost $3 million for unpaid fees. But the Debtor failed to list Cohen & Lord as a creditor.

- The Debtor owes millions of dollars to his Discretionary Trust, which he failed to list as a creditor. This is not a minor debt that might have slipped the Debtor's mind; in 2018, according to the Debtor's FDD, this debt exceeded $24 million. Ex. E at p.8. Under questioning at his 341a, the Debtor acknowledged the existence of the debt, but claimed not to know how much he owed, saying only that it "Started at 10 million and I'm not sure where the number is today." *See* Ex. D, Second 341a, at 60:4-11.

17.    The Debtor also failed to list any of his co-debtors in his Schedules. Schedule H, Question 1 asks, "Do you have any codebtors?" The Debtor, a lawyer, answered this question by checking the "No" box. *See* Ex. A, Schedules, at Schedule H. However, it soon became apparent that this statement was false, in several respects:

- Carlye is a co-debtor on the $1.7 million mortgage for the Oak Brook property

- The Debtor, his brother, and their sister are co-debtors on multiple business obligations that they guaranteed. The Debtor failed to include <u>any</u> of these debts on his Schedules, and failed to list any of the co-debtors as well.

*See* Ex. D, Second 341a, at pp.27-28.

### D. The Debtor Failed to Disclose Gifts and Prepetition Property Transfers.

18.    At his first 341a meeting, counsel for the U.S. Trustee asked the Debtor a very simple, and very clear question: "Now, have you gifted or given any property to anybody in the last four years that is worth more than $600?" The Debtor's response was equally simple and clear: "No." *See* Transcript of First 341a Meeting ("**First 341a**," copy attached as Exhibit C to the Goldberg Declaration), at 38:26 – 39:1.

7

19.     The Debtor's response was a lie.  During the second 341a it came out that despite claiming to have no income, despite not having paid either of his mortgagees for months, and despite not having paid Carlye the spousal support she is entitled to under their divorce decree for almost a year, the Debtor had been giving each of his two "children" $4,000 per month, including after the Petition Date.[2] See Ex. D, Second 341a, at 62:8-24.  None of these payments was disclosed on the SoFA, where Question 13 specifically asks about gifts and transfers, and none of the post-petition transfers was disclosed in Monthly Operating Reports ("**MORs**"), because the Debtor has not filed any.

20.     SoFA Question 7 asks "Within 1 year before you filed for bankruptcy, did you make any payment on a debt owed anyone that was an insider?"  Similarly, SoFA Question 8 asks "Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefitted an insider?" The Debtor answered "No" to both questions.  *See* Ex. B, SoFA, at Questions 7 and 8.

21.     The Debtor's responses to both questions were false.  Perhaps because he was trying to be consistent with his answer to Question 25 in the Schedules (where he denied outright that he was the beneficiary of any trust), the Debtor failed to disclose that he had transferred a portion of the Oak Brook mansion furnishings to his own trust to repay part of a loan from one trust to the other.  *See* Ex. D, Second 341a, at pp.48-49.

22.     The Debtor admitted under questioning at his second 341a that this transfer of property was "to repay a loan from my Revocable [Trust] to my Discretionary [Trust]." *Ibid.* at p.49.  The Debtor further acknowledged that he was the sole current beneficiary

---

[2] The Debtor's children are 34 and 38 years old. *See* Ex. D, Second 341a, at 64:10. On information and belief, for years prior to the Petition Date the Debtor regularly transferred $10-12,000 per month to each of his adult children.

WEST\292592519.3

of the Discretionary Trust, which was self-settled by the Debtor's father. *See* Ex. D, Second 341a, at 68:19-25. Despite these facts, the Debtor responded "No" to SoFA Question 19, which asks, "Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust of which you are a beneficiary." *See* Ex. B, SoFA, at Question 19. Accordingly, the Debtor either lied in his response to this question on the SoFA, or he lied during his 341a about the nature and existence of the transfer.

### E. The Debtor's Pattern of Evasion and Non-disclosure Extends to His Income.

23. Form 1061 of the Schedules asks about an individual debtor's monthly income. The Debtor here stated that his monthly income was "$0," but his monthly expenses were almost $57,000. *See* Ex. A, Schedules, at Schedules I and J. At his 341a the Debtor confirmed this 'fact,' and then went on to 'explain' as follows:

> MR. HOLTKAMP:        *Now, Schedule I, you list no income whatsoever. Is that right?*
>
> MR. SAMATAS:        *That's correct. And now, again, you're getting into, on my tax returns I received, apparently received income. Did you ask me, did I receive the money from that income, the answer is no. So I don't have any, you know, which way do you want me to answer your question? Did I receive income? According to my tax statements and my tax attorney, yes. Did I receive the money because of part of the litigation with my brother and sister? The answer is no, I couldn't even pay my taxes.*
>
> MR. HOLTKAMP:        *Well, let's just go through this.*
>
> MR. SAMATAS:        *I'm sorry to make it…*
>
> MR. HOLTKAMP:        *Let's just, let's just go through it.*
>
> MR. SAMATAS:        *Well, you're trying to get every little nook and cranny but I'm trying to explain to you, sometimes these, what you think is simple to answer, is not so simple to answer.*
>
> MR. HOLTKAMP:        *I got it. So do you have any wages, salary, or commissions?*
>
> MR. SAMATAS:        *No.*
>
> MR. HOLTKAMP:        *Okay, do you have any income from rental property or operations of a business, profession or farm?*
>
> MR. SAMATAS:        *Technically, as I just explained, on the tax return, yes. But I don't have the money so…*

Ex. D, Second 341a, at 28:23-29:13.

24.     When asked to explain the incongruity between (a) having zero monthly income, and (b) having monthly expenses of almost $57,000, the Debtor testified that he made ends meet by "Selling personal property".   *See* Ex. C, First 341a, at 38:4.   Of course, the Debtor's SoFA make no such mention of any such transfers of property during the period before the Petition Date.   Then, the Debtor was asked what he had been doing for income since the Petition Date, *i.e.*, whether he had sold any personal property during the bankruptcy case.   His answer:   "During this case?   No."   *See* Ex. D, First 341a, at 38:6.   The Debtor's story about his income simply makes no sense.

**F.   The Debtor Has No Intention to File, and No Ability to Confirm, a Plan.**

25.     With no regular income, confirming a Chapter 11 plan will be a challenge for this Debtor.   The Debtor, however, does not seem bothered by this because he has no intention of filing a plan.   Rather, his intention is to sell the Hollywood property, pay off the creditors secured by that property, and then dismiss his bankruptcy so he can keep the excess proceeds without paying any of his unsecured creditors:

> MR. HOLTKAMP:         *So, if there's an equity, if there's equity after you sell the house, what do you plan on doing with it, that money?*
>
> MR. SAMATAS:         *I would, well, I would live.   There's a number of moving parts going on and if I was able to pull enough equity out of there, and if I would probably at that, petition would be dismiss the bankruptcy because I would have fulfilled my obligations to creditors.*
>
> MR. HOLTKAMP:         **But you don't intend to use that money to pay any unsecured creditors or any creditors that do not have a lien on that property***?*
>
> MR. SAMATAS:         **Well, my, no, no***.*
>
> ***
>
> MR. HOLTKAMP:         **Okay, so if the property is sold you just intend to move to dismiss your bankruptcy case then?**
>
> MR. SAMATAS:         *In all likelihood, yes.*
>
> MR. HOLTKAMP:         **Okay, so you don't intend to fund a plan or do, do anything like that***?*

10

> MR. SAMATAS:          *No*.

Ex. D, Second 341a, at 4:1-18 (emphasis added).

26.     Incredibly, after admitting that he had filed Chapter 11 without any regular income; admitting that he had no intention to file a plan; and admitting that he planned to keep for himself the equity from the sale of the Hollywood mansion, rather than pay any of his unsecured creditors, the Debtor went on to brag about how, during 2021 (apparently after dismissing his own case), he expects to receive millions of dollars from the sale of some of the businesses in which one of his trusts has an interest:

> [A]s long as we're on the subject matter of what you're asking me, Mr. Schwartz and Mr. Blonder [the attorneys representing the Debtor's brother and sister in their suit against the Debtor] are acutely aware of the sale that will happen within five months of one of the assets that I've listed in the schedules that should afford me several millions of dollars on the conclusion of that sale.

Ex. D, Second 341a, at 4:18-21.  Thus, not only did the Debtor file for Chapter 11 without any intention of fling a plan or paying any of his unsecured creditors, but he planned it so that he could get in and out of bankruptcy before he came into the millions of dollars he expects to receive in 2021 from his share of the proceeds of the sale of multiple businesses held by his trusts.  This Debtor is not acting in good faith.

27.     Further evidence of this Debtor's lack of good faith is shown by his lack of any action being taken to sell the Hollywood property.  As discussed above, the Debtor testified that he planned to repay his secured creditors by selling the Hollywood property, which he believes will also generate enough surplus for him to live on.  Ex. D, Second 341a, at 4:1-3.  Yet the Debtor, who acknowledged at his first 341a that selling the property would require Court approval of his employment of a broker, as well as approval of the ultimate sale, has failed to list any property for sale; failed to file an application to

11

employ a broker; and failed to take any tangible steps to sell the property, even though

this case has now been pending for three months.  *See* Ex. C, First 341a, at 15:27-17:6.

### G. The Debtor Has Demonstrated A Complete Lack of Candor and Utter Contempt for His Creditors and the Bankruptcy Process.

28.     The Debtor's attitude toward the bankruptcy process, and his obligations as

a debtor thereunder, were shown plainly during his 341a.  The following exchanges are

emblematic of the Debtor's truculent and uncooperative behavior.

29.     On the topic of his income, after testifying that "I haven't seen any income

from my business for over three years…" Ex. D, Second 341, at 29:17-18, the U.S.

Trustee asked the Debtor why, if he had not received any income in years, in 2018 (only

two years before the Petition Date) he had agreed as part of his divorce decree to pay

Carlye $20,000 per month in spousal support, the Debtor testified as follows:

> MR. HOLTKAMP:      *Okay, and did you think you had the income or cashflow available to pay $20,000 a month?*
>
> MR. SAMATAS:      *Yes.*
>
> MR. HOLTKAMP:      *In June of 2018 you were making $20,000 a month or more?*
>
> MR. SAMATAS:      *Yes.*
>
> MR. HOLTKAMP:      *And where was that money coming from?*
>
> MR. SAMATAS:      *Oh I had sources, I don't remember how, but yes.*
>
> MR. HOLTKAMP:      *Okay, and where was that money…*
>
> MR. SAMATAS:      *I mean, I wouldn't enter an agreement if I didn't think I could make it.  I mean, hello?*
>
> MR. HOLTKAMP:      *Okay.  So you were making at least $20,000 a month back in 20, June of 2018?*
>
> MR. SAMATAS:      *Well, let's just say I had sufficient assets to be able to make her payment, that's a better way of putting it.  You're asking me if I was making income, as in contradiction to my claim about what was being done in my business, which was my main source of income.*
>
> MR. HOLTKAMP:      *Mm-hmm, so how did you think you were going to make this $20,000 in monthly payments?*

12

MR. SAMATAS:        *I had other assets at the time.*

MR. HOLTKAMP:       *So you were going to sell assets?*

MR. SAMATAS:        *As far as the settlement.  I'm sorry?*

MR. HOLTKAMP:       *So you were going to sell assets to pay this?*

MR. SAMATAS:        *I had liquidity at a point that I could make it and I knew there was other assets that were going to be sold or other income that would come separate and apart from the businesses, yes.*

MR. HOLTKAMP:       *Okay, back in June of 2018, when you entered into this settlement, where were you receiving funds from?*

MR. SAMATAS:        *Can I ask you, what's the relevancy of that question?*

                                        ***

MR. SAMATAS:        *Where do you want to go with this?*

MR. HOLTKAMP:       *I want to know where the money was coming from in June of 2018.*

MR. SAMATAS:        *I don't remember.*

MR. HOLTKAMP:       *But you had money coming in?*

MR. SAMATAS:        *I had money…*

MR. HOLTKAMP:       *You already had money?*

MR. SAMATAS:        *Hello, I sold a piece of property.*

MR. HOLTKAMP:       *Okay, in 2018 you sold a piece of real property?*

MR. SAMATAS:        *So I mean you can't take the snap-, you can't take the snapshot out of my life and, you know, look, David, not trying to be rude but if you want to spend 12 hours and know about my life, I'm more than happy to tell you every little detail you want to know to dot your i's and cross your t's, okay?*

MR. HOLTKAMP:       *We shouldn't have to, sir…you should have already put this all in your schedules, is the problem, okay?  So we'll go through it.*

MR. SAMATAS:        *No.*

MR. HOLTKAMP:       *We'll go through it.*

                                        ***

MR. HOLTKAMP:       *Let's just go over to your Statement of Financial Affairs here. Okay, number four on your Statement of Financial Affairs says, Did you have any income from employment or operating a business during this year or the two previous calendar years?  So it asks from January 1st to December 31st, 2018, to the date you filed for bankruptcy, did you have any income from employment or operating a business?  And you put "no."*

13

MR. SAMATAS:          No.

MR. HOLTKAMP:        So…

MR. SAMATAS:          That's correct.

MR. HOLTKAMP:        Okay, number five asks you…

MR. SAMATAS:          So?

MR. HOLTKAMP:        Number five asks, did you receive any other income during that two-year calendar period?  Other income would include alimony, child support, Social Security, unemployment, public benefits, pension, interest, dividends, distributions, money collected from lawsuits, royalties, gambling, lottery winnings.  You get where I'm going here, it's any other forms of funds that come in, and you said, no.

MR. SAMATAS:          Are we talking about Section 61 of the Internal Revenue Code about what's defined as income?

MR. HOLTKAMP:        No, I'm saying what's defined…

MR. SAMATAS:          Come on, I sent it.  Look, I mean really, I mean, you asked a question on a form and again, I'm not trying to be argumentative but you're like…

MR. HOLTKAMP:        I'm just wondering how you can have $56,000 a month in expenses and not have any income, zero dollars coming in since January 1, 2018.  I just want an explanation.

MR. SAMATAS:          Okay, real simple, you've got Bruce Cohen on the phone, he can answer the question for you.

MR. HOLTKAMP:        He's not under oath, sir.

MR. SAMATAS:          Come on, Bruce.

MR. HOLTKAMP:        You're under oath.

MR. SAMATAS:          Okay, alright, look, there was litigation and I received income from that litigation and the litigation also involves a malpractice suit against Mr. Cohen, who screwed up the case.  So I did have some money, and I would have had a lot more money if he didn't screw the case up which is as far as I can say, legally at this point which I'm in litigation with him.

MR. HOLTKAMP:        Okay, so you received money from litigation?

MR. SAMATAS:          But I.  Yes.

MR. HOLTKAMP:        Let's just try to just, you know, little baby steps here.  So you received some money from litigation.  How much?

MR. SAMATAS:          Well, what I received, and I had to pay a lot of attorneys off after that because of what Mr. Cohen did, so it was probably less than a million was left.

MR. HOLTKAMP:        Well, what was the total amount you received?

14

> MR. SAMATAS:        *I can't answer that quickly, because there was judgments against*
*me because of what Mr. Cohen did . . .*

> MR. HOLTKAMP        *Can we just leave the, we don't need to litigate.*

> MR. SAMATAS:        *I can't give you a net, the net is less than a million, okay?  So*
*you .asked me, how much did I receive?  I didn't really receive what money it started with because it went*
*off to pay judgment creditors, okay?*

> MR. HOLTKAMP:       *So what was the gross?*

> MR. SAMATAS:        *I think around a million four, million five.*

Ex. D, Second 341a, at 31:22-35:13.  Thus, within ten minutes the Debtor testified under

oath that during the two years before filing bankruptcy he (a) had no income at all; (b) had

at least $20,000 per month of income; (c) had income from the sale of a piece of property;

and (d) received more than a million dollars from the settlement of a lawsuit.

    30.    The dissembling continued:

> MR. HOLTKAMP:       *Now, within two years before you filed for bankruptcy, did you*
*sell, trade, or otherwise transfer any property to anyone other than in the ordinary course of business?*

> MR. SAMATAS:        *No.*

***

> MR. GOLDBERG:       *Okay, let's go back to those disclosures again.  You mentioned*
*that you had three cars, a Jeep Wrangler, an HHR, and a Lexus RX350.  And, in connection with your*
*divorce, your financial disclosures indicated that you owned two Corvettes.  What happened to the two*
*Corvettes?*

> MR. SAMATAS:        *They went and paid lawyers.*

> MR. GOLDBERG:       *When were they sold, is that what you're saying?*

> MR. SAMATAS:        *No, they were sold.*

> MR. GOLDBERG:       *When were they sold?*

> MR. SAMATAS:        *Earlier this year.*

> MR. GOLDBERG:       *Okay, and do you have paperwork to support that?*

> MR. SAMATAS:        *No.  Of course not.  I got paper bags of cash.*

> MR. GOLDBERG:       *How much did you sell each of those Corvettes for?*

15

> *MR. SAMATAS:        What's the relevancy of that?  To your questioning, you're representing my wife, please explain to me the relevance.  Look, you don't have carte blanche here to ask me anything.  You want to know what size underwear I wear, or what?  What does it matter?*

Ex. D, Second 341a, at 36:20-44:10.    Again, within minutes the Debtor completely contradicted himself, going from saying that during the two years before bankruptcy he had not sold any property outside the ordinary course of business, to admitting he sold two cars, including a rare 1959 Corvette, for cash, only months before filing bankruptcy.

31.    When counsel for Cohen & Lord (the Debtor's former counsel, to which firm the Debtor owes approximately $3 million), tried to inquire about the trusts, the Debtor again showed his contempt for his creditors and the bankruptcy process:

> *MR. SAMATAS:        You're not even, you're not even a secured creditor, okay?  I hope someday I get to chase you for what money you owe me, okay?  That's, that's of course not within the purview of today's conversation.  According to David, you have a contingent claim against me so, that grants you the right to sit at the table and ask me the questions so, go for it buddy.*

Ex. D, Second 341a, at 66:22-25.

## IV.
## ARGUMENT

32.    Bankruptcy Code Section 1112(b) sets forth a non-exclusive list of factors that constitute "cause" to dismiss or convert a Chapter 11 case.    Here, multiple independent grounds exist to dismiss or convert the Debtor's case.    While the Court could simply dismiss the case, that would only allow the Debtor to continue his evasion and non-disclosure, and force the Debtor's creditors to continue chasing the Debtor and his substantial assets in multiple jurisdictions across the country.    In contrast, converting the case will result in the appointment of a responsible trustee to investigate, take control of, and ultimately liquidate the Debtor's substantial assets for the benefit of creditors.

**A. Cause Exists To Convert The Case Because The Estate Is Diminishing In Value And There Is No Likelihood Of Rehabilitation For This Debtor.**

33.     Bankruptcy Code Section 1112(b)(4)(A) provides that a Chapter 11 case should be converted or dismissed when there is "[(1)] substantial or continuing loss to or diminution of the estate and [(2)] the absence of a reasonable likelihood of rehabilitation."

34.     Diminution, the first element of § 1112(b)(4)(A), exists if the value of the estate diminishes during the case, or the Debtor makes unauthorized transfers of property of the estate.  *In re Kowalski*, 2018 WL 6841355, at *2 (Bankr.N.D.Ill. Nov. 30, 2018) (diminishing value of estate and debtor's unauthorized transfer of property of the estate constitutes "diminution of value"); *In re Grasso,* 497 B.R. 448, 455-56 (Bankr.E.D.Pa. 2013) (debtor's unauthorized expenditure of estate assets constitutes diminution).

35.     Here, the estate is indisputably diminishing, in at least three ways. <u>First</u>, while he failed to disclose them in his SoFA or MORs, the Debtor admitted under oath at his 341a that he made at least four unauthorized post-petition transfers of estate property to his two non-dependent, adult children ($4,000 each, twice). <u>Second</u>, the Debtor acknowledges that he has post-petition income and can only pay his living expenses by "selling personal property," and each time he does that, the estate is diminished. <u>Third</u>, each of the Debtor's two luxury homes is encumbered by liens that, according to the Debtor, total less than the value of each house.  As a result, pursuant to Bankruptcy Code Section 506(a) these claims, which total roughly $10 million, are accruing post-petition interest, penalties and fees, and are thereby diminishing the estate by roughly $50,000 per month while the Debtor dithers over selling one or both of these luxury residences.

36.     The second element of cause under §1112(b)(4)(A), "rehabilitation," does not focus on "the technical [issue] of whether the debtor can confirm a plan, but, rather,

17

whether the debtor's business prospects justify continuance of the reorganization effort." *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr.N.D.Ill. 2009) (debtor does not have a reasonable prospect of rehabilitation when he has a negative net income) (internal citations omitted). "Rehabilitation is not another word for reorganization. Rehabilitation means to reestablish a business. Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted).

37.    Rehabilitation is not possible when an individual debtor has "no operating business, no cash flow, no revenues, [and] no cash flow." *In re Sakon,* 617 B.R. 7, 16 (Bankr.D.Conn. 2020) (finding that individual debtor failed to demonstrate that he could rehabilitate when he did not have "any tangible capitalization, enforceable financing, or cash flow that can support" a reorganization plan). The Debtor here admits that he has not been gainfully employed or received any income in years, and has not provided any evidence that he has any prospect of generating any regular income in the near future. Further, the Debtor has admitted that the sole purpose of this Chapter 11 case was to stall the foreclosure on the Hollywood property so he could sell it to pay off his secured creditors (but not pay any of his unsecured creditors). Thus, the Debtor has admitted that he has no reasonable prospect of rehabilitation (let alone an intent to rehabilitate).

**B. Cause Exists To Convert Because The Debtor Is Mismanaging The Estate.**

38.    Cause also exists to convert this case to Chapter 7 because the Debtor has grossly mismanaged the estate. *See* 11 U.S.C. § 1112(b)(4)(B). A debtor grossly mismanages the estate when he makes unauthorized expenditures of property of the estate. *In re LG Motors*, 422 B.R. at 117-118 (debtor's use of property of the estate for his own personal benefit constitutes gross mismanagement of the estate justifying

18

conversion).    As discussed above, on at least two occasions the Debtor made unauthorized post-petition transfers of property of the estate to his adult children.  At the same time, the Debtor has no income, and provided no evidence that he has replenished, or plans to replenish, the estate.    Each of these transfers constitutes gross mismanagement of the estate and justifies conversion of this case to Chapter 7.

**C. Cause Exists To Convert The Case To Chapter 7 Because The Debtor Has Failed To Timely File Accurate & Complete Schedules And Statements.**

39.    Bankruptcy Code Section 1112(b)(4)(F) provides that "cause" to dismiss or convert includes any "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under" Chapter 11.  Courts have interpreted Section 1112(b)(4)(F) to dismiss or convert a case where the debtor has filed incomplete schedules, failed to disclose income, or failed to disclose assets and transfers to insiders.  *See, e.g.*, *In re Melendez Concrete, Inc.*, 2009 WL 2997920, *6 (Bankr.D.N.M. 2009) (debtor's failure to disclose assets and insider transfers constitutes "cause"); *In re Canion,* 129 B.R. 465, 470 (Bank.S.D.Tx. 1989) (failure to disclose assets and income is "cause"); *In re Moultrie,* 586 B.R. 498, 504-05 (Bankr.N.D.Ga. 2018) (failure to disclose assets constitutes "cause").

40.    As discussed above, the Debtor's filings in this case are woefully inaccurate and incomplete.  Among other things, the Debtor:

> · Failed to list multiple creditors who are owed millions of dollars, including Carlye (his ex-wife), John Samatas & Cythia Thiem (his brother and sister) and the Cohen & Lord firm (his former counsel);
>
> · Falsely claimed in his Schedules that he had no interest in any trusts, when in fact he is the beneficiary of at least two multi-million dollar trusts;
>
> · Falsely claimed in his Schedules that he had no interest in any life insurance policies, when in fact he has an interest in a policy on his mother;

19

· Failed to disclose as assets business entities in which he has an interest;

· Failed to disclose transfers made to insiders (his adult children and his Discretionary Trust), both before and after the Petition Date; and

· Falsely claimed in his SoFA that he had made no pre-Petition Date transfers out of the ordinary course of business, when in fact he had (his sale of 2 Corvettes, the transfer of some of the furnishings in the Oak Brook property to repay an alleged loan from one trust to another, and the sale of various collectibles)

41.    Based on the forgoing, cause exists to dismiss or convert the case based on the Debtor's failure to file accurate Schedules and SoFA.

**D. Cause Exists To Convert The Case Because The Debtor Is Unable To Confirm A Plan Of Reorganization.**

42.    Bankruptcy Code Section 1112(b)(4)(M) provides that cause exists to convert a Chapter 11 case when a debtor fails to timely file or confirm a plan.  11 U.S.C. § 1112(b)(4)(M).  A debtor that does not earn income cannot fund a Chapter 11 plan because he is unable to "sustain payments to pre-petition and post-petition creditors." *See, e.g., In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 743-44 (Bankr.N.D.Ill. 2004) (a debtor cannot propose a feasible plan when it lacks any realistic source of income).  Here, the Debtor has admitted that he does not earn any income; admitted that his income is not likely to increase within the next year; and acknowledges that his lack of income means that the estate has to be diminished in order to for him to pay his ongoing living expenses.  There is simply is no way this Debtor can confirm a reorganization plan, because he has no regular income to fund payments to his creditors.  Accordingly, cause exists to convert this case under Bankruptcy Code Section 1112(b)(4)(M).

**E. Cause Exists To Convert The Case Because The Debtor Has Failed To Pay His Post-petition Spousal Support Obligations To Carlye.**

43.    Bankruptcy Code Section 1112(b)(4)(P) provides that cause exists to convert a Chapter 11 case when a debtor fails to pay post-petition "domestic support obligations." 11 U.S.C. § 1112(b)(4)(P).  The Code defines "domestic support obligations" to include alimony, maintenance, support, or any debt to a former spouse arising as a result of a separation agreement, divorce decree, or property settlement agreement.  11 U.S.C. § 101(14A).  Here, pursuant to a Judgment of Dissolution filed with the Superior Court of California on July 2, 2018 ("**Divorce Judgment**," a copy of which is attached to the Goldberg Declaration as Exhibit F), the Debtor was ordered to pay Carlye the sum of $20,000 per month as "Non-modifiable spousal support."  *See* Exhibit F at pdf pp. 11-15.

44.    Despite his legal obligation to do so, the Debtor has not paid Carlye any spousal support since January of 2020; Carlye has not received <u>any</u> spousal support from the Debtor since the Petition Date.  Accordingly, cause exists to convert the case to chapter 7 pursuant to Bankruptcy Code Section1112(b)(4)(P).

**F. Cause Exists To Convert The Case Because The Debtor Has Failed To Provide Information Required By The U.S. Trustee.**

45.    Bankruptcy Code Section 1112(b)(4)(F) provides that cause exists to convert a case when a debtor fails to timely or accurately file any required reports.  11 U.S.C. § 1112(b)(4)(F).  A debtor's failure to file monthly MORs satisfies this basis for cause.  *In re Aurora Memory Care, LLC*, 589 B.R. 631, 640 (Bankr.N.D.Ill. 2018) (failure to file operating reports constitutes "cause" warranting conversion).  The Debtor, having filed for Chapter 11 on September 21, 2020, already should have filed MORs for September, October and November, yet he has failed to file a single one.  Accordingly, cause exists to convert this case pursuant to Bankruptcy Code Section 1112(b)(4)(F).

21

**G. Cause Exists To Convert The Case Because The Debtor Has Failed To Pay Quarterly US Trustee Fees.**

46.     Bankruptcy Code Section 1112(b)(4)(K) provides that cause exists to convert a case when a debtor fails to "pay any fees or charges required under chapter 123 of title 28."  Chapter 123 of title 28 includes section 1930, which sets out a debtor's obligation to pay quarterly fees to the U.S. Trustee.  Here, the Debtor has failed to pay any U.S.  Trustee fees since the Petition date, and thus cause exists to convert this case pursuant to Bankruptcy Code Section 1112(b)(4)(K).

**H. Cause Exists To Convert The Case Because The Debtor Filed In Bad Faith.**

47.     The most common example of "cause" that is not enumerated in Section 1112(b)(4) is the bad faith filing of a Chapter 11 case.  It is well settled that in considering a motion to dismiss or convert a case, the court may take into consideration a debtor's bad faith.  *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071–72 (5th Cir. 1986).

48.     The Debtor in this case, however, has shown through his actions that his bankruptcy filing was <u>not</u> made in good faith.  As shown above, the Debtor here:

- · Filed chapter 11 on the eve of foreclosure on the Hollywood mansion

- · Has no intention to file a plan, and in fact plans to dismiss his case after selling the Hollywood property

- · Intends to keep for himself any equity from the sale, and not pay any of his unsecured creditors

- · Failed to disclose in his Schedules millions of dollars in assets and liabilities

- · Failed to disclose in his SoFA significant asset transfers to insiders

- · Failed to file Monthly Operating Reports or pay U.S. Trustee fees

- · Failed to adequately explain his sources of income and expenses

WEST\292592519.3

· Refused to disclose any meaningful information about his Discretionary Trust, which holds multiple business interests worth millions of dollars

· Lied, dissembled, and exhibited utter contempt for his creditors as they tried to get answers about his assets and liabilities

49.    There is no doubt that the Debtor's Chapter 11 case was not filed in good faith, and cause exists to dismiss or convert the case to Chapter 7.[3]

**I. The Case Should Be Converted Immediately So That A Trustee Can Investigate And Take Control Of The Debtor's Substantial Assets.**

50.    For any of the reasons discussed above, cause exists to convert this case. While the Court has discretion to convert or dismiss this case for "cause," the Court should choose the option that is in creditors' best interests. 11 U.S.C. § 1112(b)(1). Courts consider the following factors in determining whether to convert or dismiss a case: (1) "the ability of a trustee to reach assets for the benefit of creditors;" (2) "whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;" and (3) "whether the appointment of a trustee is desirable to supervise the estate." 7 *Collier on Bankruptcy* ¶ 1112.04[7] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted). All of these factors favor conversion of the case over dismissal.

51.    As discussed above, the Debtor here has:

· Engaged in multiple pre- and post-petition transfers of property to insiders

---

[3] *See, e.g., In re Willis Brown, Jr.*, 109 B.R. 555, 556 (Bankr.D.R.I. 1989) (cause exists when debtor commingles property of the estate and other assets, transferring said assets to third parties, and fails to disclose substantial assets); *In re Viscion Shareholders Trust*, 478 B.R. 292, 310-11 (Bankr.S.D.Oh. 2012) (court found cause due to lack of candor when debtor failed to disclose pertinent information about its financial affairs); *In re Midwest Properties of Shawano, LLC*, 442 B.R. 278, 286 (Bankr.D.De. 2010) (debtor's failure to provide UST with basic information about assets/liabilities and operations exhibits lack of candor and "cause."); *In re First Connecticut Consulting Group, Inc.*, 579 B.R. 673, 685 (Bankr.D.Ct. 2018) (debtor's "evasive conduct" constitutes cause).

- Failed to adequately explain the disappearance of millions of dollars' worth of assets in the years before bankruptcy

- Provided inconsistent and implausible explanations for his lack of income

- Refused to provide any meaningful information about his Discretionary Trust, which by the Debtor's own admission, holds millions of dollars of assets, and is his "alter ego"

52.     The Debtor here continues to assert – without evidence - that his Discretionary Trust is not part of his bankruptcy estate pursuant to Bankruptcy Code section 541(C)(2) because it is a "spendthrift trust.".  The law, however, is clear that it is the *Debtor's burden* to establish that the Discretionary Trust is a true spendthrift trust, and protected by Bankruptcy Code Section 541(c)(2).  *In re West*, 507 B.R. 252 (Bankr. N.D. Ill. 2014); *In re Barnes*, 254 B.R. 415, 420-21 (Bankr. E.D. Mich. 2001.  Converting the case will allow a trustee to review the Discretionary Trust documents and determine whether it is a true spendthrift trust, rather than a means of keeping the Debtor's assets beyond the reach of his many creditors.

53.     Even without the ability to access the Discretionary Trust, converting the case to Chapter 7 makes far more sense than a simple dismissal.  If this Chapter 11 case were dismissed, creditors would be forced to engage in piecemeal, uncoordinated efforts in multiple jurisdictions to locate and administer the Debtor's undisclosed assets and trace the improper transfers; that process would only inure to the Debtor's benefit.

24

## V.
## CONCLUSION

54.     For all the forgoing reasons, the Court should exercise its authority to convert this case to a Chapter 7 case and immediately appoint a Chapter 7 Trustee to investigate the Debtor's assets, liabilities, income and expenses.

RESPECTFULLY SUBMITTED:


Carlye Goldberg Samatas, creditor


Dated:  December 29, 2020          By: *Eric. D. Goldberg*
                                        Eric D. Goldberg
                                        DLA Piper, LLP (US)
                                        Avenue of the Stars, Suite 400N
                                        Los Angeles, CA 90067
                                        310/595-3085
                                        eric.goldberg@dlapiper.com
                                        *Admitted pro hac vice*