# **EXHIBIT C**

**(First 341a Transcript)**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 PROCEEDING |
| | ) | |
| | ) | |
| JAMES SAMATAS, | ) | CASE NO. 20-BK-17355 |
| | ) | |
| | ) | |
| DEBTOR. | ) | HON. A. BENJAMIN GOLDGAR |

_____

**TRANSCRIPT OF TELEPHONIC 341(a) MEETING:**

**SESSION #1**

**JAMES SAMATAS**

**OCTOBER 22, 2020**

**11:30 AM**

1          *Speakers:        David Holtkamp, James Samatas, Eric Goldberg, Sarah Barngrover, Jeff*

2     *Schwartz, Steven Blonder, Bruce Cohen, Mark Lester*

3          MR. HOLTKAMP:    Alright, my name is David Holtkamp.  I'm a trial attorney with the US

4     Trustees Office here in Chicago, Illinois, in the Northern District of Illinois.  We're here for the 341 meeting

5     of James Samatas.  It is October 22nd at about 1:30 p.m., the case number is 20BK17355.  And if we just go

6     around, I guess the virtual room, and get everybody to say their name for the record starting with the debtor

7     and then I guess we'll, hopefully we can do this without talking over each other.  So Mr. Samatas, if you

8     could put your name on the record, please.

9          MR. SAMATAS:    James Samatas.  Debtor.

10         MR. HOLTKAMP:    Alright, and you want to be called Jim?

11         MR. SAMATAS:    Yes.

12         MR. HOLTKAMP:    Alright and let's go with Eric.

13         MR. GOLDBERG:    Hi, this is Eric Goldberg.  I'm a lawyer with DLA Piper in Los Angeles

14     and I represent the debtor's ex-wife, Carlye Samatas.

15         MR. HOLTKAMP:    Okay, next creditor.

16         MS. BARNGROVER:        Sarah Barngrover.  I represent Chase on a property located in Los

17     Angeles.

18         MR. HOLTKAMP:    Okay, next.

19         MR. SCHWARTZ:    Jeff Schwartz.  I represent John Samatas and Cynthia Thiem.

20         MR. HOLTKAMP:    Okay, next.

21         MR. BLONDER:    Steven Blonder.  I also represent John Samatas and Cynthia Thiem.

22         MR. HOLTKAMP:    Okay, and next.

23         MR. COHEN: Bruce Cohen, for Cohen & Lord or BMCA.

24         MR. HOLTKAMP:    Is that it, or are there more?

25         MR. LESTER:        You also have me, this is Mark Lester.  I also represent Cohen & Lord.

26     I'm an attorney in southern California.

27         MR. HOLTKAMP:    Okay, is that everybody?  Anybody else?

1          MR. SAMATAS:          Can I ask a question, David?

2          MR. HOLTKAMP:         Who is this?

3          MR. SAMATAS:          This is Jim.

4          MR. HOLTKAMP:         Okay, Jim.

5          MR. SAMATAS:          Okay, I question the participation of Jeff Schwartz and Steve Blonder.

6    They're not secured creditors, they're not party to the bankruptcy.  I have no understanding as to the legality

7    of why they're participating.

8          MR. HOLTKAMP:         Well, I'm not kicking anybody out.  They can be here if they want to

9    participate.  I believe they represent creditors or parties, at least parties-in-interest in the case.  So I'm not

10   kicking anybody out and at the end, I mean, you can object to whatever you want to, but I am going to give

11   everybody a chance to ask you questions.  Okay, so with that let's, yeah, we're just going to move on.  So Mr.

12   Samatas, if you could raise your right hand please.

13         MR. SAMATAS:          Done.

14         MR. HOLTKAMP:         Okay, do you swear or affirm the testimony you're about to give is the

15   truth, the whole truth, and nothing but the truth?

16         MR. SAMATAS:          Yes.

17         Mr. Holtkamp:          Okay, and you're the debtor that filed this bankruptcy case here in the

18   Northern District of Illinois?

19         MR. SAMATAS:          Yes.

20         MR. HOLTKAMP:         Okay, and just so we know, let's go through our few preliminary things.

21   You know this is being recorded, so you're going to need to speak loudly and clearly, and with audible

22   responses, right?

23         MR. SAMATAS:          Yes.

24         MR. HOLTKAMP:         Okay, and if you need to take a break, just let me know, this could take a

25   little bit.  If you need to use the restroom or anything, I would just ask that you answer any pending questions

26   before we take a break, okay?

27         MR. SAMATAS:          Yes.

2

1     MR. HOLTKAMP: Okay, and you're not under the influence of any drugs, alcohol, medication

2 or anything else like that, that would impair your ability to testify here truthfully and honestly today?

3     MR. SAMATAS:  No.

4     MR. HOLTKAMP: Okay, completely sober?

5     MR. SAMATAS:  Yes.

6     MR. HOLTKAMP: Okay, and for the record, could you state your full name?

7     MR. SAMATAS:  James Samatas.  S-A-M-A-T-A-S.

8     MR. HOLTKAMP: Do you have a middle name?

9     MR. SAMATAS:  No.

10     MR. HOLTKAMP: Okay, a middle initial?

11     MR. SAMATAS:  No.

12     MR. HOLTKAMP: Okay, and do you have an attorney in this case?

13     MR. SAMATAS:  No.

14     MR. HOLTKAMP: Do you intend to get one?

15     MR. SAMATAS:  I'm considering it.

16     MR. HOLTKAMP: Have you reached out to anybody?

17     MR. SAMATAS:  Yes.

18     MR. HOLTKAMP: Okay, and let's just go through some required questions.  It looks like

19 here that you have filed some but not all the required documents.  It looks like here I have Official Form 101,

20 the Voluntary Petition for Individuals Filing for Bankruptcy.  And you're aware you filed that document, sir?

21     MR. SAMATAS:  Am I aware if I filed that document?  Was that the question?

22     MR. HOLTKAMP: Yes, that's the question.  Are you aware you filed it?

23     MR. SAMATAS:  Well, I don't have the documents in front of me so the specific form is

24 not in my memory bank, so if you could be, I filed a requisite number of documents initially on September

25 21st.  The specifics, I don't recall but if you want to review them or mention them, I'll confirm it.

26     MR. HOLTKAMP: So you filed a petition for bankruptcy, correct?

27     MR. SAMATAS:  Correct.

| 1 | MR. HOLTKAMP: | And do you recall signing documents along with filing that petition? |
| 2 | MR. SAMATAS: | Yes. |
| 3 | MR. HOLTKAMP: | And you did sign the petition under penalty of perjury? |
| 4 | MR. SAMATAS: | Yes. |
| 5 | MR. HOLTKAMP: | Okay, and do you recall you also filed a Official Form 104, the 20 |
| 6 | Largest Unsecured Creditors form in this case? |
| 7 | MR. SAMATAS: | Yes. |
| 8 | MR. HOLTKAMP: | Okay, and do you recall you signed that document under penalty of |
| 9 | perjury? |
| 10 | MR. SAMATAS: | Yes. |
| 11 | MR. HOLTKAMP: | Okay, and then you also filed a Schedule D:  Creditors Having Claims |
| 12 | Secured by Property.  Do you recall that? |
| 13 | MR. SAMATAS: | Yes. |
| 14 | MR. HOLTKAMP: | And did you review that document before you filed it? |
| 15 | MR. SAMATAS: | Yes. |
| 16 | MR. HOLTKAMP: | Okay, is all the information in that document true and correct? |
| 17 | MR. SAMATAS: | At the time I signed them, yes. |
| 18 | MR. HOLTKAMP: | Have they changed? |
| 19 | MR. SAMATAS: | No, not that I'm aware of. |
| 20 | MR. HOLTKAMP: | Okay, and is that document complete? |
| 21 | MR. SAMATAS: | To the best of my knowledge, it was. |
| 22 | MR. HOLTKAMP: | So all of your secured creditors are listed on this document? |
| 23 | MR. SAMATAS: | As far as I know. |
| 24 | MR. HOLTKAMP: | Okay, and it doesn't look like you've signed this document or signed |
| 25 | anything to verify this document.  So you're going to need to do that if you want to proceed.  Now it looks |
| 26 | like you also... |
| 27 | MR. SAMATAS: | Okay. |

4

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | It looks like you also filed a Schedule E/F:  Creditors Having Unsecured |

2 Claims.  Do you recall that?

3 MR. SAMATAS: Yes.

4 MR. HOLTKAMP: And all the information contained in that document is true and correct?

5 MR. SAMATAS: To the best of my knowledge, yes.

6 MR. HOLTKAMP: Okay, is that document complete?

7 MR. SAMATAS: To the best of my knowledge, I believe it is.

8 MR. HOLTKAMP: Okay, so you only have two unsecured creditors?

9 MR. SAMATAS: To the best of my knowledge, yes.

10 MR. HOLTKAMP: Do you have any priority debts, sir?

11 MR. SAMATAS: Could you elaborate on the question?

12 MR. HOLTKAMP: Do you have any tax debt, anything like that?

13 MR. SAMATAS: Yes, I believe I do.

14 MR. HOLTKAMP: And why isn't that listed on this schedule?

15 MR. SAMATAS: I didn't think that was something that was required on the form, and if

16 that, I simply may have made a mistake if it should have been.

17 MR. HOLTKAMP: So you didn't think tax debt was debt?

18 MR. SAMATAS: I'm sorry?

19 MR. HOLTKAMP: You didn't think tax debt was debt that needed to be listed on the form?

20 MR. SAMATAS: The way I read some of the instructions and things, I simply may have, I

21 wasn't trying to circumvent anything.  It was just the, I may have misinterpreted whether it reflected creditors

22 so to speak.  And I did not know the specifics of, there was an extension on my tax return, so that was just

23 very recently filed.  So you know, my familiarity with that as a creditor so to speak was, if it was omitted, it

24 was a simple error on my part.

25 MR. HOLTKAMP: Okay, and do you owe any law firms any money?

26 MR. SAMATAS: Yes.

27 MR. HOLTKAMP: And why aren't they listed on here?

1       MR. SAMATAS:     The law firms that I owe money to were secured creditors and the one,

2    there's one or two that I'm actually in litigation with, and they're contingent and being challenged in legal

3    proceedings.  And again, just simple misinterpretation on my part, as the veracity of the claims and whether or

4    not I was obligated to put them down.  It was nothing more than that.  It wasn't in an attempt to omit them, it

5    was just an interpretation of what was considered a creditor so to speak.

6       MR. HOLTKAMP:   Well you know, the term creditor is defined in the code, so is claim, and

7    it's contingent, even if it's contingent, unliquidated, disputed, you have to check, I mean there's boxes to

8    check and if you look at the form there's boxes to check for that.  So what I'm hearing is there's probably

9    other creditors that need to be put on here, and these would need to be amended and you'd need to do a little

10    bit more diligence on figuring out what needs to be listed there.

11       MR. SAMATAS:     Understood, I apologize.  I do understand.

12       MR. HOLTKAMP:   Okay, and that document E/F is also unsigned.  So it's...

13       MR. SAMATAS:     Okay.

14       MR. HOLTKAMP:   ...it says if, it's not filed either.  I'm not looking at it as filed, but that

15    would need to be fixed...

16       MR. SAMATAS:     Okay.

17       MR. HOLTKAMP:   ...immediately.  You're already past due on all these documents.  So let's

18    just go over the documents I'm missing.  And this is not an exclusive list, but you need a Schedule A/B,

19    which is Property, Real Property and Personal Property.  I don't have that.  I don't have Schedule C, which is

20    Property That You Claim as Exempt.  I don't have a Schedule G, which is Executory Contracts.  I don't have

21    a Schedule H, which would be Co-debtors.  I don't have a Schedule I, which would be Income.  I don't have a

22    Schedule J, which would be Expenses.  I don't have a Statement of Financial Affairs.  And nor do I have a

23    Statement of Current Monthly Income.  When do you plan to get those on file?

24       MR. SAMATAS:     I believe within, you have a motion coming on Monday and that I was

25    seeking relief for two weeks thereafter to complete the rest of these documents and to address the issues

26    you've raised.

1          MR. HOLTKAMP:    Okay, and you intend to put these all together yourself, or with the help

2  of an attorney?

3          MR. SAMATAS:    Chances are, I probably will at best, juncture, do it with the assistance of

4  an attorney.

5          MR. HOLTKAMP:    I think that would be a very smart move.  Okay, have you ever filed for

6  bankruptcy before, sir?

7          MR. SAMATAS:    No.

8          MR. HOLTKAMP:    Okay, and you did the IDI with our, I'm sorry, Initial Debtor Interview

9  with our office already, correct?

10         MR. SAMATAS:    Correct.

11         MR. HOLTKAMP:    Okay, and did the person conducting that interview tell you, you needed

12  to get us copies of your most recent tax returns?

13         MR. SAMATAS:    No, did not mention that.  I don't recall him mentioning that.

14         MR. HOLTKAMP:    Okay, well we're going to need a copy of your most recent tax returns.

15  Have you filed for 2019 yet?

16         MR. SAMATAS:    Yes, as I mentioned a few minutes ago, there was an extension and I

17  believe it's within the last 60 days that it was filed.

18         MR. HOLTKAMP:    Okay, well before I can conclude the 341 meeting, in addition to the

19  documents that you need to file on the docket, which would be all the schedules, you need to provide to our

20  office, a copy of your most recent tax returns, okay?

21         MR. SAMATAS:    Understood.

22         MR. HOLTKAMP:    Alright, let's go through a few more things here.  Alright, so it looks like

23  you reside at 9 Natoma Drive, Oak Brook, Illinois, in DuPage County.  Is that correct?

24         MR. SAMATAS:    Correct.

25         MR. HOLTKAMP:    Okay, and that's your primary residence?

26         MR. SAMATAS:    Yes.

27         MR. HOLTKAMP:    Okay, and do you own that?

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | Yes. |
| 2 | MR. HOLTKAMP: | Do you personally own it, or is it in a trust, or how do you own it? |
| 3 | MR. SAMATAS: | It's in the James Samatas Revocable Trust. |
| 4 | MR. HOLTKAMP: | Okay, and who's the trustee of that trust? |
| 5 | MR. SAMATAS: | I am. |
| 6 | MR. HOLTKAMP: | And who's the beneficiary? |
| 7 | MR. SAMATAS: | I am, during my lifetime. |
| 8 | MR. HOLTKAMP: | Okay, and it's only you? |
| 9 | MR. SAMATAS: | That's correct. |
| 10 | MR. HOLTKAMP: | You're the sole trustee? |
| 11 | MR. SAMATAS: | That's correct. |
| 12 | MR. HOLTKAMP: | Alright, so who is the beneficiary after your lifetime? |
| 13 | MR. SAMATAS: | My children, in separate trusts that are set up upon my death. |
| 14 | MR. HOLTKAMP: | Okay, and are your children minors? |
| 15 | MR. SAMATAS: | No. |
| 16 | MR. HOLTKAMP: | How many children do you have? |
| 17 | MR. SAMATAS: | Two. |
| 18 | MR. HOLTKAMP: | And who are they? |
| 19 | MR. SAMATAS: | Collin and Gabrielle. |
| 20 | MR. HOLTKAMP: | What's Collin's last name? |
| 21 | MR. SAMATAS: | Samatas. |
| 22 | MR. HOLTKAMP: | Okay, and Gabrielle's last name? |
| 23 | MR. SAMATAS: | Samatas. |
| 24 | MR. HOLTKAMP: | And they each have a trust? |
| 25 | MR. SAMATAS: | The trust gets set up upon my death automatically, pursuant to the document. |
| 26 | MR. HOLTKAMP: | Okay, and now the James Samatas Revocable Trust, that's the trust that |
| 27 | owns this property? | |

8

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | Correct. |
| 2 | MR. HOLTKAMP: | Okay, is there any other property held by that trust? |
| 3 | MR. SAMATAS: | Yes. |
| 4 | MR. HOLTKAMP: | And what property is that? |
| 5 | MR. SAMATAS: | 1424 Tanager Way, Los Angeles, California. |

6    MR. HOLTKAMP:    Okay, and is there any other property other than those two pieces of real

7    estate in the trust?

| | | |
|---|---|---|
| 8 | MR. SAMATAS: | No, no. |
| 9 | MR. HOLTKAMP: | Do you have copies of the trust documents? |
| 10 | MR. SAMATAS: | I would have to procure them. |
| 11 | MR. HOLTKAMP: | From? |

12    MR. SAMATAS:    From, probably the attorney who drafted it 30 years, or some time ago.  I

13    don't have it readily accessible, but I can procure it.

| | | |
|---|---|---|
| 14 | MR. HOLTKAMP: | Okay, why don't you try to do that for me.  I'd like a copy, to see that. |
| 15 | MR. SAMATAS: | Okay. |
| 16 | MR. HOLTKAMP: | Okay, and does anybody else, who lives at the Natoma Drive property? |
| 17 | MR. SAMATAS: | I do. |
| 18 | MR. HOLTKAMP: | Anybody else? |
| 19 | MR. SAMATAS: | No. |
| 20 | MR. HOLTKAMP: | Okay, and how long have you owned that property? |
| 21 | MR. SAMATAS: | Since 1998.  Since actually, 1996. |
| 22 | MR. HOLTKAMP: | And you've lived there since 1996? |
| 23 | MR. SAMATAS: | For the most part. |
| 24 | MR. HOLTKAMP: | You've lived other places? |
| 25 | MR. SAMATAS: | Well, I have this other home you asked me about.  An investment |

26    property in California that I would visit but my primary residence has been Natoma.

27    MR. HOLTKAMP: Okay, and the Natoma property, how much do you estimate that that's worth?

1           MR. SAMATAS:      I'm sorry, sir?

2           MR. HOLTKAMP:    How much do you estimate that the property is worth?

3           MR. SAMATAS:      Considering the marketplace today, probably between $3 and $4 million.

4           MR. HOLTKAMP:    And do you have a mortgage against that property?

5           MR. SAMATAS:      Yes.

6           MR. HOLTKAMP:    How many?

7           MR. SAMATAS:      One.

8           MR. HOLTKAMP:    Okay, and who do you have the mortgage with?

9           MR. SAMATAS:      Bank of America.

10          MR. HOLTKAMP:    And how much is owed on that mortgage?

11          MR. SAMATAS:      $1,689,000.

12          MR. HOLTKAMP:    Well, it looks like you took out a mortgage in 2010 for $1,689,000.  So

13  you still owe the exact amount you took out?

14          MR. SAMATAS:      Correct.

15          MR. HOLTKAMP:    You haven't paid down any of it?

16          MR. SAMATAS:      It was an interest-only loan.

17          MR. HOLTKAMP:    And it continues to be interest-only?

18          MR. SAMATAS:      Yes.

19          MR. HOLTKAMP:    Are you current on that mortgage?

20          MR. SAMATAS:      No.

21          MR. HOLTKAMP:    And when's the last time you made a payment?

22          MR. SAMATAS:      I believe about six or seven months ago.

23          MR. HOLTKAMP:    And what's the monthly payment on that?

24          MR. SAMATAS:      I believe it's $9,000, it's either $8 or $9,000 and that includes an escrow

25  for real estate taxes.  And I believe they modified it to include principal because it hit the 10-year mark.

26          MR. HOLTKAMP:    So...

27          MR. SAMATAS:      And because of what's going on I did not negotiate a modification.

10

1        MR. HOLTKAMP:    Okay, so the terms were, it was interest-only for 10 years and then it

2   would change?

3        MR. SAMATAS:    Without having the document in front of me, I do recall recently

4   receiving a notice from them that they, because it expired after 10 years of interest-only, I believe they did a

5   P&I, amortized over what period, I don't know.  And then because I was in default, they added the monthly

6   payment to include taxes, which are roughly $26,000 a year annually.  So when you asked me the question

7   about what's the monthly payment, I believe right now it's the P&I plus the taxes, it's around $8 or $9,000 a

8   month.

9        MR. HOLTKAMP:    Okay, and were you supposed to pay this off within the 10-year period or

10  was it intended...

11        MR. SAMATAS:    No.

12        MR. HOLTKAMP:    ...to go longer?

13        MR. SAMATAS:    No, at the time I was in default I, there was a snowballing effect of

14  liquidity and they were open to modify the loan, I just never pursued it before everything I just stated kicked

15  into gear at the expiration of the 10-year.

16        MR. HOLTKAMP:    Okay, so is this, what's the term of the, how long is the mortgage

17  supposed to go?  Is it supposed to go 30?  20?  15?

18        MR. SAMATAS:    I believe, I believe it was either, I believe it was a 20 or a 30 originally.

19        MR. HOLTKAMP:    And are you current on the taxes?

20        MR. SAMATAS:    By virtue of them advancing the fees, yes.

21        MR. HOLTKAMP:    Okay, and you said, this mortgage is with Bank of America, correct?

22        MR. SAMATAS:    That's correct.

23        MR. HOLTKAMP:    Then Bank of America would've been paying the taxes?

24        MR. SAMATAS:    Yes.

25        MR. HOLTKAMP:    Okay, but you're in default about six months.  Has Bank of America paid

26  any taxes during that period?

27        MR. SAMATAS:    Yes, and yes.

1          MR. HOLTKAMP:    And it looks like there's a, on the recorder of deeds there's an old

2    Oakbrook Corporation that filed a lien against the property for about $3,200 in 2019.  Are you aware of that?

3          MR. SAMATAS:    That's, that was, should have been extinguished, and was paid nine

4    months ago.  They just didn't extinguish it.

5          MR. HOLTKAMP:    Okay, so it should've been released?

6          MR. SAMATAS:    It's been paid.

7          MR. HOLTKAMP:    Okay.

8          MR. SAMATAS:    Yep, it's been paid.

9          MR. HOLTKAMP:    And to the best of your knowledge, are there any other liens against this

10    property?

11          MR. SAMATAS:    No.

12          MR. HOLTKAMP:    Okay, so only the Bank of America mortgage for about $1.7 million?

13          MR. SAMATAS:    Correct.

14          MR. HOLTKAMP:    And does anybody else other than the trust claim an interest in that property?

15          MR. SAMATAS:    No.

16          MR. HOLTKAMP:    Okay, and you also mentioned that in the trust is 1424 Tanager Way,

17    West Hollywood, California.  Is that right?

18          MR. SAMATAS:    It's technically Los Angeles, California.

19          MR. HOLTKAMP:    Okay.

20          MR. SAMATAS:    The zip code is West Hollywood.

21          MR. HOLTKAMP:    And you said the trust owns that, right?

22          MR. SAMATAS:    Correct.

23          MR. HOLTKAMP:    And it has the same beneficiaries?  It's not different for different properties?

24          MR. SAMATAS:    Correct.

25          MR. HOLTKAMP:    Okay.

26          MR. SAMATAS:    Correct.

27          MR. HOLTKAMP:    And when did you buy that?

1        MR. SAMATAS:        April of 2010.

2        MR. HOLTKAMP:       And how much did you buy it for?

3        MR. SAMATAS:        $8,250,000.

4        MR. HOLTKAMP:       And what was the purpose of the purchase?  Was it investment, or for

5    residential consumer purpose?

6        MR. SAMATAS:        It was actually to try and save my very sick wife's mental condition.

7    That's, that was the motivator to buy the house.

8        MR. HOLTKAMP:       Okay, so without getting too much into that, you wanted to buy it so she

9    could live there?  Or am I getting this wrong?

10       MR. SAMATAS:        No, you're getting it right...

11       MR. HOLTKAMP:       I mean without...

12       MR. SAMATAS:        She's very ill.  I'm not getting into great detail, I understand.  I'm trying

13   to be very precise and to the point to your question.  She has a very serious illness and she wanted a place in

14   Los Angeles.  And to accommodate her, that I would go back and forth, I purchased the residence that you've

15   mentioned.  That was the basis of why I bought the house.

16       MR. HOLTKAMP:       Okay, and did you do any work on the house?  Any rehab?

17       MR. SAMATAS:        No.

18       MR. HOLTKAMP:       Okay, and how much do you think that that place in Los Angeles is worth?

19       MR. SAMATAS:        Again, referencing the state of the economy and real estate even in

20   Southern California, I would say between $9 and $10 million.

21       MR. HOLTKAMP:       Okay, and are there any liens or mortgages against that property?

22       MR. SAMATAS:        Yes.

23       MR. HOLTKAMP:       How many?

24       MR. SAMATAS:        The primary one is JPMorgan Chase for the original principal amount,

25   $5,390,000.  The second one is a, the consensual lien granted to my ex-wife in settlement of our divorce

26   several years ago, for currently it's approximately $1.4 million.  And then behind that is three law firms, one

27   of them is Wolf Wallenstein for about $300,000.  Another one is to Parker Mills for about $150, and the last

1    one's about $50,000 for Howard & Howard, another law firm.  So you have the primary bank loan, you have

2    my wife's lien from the divorce decree, you have three law firms behind that.

3                MR. HOLTKAMP:    Okay, and the JPMorgan lien, what is that, how much is there, that lien today?

4                MR. SAMATAS:    I believe it's about $800,000 plus, because they've been paying taxes on

5    that too.  So I believe that the number of the last statement I got was roughly about $6.2 million.

6                MR. HOLTKAMP:    So what's the mortgage payment on, to JPMorgan on that property monthly?

7                MR. SAMATAS:    I, you know, that was on an adjustable interest-only, I thought I saw a

8    notice, it went from $10 to $15, $18, I don't know exactly what it is now.  And I also know that they have

9    been paying the taxes in escrow.  So I believe it's probably close to $18,000 a month with the taxes.

10            MR. HOLTKAMP:    And are you current on that...

11            MR. SAMATAS:    Maybe a little more.

12            MR. HOLTKAMP:    Are you current?

13            MR. SAMATAS:    I'm not, but they've made it current.

14            MR. HOLTKAMP:    Okay, are you current to the bank though?  You're not.

15            MR. SAMATAS:    No.

16            MR. HOLTKAMP:    No.  When's the last time you made a payment to the bank?

17            MR. SAMATAS:    About nine months ago, 10 months ago.

18            MR. HOLTKAMP:    And at that point were you current?

19            MR. SAMATAS:    Well, we actually entered into a forbearance agreement toward the end of

20    2019 so the answer to your question, was I current, no, not totally.  But I did make a significant payment for

21    the arrearage, but I don't believe it brought it right back to being totally current.

22            MR. HOLTKAMP:    Okay, so you made a...

23            MR. SAMATAS:    My recollection.

24            MR. HOLTKAMP:    So you made a significant payment on the arrearage.  How much was that

25    payment?

26            MR. SAMATAS:    I don't remember.

27            MR. HOLTKAMP:    You don't have, you have no idea?

1        MR. SAMATAS:        I think it was over $100,000 for sure, but I don't remember the specific

2    number.

3        MR. HOLTKAMP:        Okay, and are you currently attempting to sell that property?

4        MR. SAMATAS:        Yes.

5        MR. HOLTKAMP:        Have you engaged a broker or agent to do that?

6        MR. SAMATAS:        I had a very prominent broker who listed it for six months.  I also have a

7    current litigation against my wife who the attorneys on the phone for tortious interference during the listing.  I

8    currently have four brokers, reputable, and a real estate developer that are all contributing almost on a daily

9    basis, potential purchases for the property.

10        MR. HOLTKAMP:        Okay, so there's a current listing on the MLS?

11        MR. SAMATAS:        No, there isn't.  And the reason why, is as I just expressed, my, I filed a

12    lawsuit prior to the bankruptcy against my wife for tortious interference with the listing.  And so I wanted to

13    give it a breather and during the breather I've been working with not less than five brokers, reputable brokers,

14    without the formal MLS listing.  Just networking through what they call like pocket listings, trying to get the

15    house sold.  So it's not like I'm not doing anything, I'm ready to re-engage but I have a very good opportunity

16    with the developer that may purchase it for enough money to address the bankruptcy issue but that's still

17    pending as I speak.

18        MR. HOLTKAMP:        Okay.

19        MR. SAMATAS:        So there is activity, it's not like it's just sitting there.

20        MR. HOLTKAMP:        And how much are you asking for the property?

21        MR. SAMATAS:        At the end of the listing, and currently, I'm asking for $10,900,000.

22        MR. HOLTKAMP:        Okay, and do you have any active potential buyers?

23        MR. SAMATAS:        I've had, even as of yesterday, I would consider them unfortunately,

24    bottom feeders.  I've had two offers at $8.5 million, which is just short of addressing all creditors at this junction.

25        MR. HOLTKAMP:        Okay.

26        MR. SAMATAS:        So I, go ahead.

27        MR. HOLTKAMP:        And do you have bankruptcy court approval to sell that property?

15

1        MR. SAMATAS:     Formally, no.

2        MR. HOLTKAMP:    Do you have informal bankruptcy court approval to sell that property?

3        MR. SAMATAS:     Well I was, any contract I would enter into would be contingent and

4 subject to bankruptcy approval.

5        MR. HOLTKAMP:    Okay, do you have bankruptcy...

6        MR. SAMATAS:     I know that...

7        MR. HOLTKAMP:    Have you sought bankruptcy court approval to employ any agent or

8 broker to help you sell that property?

9        MR. SAMATAS:     No, not at this juncture.

10       MR. HOLTKAMP:    But you have people working for you without court approval?

11       MR. SAMATAS:     Yes, and I could list names, and offers that have been made, contracts.

12 And yes, there's been activity, it's just very difficult right now considering the situation but yes…

13       MR. HOLTKAMP:    Do any of these…

14       MR. SAMATAS:     …I could.  I'm sorry?

15       MR. HOLTKAMP:    Do these, the individuals that are helping you or your agents or brokers,

16 do they know about the bankruptcy?

17       MR. SAMATAS:     Yes.

18       MR. HOLTKAMP:    Okay.

19       MR. SAMATAS:     They know that.

20       MR. HOLTKAMP:    Do you have contracts with them that state how much commission they

21 would get or how much they'd get paid if they sold the property?

22       MR. SAMATAS:     Yes, some of them are oral, some of them are written.  It depends if

23 they're, if they procure a purchaser alone, it's 3%.  And of course the typical MLS, is if there's a cooperating

24 broker it's 5%.  And the original six-month listing I had, where my wife tortiously interfered was with an

25 extremely well-respected broker in the L.A. area.  And you know, it was the typical 5% commission.  And, I,

26 it's only recently that that expired and as I stated, because, the house got listed a week before COVID hit.  So

27 that was a contribution to the problem.  Not necessarily the cause but the real estate market is in a freefall, and

1    you know, again with her tortious interference, I'm trying to get a fair chance to put it on the market for the

2    value that you asked me what do I thought it was worth.  And I still think it's worth that, it's just getting the

3    right buyer.

4          MR. HOLTKAMP:    Okay, well, this is another reason why you should get a bankruptcy

5    attorney.  You need bankruptcy court approval and you need to apply to the bankruptcy court to employ

6    professionals like that.  And, you need bankruptcy court approval to sell the property, and I haven't seen any

7    of that, I mean we don't even have schedules, so the court is a in the dark.  But we'll move on.  It looks like

8    there might be some State of California liens on that property, is that correct?

9          MR. SAMATAS:    I'm not aware of any.

10         MR. HOLTKAMP:    You're not aware of any?

11         MR. SAMATAS:    No.

12         MR. HOLTKAMP:    Have you looked in the recorder of deeds to see if there is any recorded

13   liens against that property?

14         MR. SAMATAS:    No.

15         MR. HOLTKAMP:    Okay, have you done any type of diligence to try to figure out if there's

16   any kind of recorded liens or any other kind of liens against the property?

17         MR. SAMATAS:    Other than what I discussed with brokers that pull title and none of them

18   ever shared that with me.  I have no idea what you're talking about with the State of California.

19         MR. HOLTKAMP:    Okay, and do you own or does any trust you have an interest in, own any

20   other property real estate?

21         MR. SAMATAS:    No, I may, there was a property I owned next door and I know the State

22   of California was looking to find every penny they could.  And they opened up a file on the sale of that

23   property and we were in the midst of discussing it and I was submitting documentation to prove why they

24   weren't entitled to anything and they may have filed a lien, I'm not aware of it, but then COVID hit and

25   nothing took place.

26         MR. HOLTKAMP:    Okay.

27         MR. SAMATAS:    But I never received a formal lien notice from them.

17

1          MR. HOLTKAMP:    Okay, we're past that.  Do you own any other real estate, or does any of

2    your trusts own any other real estate?

3          MR. SAMATAS:    No.

4          MR. HOLTKAMP:    No.  You don't any other property at 1300 South Main Street in Lombard?

5          MR. SAMATAS:    I do, not my trusts, I do individually.

6          MR. HOLTKAMP:    Okay, well, I asked if you or…

7          MR. SAMATAS:    Again…

8          MR. HOLTKAMP:    ...your trusts did.

9          MR. SAMATAS:    Okay.

10         MR. HOLTKAMP:    So, you do.  You do own a property…

11         MR. SAMATAS:    Yeah.

12         MR. HOLTKAMP:    …at that address.  Okay, personally?

13         MR. SAMATAS:    Yeah.

14         MR. HOLTKAMP:    And what is that?

15         MR. SAMATAS:    I believe that one is personal.

16         MR. HOLTKAMP:    Okay, and what is that?  Is that an apartment?  Condo?

17         MR. SAMATAS:    It's a, no, it's a strip center.

18         MR. HOLTKAMP:    Like a strip mall?

19         MR. SAMATAS:    Yes, sir.

20         MR. HOLTKAMP:    Okay, and you own the whole, that whole address, the whole strip mall or

21    just one part of it?

22         MR. SAMATAS:    I'm a minority owner in it.

23         MR. HOLTKAMP:    Okay, so there's other owners of that property.

24         MR. SAMATAS:    Yes.

25         MR. HOLTKAMP:    Is it owned through a corporation, or a partnership, or just a bunch of

26    people personally?

27         MR. SAMATAS:    Partner, partnership.

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | Okay, and what's the name of that partnership? |
| 2 | MR. SAMATAS: | I don't remember because this was such a long time ago.  It was a family- |
| 3 | owned property. | |
| 4 | MR. HOLTKAMP: | Okay, so who own an interest in that property?  You and? |
| 5 | MR. SAMATAS: | My mother. |
| 6 | MR. HOLTKAMP: | And... |
| 7 | MR. SAMATAS: | And brother. |
| 8 | MR. HOLTKAMP: | Okay, what's your mother's name? |
| 9 | MR. SAMATAS: | Andigoni.  A-N-D-I-G-O-N-I. |
| 10 | MR. HOLTKAMP: | Is that first or last name? |
| 11 | MR. SAMATAS: | That's her first name. |
| 12 | MR. HOLTKAMP: | And her last name is Samatas? |
| 13 | MR. SAMATAS: | She's got the same last, Samatas, yes. |
| 14 | MR. HOLTKAMP: | Okay, and your brother? |
| 15 | MR. SAMATAS: | His first name is John. |
| 16 | MR. HOLTKAMP: | Samatas? |
| 17 | MR. SAMATAS: | Same last name. |
| 18 | MR. HOLTKAMP: | Okay. |
| 19 | MR. SAMATAS: | Yes. |
| 20 | MR. HOLTKAMP: | Do you each own a third of it? |
| 21 | MR. SAMATAS: | Yes. |
| 22 | MR. HOLTKAMP: | And, when was that property purchased? |
| 23 | MR. SAMATAS: | On or about 1986. |
| 24 | MR. HOLTKAMP: | And is there a lien against that property? |
| 25 | MR. SAMATAS: | I believe so, with West Suburban Bank. |
| 26 | MR. HOLTKAMP: | And, how much is the lien? |
| 27 | MR. SAMATAS: | It's over a million, specifically, I couldn't recall. |

1                 MR. HOLTKAMP:     Okay, and how much is that property worth, do you think?

2                 MR. SAMATAS:     I'm only chuckling for a bit because, that's difficult answer.  I mean to

3 provide, considering the marketplace, I don't know what it's worth today, I mean, you'd be hard-pressed to hit

4 a number.

5                 MR. HOLTKAMP:     Okay, do you think it's underwater?  Or do you think there's equity?

6                 MR. SAMATAS:     No, there's equity, I believe there's equity there.  Not much, but I believe

7 there is.

8                 MR. HOLTKAMP:     Okay, is this partnership, is it a general partnership?  Or is it a limited

9 partnership?  Or is it registered with the Secretary of State?

10                 MR. SAMATAS:     It's a general partnership.

11                 MR. HOLTKAMP:     Is there a partnership agreement?

12                 MR. SAMATAS:     I don't recall if we did form one or not.  I don't believe so, but I don't

13 remember.

14                 MR. HOLTKAMP:     Okay, and are there tenants of that property?  That some of it's rented?

15                 MR. SAMATAS:     Yes.

16                 MR. HOLTKAMP:     Okay.

17                 MR. SAMATAS:     I'm sorry?

18                 MR. HOLTKAMP:     Some of it is rented?

19                 MR. SAMATAS:     Yes.

20                 MR. HOLTKAMP:     And how much?

21                 MR. SAMATAS:     I don't know.

22                 MR. HOLTKAMP:     Who manages that property?

23                 MR. SAMATAS:     Well, for the most part my, it's a long story, but my brother, pretty much

24 is controlling it.

25                 MR. HOLTKAMP:     Okay, and what happens to the revenue from that property?

26                 MR. SAMATAS:     I don't know, I haven't seen any for years.

27                 MR. HOLTKAMP:     Does it make revenue?

1    MR. SAMATAS:  Yes.

2    MR. HOLTKAMP: And...

3    MR. SAMATAS:  Now you're getting into another issue of litigation with my brother and

4 sister.  I don't know, I haven't seen any money coming from there.

5    MR. HOLTKAMP: Okay.

6    MR. SAMATAS:  Even though I know it's made money.

7    MR. HOLTKAMP: So you have a lawsuit pending against your brother and sister over this?

8    MR. SAMATAS:  Just in general, there's some issues between us.  Yes, there's litigation,

9 currently existing litigation.

10    MR. HOLTKAMP: And where's that at?

11    MR. SAMATAS:  Regarding...

12    MR. HOLTKAMP: What…

13    MR. SAMATAS:  It's in the Cook County.

14    MR. HOLTKAMP: And that would your, you versus them?  I mean, what, what's the name

15 of the case?

16    MR. SAMATAS:  It's me versus them, my trust versus them, them versing my trust, it's,

17 you have two of the attorneys, one of the attorneys is engaged in this, it's is probably why he's on the phone.

18 But there's issues of distributions and funds coming, yes.

19    MR. HOLTKAMP: Okay, and when was that case filed, do you know?  What year?

20    MR. SAMATAS:  I believe it was filed last year.  But I will state that I have a different trust,

21 called the discretionary trust, which is a irrevocable trust set up under our grantors trust from my father back

22 in 1988, which is not part of my bankruptcy or my personal holdings.  It's a completely separate trust that was

23 set up back in '88.

24    MR. HOLTKAMP: So there's a separate trust called the discretionary trust, and that's, what

25 is it?  Your-Name-Discretionary Trust?  Or what's the name of the trust?

26    MR. SAMATAS:  The James Samatas Discretionary Trust.

27    MR. HOLTKAMP: And, who's the beneficiary…

1          MR. SAMATAS:          That is completely, I am.

2          MR. HOLTKAMP:          You're the beneficiary?

3          MR. SAMATAS:          Yes.

4          MR. HOLTKAMP:          And, you're the sole beneficiary?

5          MR. SAMATAS:          During my lifetime, yes.

6          MR. HOLTKAMP:          And after?

7          MR. SAMATAS:          And again, I, not to complicate the matter, it's a revocable trust coming

8    from a grantors trust.  So it has own EIN number, it's a separate legal entity, it's not me personally.

9          MR. HOLTKAMP:          Yes, okay, and who's the trustee of trust?

10          MR. SAMATAS:          Me and Craig Lavus.  L-A-V-U-S.

11          MR. HOLTKAMP:          And is, how do you, what's your relationship with Mr. Lavus?

12          MR. SAMATAS:          He's been our family CPA for 25-plus years.

13          MR. HOLTKAMP:          Okay, and what property's in the, in this discretionary trust?

14          MR. SAMATAS:          Oh my lord, that's eight nursing homes, retirement centers, home

15    healthcare, telemedicine.  They're all in the healthcare field.

16          MR. HOLTKAMP:          So, interest in corporations and LLCs are in that trust?

17          MR. SAMATAS:          Yes, you have everything, you have the LLCs, you have general, you

18    have limited partnerships, you have some sub S corps.  This all stemming from activity from 1988 on to

19    where we are.  They're all set up in the discretionary trust.  And the litigation I made reference to is

20    essentially discretionary trust litigation.

21          MR. HOLTKAMP:          Okay, and other than the interest in the companies, does it own any other

22    property?

23          MR. SAMATAS:          Who?  My revocable trust?

24          MR. HOLTKAMP:          Your discretionary trust.

25          MR. SAMATAS:          No, other than what I mentioned.

26          MR. HOLTKAMP:          No, just, it just owns the interest in the companies?

27          MR. SAMATAS:          In the multiple companies I mentioned.

1     MR. HOLTKAMP: Yes.

2     MR. SAMATAS: There are quite a number of companies.  Yes, correct.

3     MR. HOLTKAMP: Okay, and do you have an interest in any other trusts that we haven't

4 talked about yet?

5     MR. SAMATAS: No, there's an omission on my part which I didn't think of in that terms.

6 I don't, it's not in my revocable trust, but like the 1300 South Mainstreet, I have an interest in one nursing

7 home, in Lombard.

8     MR. HOLTKAMP: Is that through a...

9     MR. SAMATAS: But that...

10     MR. HOLTKAMP: …company, or you personally?

11     MR. SAMATAS: No, that would be me personally.  It's not listed under the revocable trust

12 and it's not part of the discretionary trust.

13     MR. HOLTKAMP: Okay.

14     MR. SAMATAS: It's one nursing home.

15     MR. HOLTKAMP: And do you own an interest in a company that owns the nursing home?

16 An LLC, a corporation, or do you...

17     MR. SAMATAS: Correct, correct, correct.

18     MR. HOLTKAMP: Okay.

19     MR. SAMATAS: No, no, that's, yes, they're companies.  I have an interest in those closely

20 held companies.

21     MR. HOLTKAMP: Okay, now we'll go through those in a little bit.  Now, do you, do you or

22 any of your trusts own any other real estate other than what we've talked about?

23     MR. SAMATAS: No.

24     MR. HOLTKAMP: Okay, now let's go through a few more things.  Does, do you own a car?

25     MR. SAMATAS: Yes.

26     MR. HOLTKAMP: And what kind of car?

27     MR. SAMATAS: A 2012 Jeep Wrangler.

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | And is that your only car? |
| 2 | MR. SAMATAS: | I'm sorry? |
| 3 | MR. HOLTKAMP: | Is that your only car? |
| 4 | MR. SAMATAS: | No, I also have a 2009 Chrysler HHR. |
| 5 | MR. HOLTKAMP: | Mm-hmm. |
| 6 | MR. SAMATAS: | And I have a, I think it's a 2010 Lexus RX350.  And that's it for the cars. |
| 7 | MR. HOLTKAMP: | Okay, do you have control or possession of any cars that aren't owned by you? |
| 8 | MR. SAMATAS: | No. |
| 9 | MR. HOLTKAMP: | Okay, does, do any of these, does any company provide you with a car to |
| 10 | drive around? | |
| 11 | MR. SAMATAS: | No. |
| 12 | MR. HOLTKAMP: | Okay, so what's your daily driver? |
| 13 | MR. SAMATAS: | What's my daily driver? |
| 14 | MR. HOLTKAMP: | Say, yeah, you want to go to the grocery store... |
| 15 | MR. SAMATAS: | I don't… |
| 16 | MR. HOLTKAMP: | ...what do you drive?  Just go down to the garage and pick one of these three? |
| 17 | MR. SAMATAS: | I drive the Jeep Wrangler for the most part. |
| 18 | MR. HOLTKAMP: | Okay, and where is the Jeep Wrangler located? |
| 19 | MR. SAMATAS: | At 9 Natoma. |
| 20 | MR. HOLTKAMP: | And the HHR, where is that located? |
| 21 | MR. SAMATAS: | 9 Natoma. |
| 22 | MR. HOLTKAMP: | And the Lexus RX350? |
| 23 | MR. SAMATAS: | My daughter has it in the valley.  I forgot the name of the town she lives |
| 24 | in, in Los Angeles. | |
| 25 | MR. HOLTKAMP: | Okay, so your daughter drives that car? |
| 26 | MR. SAMATAS: | Correct. |
| 27 | MR. HOLTKAMP: | And are there any liens against any of these vehicles? |

| 1 | MR. SAMATAS: | Nope. |

2     MR. HOLTKAMP:   Okay, do you have any interest in any watercraft, aircraft, ATV, or

3     recreation, recreational vehicle?

4     MR. SAMATAS:   No.

5     MR. HOLTKAMP:   Okay, no, no boats or jet skis or anything like that?

6     MR. SAMATAS:   No.

7     MR. HOLTKAMP:   And do you have an interest in any jewelry including any, any watches?

8     MR. SAMATAS:   Yes.

9     Mr. Holtkamp;And what is that?

10     MR. SAMATAS:   I have some, several unique watches.

11     MR. HOLTKAMP:   And how many unique watches do you have?

12     MR. SAMATAS:   Excuse me, five or six.

13     MR. HOLTKAMP:   Five or six, and well let's go through them, what's the first one?

14     MR. SAMATAS:   Oh my God, I don't remember the name of them.  I mean when I say, you

15     know, they're just not your, I don't remember the name of them.

16     MR. HOLTKAMP:   Okay, are they like Rolex or like those type, you know.

17     MR. SAMATAS:   No, they're very unique, they were purchased many years ago and they're

18     just unique, I mean they're off, off-brand name watches.

19     MR. HOLTKAMP:   Okay, and how much do you think they'd be worth?

20     MR. SAMATAS:   I couldn't sell them, I tried.  Nobody would buy them, I saw where the

21     market was.  You asked me for a valuation, I don't know, $25,000 to $50,000.

22     MR. HOLTKAMP:   For all four or five, or however many you have?

23     MR. SAMATAS:   In the marketplace today, yes.

24     MR. HOLTKAMP:   Okay, and are there any liens against those?

25     MR. SAMATAS:   No.

26     MR. HOLTKAMP:   Okay do you have any guns or firearms?

27     MR. SAMATAS:   No.

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | Any collectibles, paintings, or artwork? |
| 2 | MR. SAMATAS: | Yes. |
| 3 | MR. HOLTKAMP: | Any of significant value?  Say over, $5,000? |
| 4 | MR. SAMATAS: | Yes, again, they've been consigned for several years, collectively I still |

can't seem, you know, it's a market issue, probably a value of no more than $100,000.

| | | |
|---|---|---|
| 6 | MR. HOLTKAMP: | Okay and do you have any household furnishings that we haven't talked |

about of significant value?

| | | |
|---|---|---|
| 8 | MR. SAMATAS: | No. |
| 9 | MR. HOLTKAMP: | No, do you have a pool table or anything like that? |
| 10 | MR. SAMATAS: | Well, when you say furnishings of significant value. |
| 11 | MR. HOLTKAMP: | Let's just say, let's just say over $5,000.  Worth over $5,000. |
| 12 | MR. SAMATAS: | Well, again, okay, I'll make the same statement.  Based on market |

conditions, I have no idea what the value is but I'd say it's just for sake of have some understanding of what I

have in terms of FF&E of any value, maybe $100,000.

| | | |
|---|---|---|
| 15 | MR. HOLTKAMP: | Okay.  And as of the petition date, did you have any cash?  Did you have |

any money under your bed, or you know, in your wallet?

| | | |
|---|---|---|
| 17 | MR. SAMATAS: | I'm sorry, do I have any cash?  Is that what you really want to know, not |

necessarily where I ...

| | | |
|---|---|---|
| 19 | MR. HOLTKAMP: | Well, if you went through the… |
| 20 | MR. SAMATAS: | ...do I have any cash? |
| 21 | MR. HOLTKAMP: | …if you went through the schedules, it asks, do you have any cash?  I'm |

going through the schedules.

| | | |
|---|---|---|
| 23 | MR. SAMATAS: | Okay, alright, you're talking about cash in bank too or just cash? |
| 24 | MR. HOLTKAMP: | Nope, just cash.  Cash in bank is next. |
| 25 | MR. SAMATAS: | $1,000. |
| 26 | MR. HOLTKAMP: | And where was that located? |
| 27 | MR. SAMATAS: | In my pocket. |

1          MR. HOLTKAMP:    You carry around $1,000 in your pocket?

2          MR. SAMATAS:    Well, right at the moment I am but that doesn't mean I do it all the time,

3  and when I go out.

4          MR. HOLTKAMP:    And do you take that out of the bank account when you get it, or how do

5  you do you get a hold of $1000 in cash?

6          MR. SAMATAS:    You go to an ATM.

7          MR. HOLTKAMP:    Okay, and now we're getting to bank accounts.  Do you have a bank account?

8          MR. SAMATAS:    Yes.

9          MR. HOLTKAMP:    Okay, on the petition date, did you have a bank account?

10         MR. SAMATAS:    Yes.

11         MR. HOLTKAMP:    And how many did you have?

12         MR. SAMATAS:    I think about five.

13         MR. HOLTKAMP:    Okay, and are those five still open today?

14         MR. SAMATAS:    Yes.

15         MR. HOLTKAMP:    Okay, and where are those bank accounts located?

16         MR. SAMATAS:    Bank of America.

17         MR. HOLTKAMP:    All five of them?

18         MR. SAMATAS:    Yes.

19         MR. HOLTKAMP:    You don't have any bank accounts anywhere else?

20         MR. SAMATAS:    I may have, I think I've got, yeah, I've got two more banks, two more

21  accounts at two different banks.

22         MR. HOLTKAMP:    And what are those banks?

23         MR. SAMATAS:    West Suburban Bank is one, and Citi Bank would be the other.

24         MR. HOLTKAMP:    Okay, and in your Bank of America accounts, Bank of America accounts,

25  if you added those, all those up, what would the total in those accounts be as of the petition date?  Just an

26  estimate.

27         MR. SAMATAS:    About 20, about $23,000.

1           MR. HOLTKAMP:    And today, what would it be?

2           MR. SAMATAS:    $20,000.

3           MR. HOLTKAMP:    Okay, and the West Suburban Bank Account?  On the petition date, how

4  much money was in there?

5           MR. SAMATAS:    I think $100.

6           MR. HOLTKAMP:    Okay, and that'd be the same today?

7           MR. SAMATAS:    I'm sorry?

8           MR. HOLTKAMP:    Would that be the same today?

9           MR. SAMATAS:    Yeah.

10         MR. HOLTKAMP:    Okay, and then the Citi Bank, what was, how much was in that account

11  on the petition date?

12         MR. SAMATAS:    I think it was about $500.

13         MR. HOLTKAMP:    And would that be the same today?

14         MR. SAMATAS:    Yes.

15         MR. HOLTKAMP:    And do you have any other financial accounts as of the petition date?

16         MR. SAMATAS:    No.

17         MR. HOLTKAMP:    Okay, and you've opened a debtor-in-possession bank account? Is that correct?

18         MR. SAMATAS:    Yes.

19         MR. HOLTKAMP:    And have you deposited any money into that account?

20         MR. SAMATAS:    Just $100 to open it.

21         MR. HOLTKAMP:    Okay, have you used it at all since you've opened it?

22         MR. SAMATAS:    No.

23         MR. HOLTKAMP:    Okay, have you used your other bank accounts since you filed for bankruptcy?

24         MR. SAMATAS:    I only used one, the other one at Bank of America which is in my

25  revocable trust and the other four are basically accounts specifically to pay bills for the property.  You know,

26  so there's only account I use and that's the James Samatas Revocable Trust Account at Bank of America,

27  that's really the only account I use other than I transfer money to do internet banking, I mean internet payment.

1          MR. HOLTKAMP:    Okay, but that, that revocable trust bank account, that's included in the

2    five accounts we talked about, right?

3          MR. SAMATAS:    Correct.

4          MR. HOLTKAMP:    Okay, and do you have any stocks, bonds, or mutual funds?

5          MR. SAMATAS:    No.

6          MR. HOLTKAMP:    You don't have any stocks, any, anything in any trading accounts, or

7    anything like that?

8          MR. SAMATAS:    No.

9          MR. HOLTKAMP:    Okay, and we talked about this a little bit, but you said your discretionary

10   trust owns an interest in several companies, right?

11         MR. SAMATAS:    Correct.

12         MR. HOLTKAMP:    Okay, let's just go through some companies that I, that seems that you

13   have an interest in, and you tell me who owns the interest in it, okay?  Or if you say you don't then, you

14   know, tell me that too.

15         MR. SAMATAS:    Okay.

16         MR. HOLTKAMP:    Okay, there is the Lexington Healthcare Center of Streamwood,

17   Incorporated.  Who owns that?

18         MR. SAMATAS:    My discretionary trust.

19         MR. HOLTKAMP:    Is it the sole owner?

20         MR. SAMATAS:    No, along with my brother and sister, we all have the same discretionary

21   trust they're separate, but they all stem from a grantors trust in '88.

22         MR. HOLTKAMP:    Okay, and what's your…

23         MR. SAMATAS:    [_____].

24         MR. HOLTKAMP:    …what's your sister's name?

25         MR. SAMATAS:    Cynthia.

26         MR. HOLTKAMP:    Samatas?

27         MR. SAMATAS:    No, Thiem.  T-H-I-E-M.

1        MR. HOLTKAMP:        And each one of these discretionary trusts own a third of that company?

2        MR. SAMATAS:        Correct.

3        MR. HOLTKAMP:        And you're the president of that company?  Is that right?

4        MR. SAMATAS:        No, my brother is, John.

5        MR. HOLTKAMP:        John is, is there a reason the Secretary of State would list you as the

6   president and not John?

7        MR. SAMATAS:        Yeah, that ministerial duties on the part of my family through the law.

8   The last time I was involved with that, those types of matters was close to 20 years ago.  So what they've

9   done between that period of time to where we are today, you'd have to ask my brother that or his attorneys

10   who are on the phone.

11        MR. HOLTKAMP:        Okay, but you're not the president?

12        MR. SAMATAS:        No.

13        MR. HOLTKAMP:        Are you an officer?

14        MR. SAMATAS:        I can't, I'm not trying to circumvent the question, but part of the litigation

15   that's going on has to do with what, to answer your question, I really don't know anymore.

16        MR. HOLTKAMP:        Okay, and do you receive any salary or income from that company?

17        MR. SAMATAS:        No.

18        MR. HOLTKAMP:        And have you ever?

19        MR. SAMATAS:        Yes.

20        MR. HOLTKAMP:        And when was the last time you received income from that company?

21        MR. SAMATAS:        I have no idea, probably more than 10 years ago.

22        MR. HOLTKAMP:        And that company is located at 665 West North Avenue in Lombard, is

23   that right?

24        MR. SAMATAS:        No, are you, are you asking questions specifically referencing Streamwood?

25        MR. HOLTKAMP:        Yes.

26        MR. SAMATAS:        Those entities got sold last year.  So I don't even know how you picked

27   that up or why it's even an issue here.

1        MR. HOLTKAMP:    Well, the Secretary of State still says this as of, and those are filed in

2    2020.  So you're telling me the Streamwood...

3        MR. SAMATAS:    [_____].

4        MR. HOLTKAMP:    ...the Streamwood company was sold?

5        MR. SAMATAS:    Mr. Holtkamp, you're, you're kind of going down a rabbit hole.  I mean,

6    we could spend 20 hours talking about every facility, and the history of it and the litigation and everything

7    else.  And I'm, as we all know, as an attorney, you know, I'm trying to be very brief in my discussion and not

8    go off on tangents, however, this facility was sold.  There is a lien, the finality of that in terms of a lender is

9    not completed which is probably the basis why my brother continued to file with the Secretary of State which

10    is what you're picking up.

11        MR. HOLTKAMP:    Okay, and there's a whole lot of these Lexington Healthcare Centers of

12    fill-in-the-blank?

13        MR. SAMATAS:    Correct.

14        MR. HOLTKAMP:    Okay, so there's Lexington Healthcare Center of Bloomingdale, is that

15    kind of the same thing as Streamwood, just a facility in Bloomingdale instead of Streamwood?

16        MR. SAMATAS:    Yep, that is correct.

17        MR. HOLTKAMP:    And it was sold as well, or?

18        MR. SAMATAS:    No, that one was not.  There was originally 10 nursing homes, there's

19    only eight left.  Two of them got sold last year.

20        MR. HOLTKAMP:    Okay, where were the two that were sold?  One was in Streamwood and

21    one was, where else?

22        MR. SAMATAS:    In Wheeling.

23        MR. HOLTKAMP:    In Wheeling.

24        MR. SAMATAS:    Yeah.

25        MR. HOLTKAMP:    Okay, so I have, I'm just going to, show, tell you what I have here.  Lexington

26    Healthcare Centers of Bloomingdale Inc., Chicago Ridge Inc., Elmhurst Inc., La Grange Inc., Lake Zurich

1    Inc., Lombard Inc., Orland Park Inc., and Schaumburg Inc.  And your revocable trust still owns an interest in

2    all three, all of those?

3                    MR. SAMATAS:        Did you ask me if my revocable trust [_____].

4                    MR. HOLTKAMP:    I'm sorry, your...

5                    MR. SAMATAS:        ...No, my revocable trust...

6                    MR. HOLTKAMP:    I'm sorry, your discretionary trust.

7                    MR. SAMATAS:        Yes, except for a one-third minority interest in the Lombard and I believe

8    I have a one-third interest in the limited partnership with Bloomingdale.  Everything else is in my

9    discretionary trust.

10                    MR. HOLTKAMP:    Okay, and out of any of those companies are you currently paid a salary

11    or paid any income, distributions, or any other kinds of wages?

12                    MR. SAMATAS:        No.

13                    MR. HOLTKAMP:    No, you don't draw any money whatsoever from any of those companies?

14                    MR. SAMATAS:        I wish you could ask Mr. Blonder, but no, as part of the litigation I have

15    not seen any money for years.

16                    MR. HOLTKAMP:    Now there are also companies that seem to be associated with those that

17    are called Lexington Healthcare Systems of Lombard, Orland Park, Wheeling, what are those?

18                    MR. SAMATAS:        There's a triage of legal entities.  There's an operating company, there's a

19    limited partnership with a corporate general.  So, every facility that you mentioned has three legal entities to

20    it.

21                    MR. HOLTKAMP:    Okay, and you're not president of any of these entities?

22                    MR. SAMATAS:        That is correct.

23                    MR. HOLTKAMP:    And when it comes to the LLCs are you a manager of any of these entities?

24                    MR. SAMATAS:        You have to specify what you're talking about because...

25                    MR. HOLTKAMP:    Okay, so...

26                    MR. SAMATAS:        ...the nursing homes aren't, the nursing homes are not LLC, so there's no

27    member/manager issue there.

32

1        MR. HOLTKAMP:    Okay, so I have Lexington Financial Services LLC, Lexington Financial

2    Services II LLC, Lexington Financial Services III LLC, Lexington, or, I guess that's the of the Lexingtons,

3    but those three, do you have any management, are you management of those entities?

4        MR. SAMATAS:    I don't know for sure, to be, I don't, I don't know if those were a

5    member-managed or manager-managed and those entities are simply conduits for a self-insurance company

6    that we have for the nursing homes for liability.  But I don't, I don't know, I can't answer because I don't

7    remember, it's been so many years since...

8        MR. HOLTKAMP:    Do you draw an income from any of, any of those three LLCs I just listed?

9        MR. SAMATAS:    No, they're not income-producing entities.

10        MR. HOLTKAMP:    Okay.

11        MR. SAMATAS:    They're conduits.

12        MR. HOLTKAMP:    Okay, and then there is Lexington Private Care Services Inc., what's that?

13        MR. SAMATAS:    Who?

14        MR. HOLTKAMP:    Lexington Private Care Services Inc.

15        MR. SAMATAS:    That's one of the entities providing home health.

16        MR. HOLTKAMP:    Okay, and are you president of that?

17        MR. SAMATAS:    I have an ownership interest in it, I don't remember specifically whether

18    it's a member or shareholder, I don't remember.

19        MR. HOLTKAMP:    Okay, do you draw any income from that?

20        MR. SAMATAS:    No.

21        MR. HOLTKAMP:    Okay, now there's also Merit Center For Sleep Health of Chicago Lakeshore

22    LLC, are you...

23        MR. SAMATAS:    Right.

24        MR. HOLTKAMP:    ...are you a manager of that?

25        MR. SAMATAS:    No, I have an ownership interest, I can't remember specifically.

26        MR. HOLTKAMP:    Now you say you have an ownership interest, is that through the

27    discretionary trust or you personally?

33

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | No, those are in my discretionary trust. |
| 2 | MR. HOLTKAMP: | Okay, and do you draw any income from that entity? |
| 3 | MR. SAMATAS: | No. |
| 4 | MR. HOLTKAMP: | No.  Have you ever? |
| 5 | MR. SAMATAS: | Yes, years ago. |
| 6 | MR. HOLTKAMP: | Okay, and there's Merit Private Duty Nursing Services LLC, what's that? |
| 7 | MR. SAMATAS: | Again, it's servicing the home health. |
| 8 | MR. HOLTKAMP: | Okay. |
| 9 | MR. SAMATAS: | Again, I don't remember how I own it but yeah. |
| 10 | MR. HOLTKAMP: | Do you draw any income from that company? |
| 11 | MR. SAMATAS: | No. |
| 12 | MR. HOLTKAMP: | Okay, now there's also Merit Sleep Technologies Inc., Merit Sleep |

13 Management LLC, and Merit Sleep Centers LLC, what are those companies?

| | | |
|---|---|---|
| 14 | MR. SAMATAS: | Again, they're centers for sleep studies for sleep apnea. |
| 15 | MR. HOLTKAMP: | Okay, and you, through your, either personally or through your |

16 discretionary trusts own part of those?

| | | |
|---|---|---|
| 17 | MR. SAMATAS: | Everything you've mentioned is not personal, it's all through my |

18 discretionary trust.

| | | |
|---|---|---|
| 19 | MR. HOLTKAMP: | Okay, and then there is Curatess LLC.  C-U-R-A-T-E-S-S, LLC, what's that? |
| 20 | MR. SAMATAS: | That's a telemedicine company. |
| 21 | MR. HOLTKAMP: | Okay, and do you own or your discretionary trust own an interest in that? |
| 22 | MR. SAMATAS: | Correct. |
| 23 | MR. HOLTKAMP: | Okay, and are you a manager of that? |
| 24 | MR. SAMATAS: | I am, I don't remember if I'm a member or manager, but I have an |

25 ownership interest in it.

| | | |
|---|---|---|
| 26 | MR. HOLTKAMP: | Is it a one-third? |
| 27 | MR. SAMATAS: | Yes, sir. |

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | Do you draw any income from that entity? |
| 2 | MR. SAMATAS: | No. |
| 3 | MR. HOLTKAMP: | Is it the same situation as the other ones we talked about, you're in a |

4 battle with your family about it?

| | | |
|---|---|---|
| 5 | MR. SAMATAS: | That's the $64,000 question.  Yes, it's, this is the reason why I am here |

6 on this phone call.

| | | |
|---|---|---|
| 7 | MR. HOLTKAMP: | Okay, and there is Vesta Management Group LLC, what's that? |
| 8 | MR. SAMATAS: | That's the management company for everything you've been mentioning so far. |
| 9 | MR. HOLTKAMP: | Okay, and do you draw any income from that? |
| 10 | MR. SAMATAS: | No. |
| 11 | MR. HOLTKAMP: | And, let's just skip, let's go down, do you know of, have you ever heard |

12 Lombard Inn and Suites Inc.?

| | | |
|---|---|---|
| 13 | MR. SAMATAS: | Sure. |
| 14 | MR. HOLTKAMP: | You're the registered agent for that? |
| 15 | MR. SAMATAS: | I'm sorry? |
| 16 | MR. HOLTKAMP: | Are you the registered agent for that? |
| 17 | MR. SAMATAS: | That was sold years ago. |
| 18 | MR. HOLTKAMP: | Okay, so it's not around anymore? |
| 19 | MR. SAMATAS: | No, if anyone is keeping annual records with the Secretary of State, it's |

20 all beyond my knowledge and understanding and it could be for taxes reasons that I am not privy to.  But

21 again, that's a particular facility that was sold, I think over five years ago, so I don't know what you're

22 picking up on what records, because if they do exist I'm unaware of it and I have no interest in it.

| | | |
|---|---|---|
| 23 | MR. HOLTKAMP: | Okay, and then there's 400 West LLC, have you heard of that? |
| 24 | MR. SAMATAS: | 400 what? |
| 25 | MR. HOLTKAMP: | West, 400 West LLC. |
| 26 | MR. SAMATAS: | I have no idea what that is. |
| 27 | MR. HOLTKAMP: | Okay.  Now, as of the petition date sir, were you employed? |

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | No. |
| 2 | MR. HOLTKAMP: | Okay, and were you making any money at all? |
| 3 | MR. SAMATAS: | No. |
| 4 | MR. HOLTKAMP: | Okay, and over the past year how much money did you make? |
| 5 | MR. SAMATAS: | I didn't make any. |
| 6 | MR. HOLTKAMP: | So your taxes would say $0? |
| 7 | MR. SAMATAS: | No, you, look, to answer your question my tax return will show I made |

8    money,...

| | | |
|---|---|---|
| 9 | MR. HOLTKAMP: | Okay. |
| 10 | MR. SAMATAS: | ...but if you asked me did I ever see a dollar, the answer is no. |
| 11 | MR. HOLTKAMP: | Okay. |
| 12 | MR. SAMATAS: | [_____] this year. |
| 13 | MR. HOLTKAMP: | Why did, why would your tax return show that you made money? |
| 14 | MR. SAMATAS: | Okay, now again, Mr. Holtkamp you've got two attorneys on the phone |

15    that I objected to, that you asked me to reserve my objection.  Now you have [_____] one of them

16    specifically were engaged in very complex issues right now beyond the scope of this bankruptcy proceeding,

17    and I may have to reserve the right not to respond, because if I make certain responses it may or may not be

18    utilized against me in the current litigation.  So I'm walking on a tight rope not to be offensive and not to be a

19    nonresponsive debtor, but you're probing into issues that are quite significant in a litigation of which two of

20    the attorneys representing my brother's and sister's trusts are on this phone.  So I have to be very careful how

21    I respond and I'm trying to be extremely cooperative here.  So...

| | | |
|---|---|---|
| 22 | MR. HOLTKAMP: | Well, I'm trying to go through the schedules... |
| 23 | MR. SAMATAS: | [_____] how you phrase the question. |
| 24 | MR. HOLTKAMP: | Okay, so let's just read what the schedule requests.  What are your gross |

25    wages, salaries, and commissions from all sources per month?

1  MR. SAMATAS:   I don't have a typical life and to answer a question in form I would've

2  reviewed, I would review it with my CPA, because I don't prepare my tax returns.  So you asked the question,

3  did I make income...

4  MR. HOLTKAMP:   Well, you decided to file this case without an attorney, so I'm conducting

5  the examination and I'm asking you what it, what it asks, okay?

6  MR. SAMATAS:   Okay, okay, yes, go ahead.

7  MR. HOLTKAMP:   So, what...

8  MR. SAMATAS:   Could you repeat the question?

9  MR. HOLTKAMP:   What is your average monthly income?  Let's just put it that way.

10  MR. SAMATAS:   Zero.

11  MR. HOLTKAMP:   $0.

12  MR. SAMATAS:   Yeah, are you asking me what's reported on my tax return or what is it

13  that I received?  Because they're two different issues.

14  MR. HOLTKAMP:   Okay, well what did you report on your tax returns?

15  MR. SAMATAS:   I believe last year it was over $100,000 divided by 12, you would say, but

16  that's not how, I don't make a salary, I don't get wages, it's whatever income is derived and that's contingent

17  on so many different factors that the accountant prepares.  But if you ask me...

18  MR. HOLTKAMP:   Okay, where then do you, from where do you derive income?

19  MR. SAMATAS:   Okay.

20  MR. HOLTKAMP:   From where do you derive income?

21  MR. SAMATAS:   From selling personal property.

22  MR. HOLTKAMP:   That is the only place you derive income?

23  MR. SAMATAS:   Yes, income that I could utilize, income on paper is a whole 'nother

24  story.  So again, I'm asking you to clarify your question.  Do I make income for tax purposes?  The answer is

25  yes.  Do I see that income?  The answer is no.

26  MR. HOLTKAMP:   Okay, we'll figure this out when we get a copy of your tax return.

27  MR. SAMATAS:   Okay.

1        MR. HOLTKAMP:        Okay, and what do you think your monthly expenses are, your living expenses?

2        MR. SAMATAS:        About 15,000 a month.  [_____] yeah, somewhere around there.

3        MR. HOLTKAMP:        And where does that 15,000 a month come from?

4        MR. SAMATAS:        Selling personal property whenever I have to.

5        MR. HOLTKAMP:        Have you sold any personal property during this case?

6        MR. SAMATAS:        During this case?  No.

7        MR. HOLTKAMP:        So, this case has been going on for over a month, where did you get the

8    money to live on during the case?

9        MR. SAMATAS:        I mentioned there was some cash in my bank account.

10       MR. HOLTKAMP:        Yes, and now it's $3,000 lower than it was on the petition date.

11       MR. SAMATAS:        Okay.

12       MR. HOLTKAMP:        So...

13       MR. SAMATAS:        Okay, so?  I haven't paid all my bills.

14       MR. HOLTKAMP:        So you haven't sold any property during the case, is what you're saying?

15       MR. SAMATAS:        No.

16       MR. HOLTKAMP:        And have you made any income during the case, any other types of income?

17       MR. SAMATAS:        No.

18       MR. HOLTKAMP:        And do you owe any money to Bell Family Holdings LLC?

19       MR. SAMATAS:        No.

20       MR. HOLTKAMP:        Okay, have you ever?

21       MR. SAMATAS:        No, not personally.

22       MR. HOLTKAMP:        But one of the companies did?

23       MR. SAMATAS:        No, my discretionary trust, and I will make a statement, you obviously

24    have information, Mr. Blonder has volunteered and you should know better, that has nothing to do with my

25    personal bankruptcy.  It's a waste of your time and my time.  That's a discretionary trust issue in litigation.

26       MR. HOLTKAMP:        Now have you gifted or given any property to anybody in the last four

27    years that is worth more than $600?

1         MR. SAMATAS:    No.

2         MR. HOLTKAMP:    No.  No, no gifts of jewelry, watches, holiday gifts of over $600 in the

3  last four years?

4         MR. SAMATAS:    No, no.

5         MR. HOLTKAMP:    Okay, and we've kind of touched on this, but are there any lawsuits,

6  pending lawsuits you're involved in?

7         MR. SAMATAS:    Yes.

8         MR. HOLTKAMP:    And how many, to the best of your knowledge?

9         MR. SAMATAS:    At least four.

10        MR. SAMATAS:    Alright, you got a malpractice suit against Cohen & Lord, the attorneys,

11  Mr. Lester is on the phone.

12        MR. HOLTKAMP:    Mm-hmm.

13        Mr. SAMATAS:    I have another one against my wife for a charge for tortious interference

14  during the brokerage time to sell 1424, that's just started, that attorney is on the phone.  The other attorney

15  that's on the phone is in multiple cases that have not been totally consolidated between my trusts, me, my

16  brother and sister, and their trusts.

17        MR. HOLTKAMP:    Okay, and...

18        MR. SAMATAS:    And, go ahead...

19        MR. HOLTKAMP:    No, no, I'm moving on, I'm not listing other...

20        MR. SAMATAS:    Alright.

21        MR. HOLTKAMP:    And why'd you file...

22        MR. SAMATAS:    Well, I do have one against the city of Los Angeles too I may add.

23        MR. HOLTKAMP:    Okay, and what's your general plan for this case?  What do you hope to

24  get out of it?

25        MR. SAMATAS:    Sell Tanager, pay off all my creditors and be able to breathe and live

26  again.  And let whatever litigation I have going, let it, look, I have a very, [_____] of having it be successful in

27  my litigations and I, you know, the only quickest, easiest way with less risk to anybody is to sell the house

1    ASAP.  Hopefully get enough to take everybody out and you know, then look at possibly exiting bankruptcy.

2    It's a timing issue and the difficulty of liquidating that particular asset.  That's my plan.

3               MR. HOLTKAMP:   Okay, but...

4               MR. SAMATAS:   Get on my feet.

5               MR. HOLTKAMP:   Okay, but you haven't done anything to employ a broker and get

6    approval to sell the property which would need to be done, it doesn't seem like you've done what needs to be

7    done but you say you're going to get an attorney, hopefully you do that.  And you know you have to file

8    operating reports during this case, right?  That was discussed with you?

9               MR. SAMATAS:   Yes.

10              MR. HOLTKAMP:   Okay, and you're going to be responsible for filing those?

11              MR. SAMATAS:   Probably, but I do disagree with the statement you made.

12              MR. HOLTKAMP:   That's fine.

13              MR. SAMATAS:   I, you know, you called to my attention the need to fulfill all the requisite

14    documents but the statements you made about engaging brokers and discussing and pursuing the plan I just

15    expressed is, was not accurately stated by you.  I am actively doing it if...

16              MR. HOLTKAMP:   Well, you need to get court approval to actively do it, that's what I'm saying.

17              MR. SAMATAS:   I got it, I understood.

18              MR. HOLTKAMP:   Okay.

19              MR. SAMATAS:   That's the takeaway from it, I get it.

20              MR. HOLTKAMP:   Okay, I'm going to go ahead and open it up to creditors.  Let's start out

21    with, I don't have my list here, let's start out with Eric, I believe he represents the ex-wife.  Eric, do you have

22    any questions?

23              MR. GOLDBERG:   Yeah, I do.  And I apologize but I'm going to have to be very fast and

24    very brief because I have something else I have to get to.  But, Mr. Samatas, do you have with you a copy of

25    the bankruptcy petition that you filed?

26              MR. SAMATAS:   Do I have a copy of it?

27              MR. GOLDBERG:   Yeah.

1          MR. SAMATAS:        Not readily available, I believe you can get it online.

2          MR. GOLDBERG:       No, no, I have it, I'm asking if you have it now.

3          MR. SAMATAS:        Not in front of me.

4          MR. GOLDBERG:       Okay.  Well, I want to ask you some questions about that and let's see if

5    you remember some things about the document if you signed under penalty of perjury.  Under Secured

6    Claims, and I'm referring now to PDF page 11 of the petition that you filed that's docket number 1 on this

7    docket.  You show as one of your secured creditors, JPMorgan, secured by a single family residence that you

8    say the value is approximately $9 million, there's no address listed but on the, based on what you've said, is

9    that referring to the Tanager house?

10         MR. SAMATAS:        Yes.

11         MR. GOLDBERG:       Okay, and then the second secured creditor you show on your schedules

12   at Item 2.2 is Witkin & Associates – Trustee, what is that?

13         MR. SAMATAS:        Ha, Ha, Ha.  You're asking me that and you're representing my wife,

14   that's pretty funny but the answer to your question...

15         MR. GOLDBERG:       Well, I'm reading this, I'm reading this and there's no mention of [_____]...

16         MR. SAMATAS:        [_____].

17         MR. GOLDBERG:       ...[_____] so I'm asking you...

18         MR. SAMATAS:        [_____].

19         MR. GOLDBERG:       Well, Witkin & Associates – Trustee.

20         MR. SAMATAS:        All right, I'd be more happy to answer, you did not exist at the time I

21   filed on September 21st, okay, so the only knowledge I had was he, I have a document that Witkin &

22   Associates was the trustee pursuing a trust sale.  So, I had no other choice but to list that as the secured

23   creditor because I have a document that states simply that he was pursuing the trust sale in his capacity as

24   trustee.  And you did not exist as a lawyer or a firm or involved in the case, so I don't see where you have a

25   problem with what I wrote.

26         MR. GOLDBERG:       Well, I'm asking what is that debt owed for, are you saying now that

27   that's the debt that you owed Carlye?

1          MR. SAMATAS:        Yes.

2          MR. GOLDBERG:        Okay, thank you.  But on that listing for the collateral it says the value,

3   there's a question, value of collateral that supports this claim, and the figure you showed there is $2.8 million.

4   What, is that referring also to the Tanager house?

5          MR. SAMATAS:        Well, I'll tell you what, it's, you know, the form is done on a computer,

6   it's not, it's not the most friendly-usable form...

7          MR. GOLDBERG:        Could you just answer my question, is that the Tanager house?

8          MR. SAMATAS:        I am, I am answering, okay, I mean, I can, it's taking a number off of a

9   subtraction of this and that.  You know exactly what I owe her, I owe her $1.4 million.

10          MR. GOLDBERG:        I know what you owe her but what I don't know is what you're trying to

11   do with your schedules because the numbers don't match.  You don't show the address of that house and you

12   show a value for the house of $2.8 million which as far as I can tell doesn't correspond to either of the houses

13   you discussed earlier and that's why I'm asking...

14          MR. SAMATAS:        It depends how you interpret the form, sir.  I interpreted it in a different way.

15          MR. GOLDBERG:        Yeah, no, it doesn't.  It just depends on facts…

16          MR. SAMATAS:        Okay, well, you know...

17          MR. GOLDBERG:        Section 2.3, the debt owed to Wolf Wallenstein, you say it's $300,

18   $300,000 secured by a single-family residence.  Is that, is the residence you're referring there also Tanager?

19          MR. SAMATAS:        I've already answered this question to Mr. Holtkamp.

20          MR. GOLDBERG:        You have not been asked this question so you can't [_____]...

21          MR. SAMATAS:        I went through every, every secured creditor...

22          MR. GOLDBERG:        You were not asked about items on your schedules, I'm asking you now,

23   Section 2.3, the California residence that secures the Wolf Wallenstein & Abrams claims, is that the Tanager

24   house, yes or no?

25          MR. SAMATAS:        Yes.

26          MR. GOLDBERG:        Thank you.  Last, Parker Mills, Item 2.4, 150,000 secured by a California

27   single-family residence, is that also the Tanager house?

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | Yes. |
| 2 | MR. GOLDBERG: | And same answer and for the debt of $50,000 owed to Howard & Howard? |
| 3 | MR. SAMATAS: | Yes. |
| 4 | MR. GOLDBERG: | Okay, you were also asked earlier whether you had any collectibles, |

paintings, or artwork and you indicated that you did have some and that it had been consigned, is that correct?

6      MR. SAMATAS:     Yes.

7      MR. GOLDBERG:   And you gave an estimate which I acknowledge you said it was an

8  estimate, of approximately $100,000 altogether, is that accurate?

9      MR. SAMATAS:     Yes.

10     MR. GOLDBERG:   Do you know if than how much you paid for those collectibles, paintings,

11  and artworks altogether?

12     MR. SAMATAS:     I don't remember.

13     MR. GOLDBERG:   Approximately?

14     MR. SAMATAS:     I can't remember, it was over a 20-year period of time.

15     MR. GOLDBERG:   Are those items insured?

16     MR. SAMATAS:     No.

17     MR. GOLDBERG:   Okay, alright, that's all I have time for.  Thank you, and I'll be reaching

18  out for a paper transcript.  Thank you, everybody.

19     MR. HOLTKAMP:   Thanks, Eric.  Who wants to go next?  If anybody has any other

20  questions.

21     MS. BARNGROVER:     This is Sarah Barngrover, for JPMorgan.

22     MR. HOLTKAMP:   Okay, go ahead.

23     MS. BARNGROVER:     I just had a couple quick questions.  Does anybody currently

24  reside at the California property?

25     MR. SAMATAS:     No.

26     MS. BARNGROVER:And you mentioned that your ex-wife, you're currently suing her for

27  tortious interference, does that involve any damage to the property or was it just with the listing itself?

1                MR. SAMATAS:      There is sufficient damages relative to the financial impact of the tortious

2  interference with the listing and her behavior.  So we're not talking about this...

3                MS. BARNGROVER:      But there were...

4                MR. SAMATAS:    Go ahead.

5                MS. BARNGROVER:      No, [_____]...

6                MR. SAMATAS:      She interfered in, with, no, no, no.  No, not.

7                MS. BARNGROVER:Okay, that was my concern.  And you said your intention is to sell the

8  property, so you wouldn't necessarily be [_____] in any plan, you would be proposing to sell it?

9                MR. SAMATAS:      A-S-A-P.  I'm on the brink, I'm just a little shy of satisfying all creditors.

10              MS. BARNGROVER:      Got it.

11              MR. SAMATAS:     That's an estimation [_____]...

12              MS. BARNGROVER:      And then, my last...

13              MR. SAMATAS:    Go ahead.  Go ahead.

14              MS. BARNGROVER:      No, you go ahead.

15              MR. SAMATAS:     No, no, you please go.  Okay, I was [_____]...

16              MS. BARNGROVER:      The last question what...

17              MR. SAMATAS:    Go ahead.

18               MS. BARNGROVER:      Go ahead and finish your statement.

19              MR. HOLTKAMP:   No, just ask the question, just ask the question.

20              MS. BARNGROVER:       Okay, would you be willing to consent to relief from stay on the

21  property?

22              MR. SAMATAS:     I'm sorry, I couldn't understand you, a release of what?

23              MS. BARNGROVER:      Relief from stay on the property.

24              MR. SAMATAS:     I'm right at the throes of going in and asking, you know, just creditor's

25  consent to the sale.  I mean, right now, and the difficulty is just kicking the price up a little bit higher so I can

26  relieve all my debts.  So why would I want to get out?  What, I mean, I'm trying to reorganize, that's the

27  whole benefit of Chapter 11.

1    MS. BARNGROVER:I know, I'm just, you know, I know you mentioned the forbearance

2    agreement and there is [_____] relief from stay which is why I'm asking the question.

3    MR. SAMATAS:      I don't understand what the benefit of relief stay would do.

4    MS. BARNGROVER: It would permit my client to proceed in state court.

5    MR. SAMATAS:      I think your client, I think I would have a legitimate claim on the

6    forbearance agreement which I really don't want to get into and how it was, and JPMorgan's behavior before I

7    got thrown into the forbearance agreement.  I don't know if you're aware of it but there's some …

8    MS. BARNGROVER:      [_____].

9    MR. SAMATAS:      ...shortcomings.  No, I don't want to go on state court on the foreclosure,

10    why would I want to do that?

11    MS. BARNGROVER:      [_____] you answered the question.  Thank you, that's all I have.

12    MR. HOLTKAMP:    Okay, and do we have anyone else that would like to ask a few questions?

13    Speaker 1:      [_____].

14    Speaker 2:    Yes.

15    Speaker 3:      [_____] reserve [_____].

16    MR. HOLTKAMP:    Okay, and anybody else?

17    MR. COHEN: Yes, thank you, Bruce Cohen, good afternoon.

18    MR. HOLTKAMP:    Who is this?

19    MR. COHEN: Bruce Cohen.

20    MR. HOLTKAMP:    Okay, Bruce.

21    MR. COHEN: Cohen & Lord BMCA.

22    MR. HOLTKAMP:    Okay, go ahead.

23    MR. COHEN: Good afternoon, Mr. Samatas.  As I understand your testimony and it was a bit

24    confusing, I'll be looking forward to getting, to go through the record, but as I understood it here today, on

25    the date of filing you had $23,000 plus or minus in a bank account of which you spent $3,000 or so and so

26    you have $20,000 plus or minus in a bank account.  At present you have no income, have received no

1    income since the date of filing and have no expectation of receiving any fixed income at the present time, is

2    this all fair?

3         MR. SAMATAS:     You added several statements to your questions so I can't really answer it.

4         MR. COHEN: Alright, let's break it down then...

5         MR. SAMATAS:     [_____] compound questions.

6         MR. COHEN: Okay, as we sit here today, what expectation do you have of receiving income

7    of any sort?

8         MR. SAMATAS:     Hopefully, hopefully I'll get some income...

9         MR. COHEN: From where?

10        MR. SAMATAS:     ...but I can't predict tomorrow.

11        MR. COHEN: Where...

12        MR. SAMATAS:     From sale of personal property.  I said from sale of personal property.

13        MR. COHEN: And what personal property is that?

14        MR. SAMATAS:     It was already stated, watches, artwork, whatever, furniture.

15        MR. COHEN: Beyond the artwork, furniture, and watches, is there any other personal

16   property from which you could possibly obtain any income?

17        MR. SAMATAS:     No.

18        MR. COHEN: What is the value of the various interests you hold in the various nursing home

19   and related health facilities and health services that you were inquired about the last half hour or so?

20        MR. SAMATAS:     You brought up a question, you have to be more specific, you also heard

21   if you really paid attention that it's bifurcated into trusts.  So the question is too general and broad.

22        MR. COHEN: Well, with respect to the first trust, whatever interests are held in the first trust,

23   what is your estimate of the net value of the various interests, what's your trust value?

24        MR. SAMATAS:     What trusts?  There's two trusts, I don't know which trust you're

25   referring to, and one has nothing to do with this proceeding.

26        MR. COHEN: [_____] I understand that you said that a couple of times the proceeding here

27   today, but you won't be any surprise to you that we don't agree with that and mostly nor do other parties on

1    the call.  With respect with your discretionary trust, what is your best estimate of the [_____] above your

2    interest?

3               MR. SAMATAS:       That is not an issue that's subject to the bankruptcy part.  Now once the

4    judge tells me otherwise it's a separate legal entity, it has nothing to do with me personally.

5               MR. COHEN: My question is what is the...

6               MR. SAMATAS:       I'm not going to, I'm not talking about my discretionary trust.

7               MR. HOLTKAMP:    Or are you...

8               MR. SAMATAS:       Final mention...

9               MR. HOLTKAMP:    Guys, guys, guys, stop.

10              MR. SAMATAS:       Not responding…

11              MR. HOLTKAMP:    Stop.  Mr. Samatas are you refusing to answer the question?

12              MR. SAMATAS:       Yes.

13              MR. HOLTKAMP:    Okay.  You're refusing to answer the question that's one thing, if you're

14   just going to refuse then counsel can bring the appropriate motion, or I can bring the appropriate motion.  I

15   think this is absolutely a part of this case, how much that or those assets are worth are absolutely relevant to

16   this case and I absolutely believe you have to answer the question.  But if you refuse to answer the question

17   you can do whatever you want, and we'll bring whatever appropriate motions, but I'll give you the option.

18   Do you want to answer the question?

19              MR. SAMATAS:       Are you specifically referring in your comments to my discretionary trust...?

20              MR. HOLTKAMP:    To your discretionary trust.

21              MR. SAMATAS:       To the bankruptcy?

22              MR. HOLTKAMP:    Yes.

23              MR. SAMATAS:       I'm sorry.

24              MR. HOLTKAMP:    Yes.  How much...

25              MR. SAMATAS:       I...

26              MR. HOLTKAMP:    How much is...

27              MR. SAMATAS:       I don't have a, go ahead.

1        MR. HOLTKAMP:    How do you think those interests, that you say the discretionary trust has,

2    how much do you think those are worth?

3        MR. SAMATAS:    I don't know.

4        MR. HOLTKAMP:    You have no idea.

5        MR. SAMATAS:    With the market today, with, well with COVID, and what's happening in

6    nursing homes and the government reimbursing, reimbursement of it.  I have no idea what they're worth

7    today.

8        MR. HOLTKAMP:    Alright.  Go ahead Mr.Cohen.

9        MR. COHEN: What is your best estimate of that value?

10        MR. SAMATAS:    I have no idea, I can't even give you a best estimate, I have no idea in the

11    marketplace today because of COVID.  What's happened to long-term care facilities.  I have no idea.

12        MR. COHEN: Are you aware of any document in which any value is estimated for any of those

13    interests?

14        MR. SAMATAS:    No.  Not aware of any.

15        MR. COHEN: When was the last time you stated any value, any estimated value, with regard to

16    any of those interests in any one…

17        MR. SAMATAS:    Which interests, again, as a general question, do you mind being specific

18    so I can answer appropriately?

19        MR. COHEN: With regard to the entities held in the, or arising from, the discretionary trust as

20    you describe it.  What is the last…

21        MR. SAMATAS:    I don't…

22        MR. COHEN: You provided any values, oral or written, to anyone, concerning your value in

23    those entities, or the value of your interest in those entities?

24        MR. SAMATAS:    Years ago.

25        MR. COHEN: When you purchased the Tanager residence, did you state the estimated value for

26    your interest in those entities?

27        MR. SAMATAS:    I don't recall.

48

1          MR. COHEN: When have you received tax reports, like of any sorts, on any of these entities

2    which are part of the tax returns that you filed with the US government?

3          MR. SAMATAS:        I don't know.

4          MR. COHEN: Who would know the answer to that question?  Your accountant?

5          MR. SAMATAS:        I don't know.  I'm not even sure.  I don't know.  I'm not, I haven't been

6    engaged in the operations, so I mean, who's responsible for it, I don't know.

7          MR. COHEN: With regard to your filing.  This is something your accountant would be

8    familiar…

9          MR. SAMATAS:        Well, actually, Bruce, since you're the one who represented me, you

10    would know better than me, my friend.  I don't know.  There's my answer.  I don't know.  We're talking

11    about well over a decade ago.  I don't remember.

12          MR. COHEN: When is the last time you borrowed any money?

13          MR. SAMATAS:        I don't remember.

14          MR. COHEN: When is the last time you opened a credit line of any kind?

15          MR. SAMATAS:        I don't think I ever opened up a credit line.

16          MR. COHEN: In the context of your divorce, did you state your interest in this trust?

17          MR. SAMATAS:        What's the question?

18          MR. COHEN: In the context of your divorce, was your interest in these entities that are part of

19    this contributory trust, or arising out of this contributory trust, were they valued in any respects?

20          MR. SAMATAS:        David.  I need, you know, this is not a deposition, I thought this was a

21    meeting of creditors, and it sure seems to me like I'm going through a deposition here, so I mean, where's the

22    ground rules on what the creditors asking relative to the importance of where we at the juncture of bankruptcy?

23          MR. HOLTKAMP:        The creditor is entitled to ask you about your assets and the value of

24    them, that is the point of the meeting of creditors, but we are getting a little long, so Mr. Cohen, if you could,

25    you know, tighten it up a little bit, I think what you're asking here is whether or not these assets were valued

26    as part of your divorce or dissolution proceedings, so were they?

27          MR. SAMATAS:        No.

49

1        MR. HOLTKAMP:    Okay.

2        MR. COHEN: Let's, let's just try it this way.  In your mind, how would we, the court, the

3    trustees, the trustees' counsel, the creditors, how would we determine the value of your interest in this

4    contributory trust, or interests arising out of this contributory trust?  How would you recommend we

5    establish…

6        MR. SAMATAS:        Which trust are you talking about?  Both trusts?  One trust?  This is the

7    third time I've asked to be specific with your question…

8        MR. HOLTKAMP:    He's talking about the discretionary trust.  The discretionary trust.

9        MR. SAMATAS:        Okay.  Okay.  So ask the question about my discretionary trust.

10        MR. COHEN: How would you recommend that we determine the value of those assets?

11        MR. SAMATAS:        Well, I don't know, and I would say once I've probably hired an attorney

12    in spite of Mr. Holtkamp's comments.  I would probably make a motion to try and not consider what all of

13    you think without being [_____] attorneys, what may or may not be relevant to this bankruptcy.  So I'm

14    going to reserve, I can't answer your question, and I will attempt to segregate which, what I believe should be

15    segregated, okay, it's a legal question and I'm not going to respond other than to.  If it comes up to it, I'll file

16    the appropriate motion to have a determination made about the relevancy of my discretionary trust.

17        MR. HOLTKAMP:    Okay, Mr. Cohen, I don't think we're going anywhere here, if you have

18    any, you know, one or two more clear and concise questions, otherwise we need to move on.

19        MR. COHEN: I'll reserve questions for the next.

20        MR. HOLTKAMP:    Okay.

21        MR. COHEN: The next proceeding on December 19th, thank you very much.

22        MR. HOLTKAMP:    Yeah, okay, who's next?  Anybody else need to ask questions?

23        MR. LESTER:        This is Mark Lester, I also represent Cohen & Lord.

24        MR. HOLTKAMP:    Okay.  And you would like to ask questions as well?

25        MR. LESTER:        Just a couple.

26        MR. HOLTKAMP:    Just a couple.  I'm going to hold you to it.

27        MR. LESTER:        Fair enough.

1                  MR. HOLTKAMP:    Go ahead.

2                  MR. LESTER:       I'll ask a couple now and reserve the ability to ask more later, since I

3  understand that 341 isn't going to be concluded today, correct?

4                  MR. HOLTKAMP:    No, it's going to be continued to November 19th at 1:30 PM Central

5  Time.  And I'll put a notice on the docket that says that and has you call a number just like this one.

6                  MR. LESTER:       You know, Mr. Holtkamp, that being the case, I'll just reserve until then.

7                  MR. HOLTKAMP:    Okay.  Do we have any other creditors on the call that would like to ask

8  questions today?  Not hearing anybody, I'm going to go ahead to continue this like I said to November 19th

9  at 1:30 PM, I'll put a notice on the docket.  Mr. Samatas, you need to get your required documents filed well

10  before then, I cannot conclude the meeting until I have those documents on file, signed, and complete, and

11  I'm also going to need your 2019 tax returns sent to us, I don't know why we didn't ask for those before,

12  they should have, I should have had a copy before the 341 meeting, and I'm going to need a copy of both of

13  your trust, the revocable trust and the discretionary trust, I need a copy of those documents.  Okay.  And

14  then like I said I'm continuing this to November 19th, at 1:30 PM central, Central Time.  And I'll probably

15  see quite a few of you or hear from quite a few of you on Monday.  Okay, and with that, I'm going to go

16  ahead and go off the record, thanks.