# **EXHIBIT D**

## **(Second 341a Transcript)**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 PROCEEDING |
| | ) | |
| | ) | |
| JAMES SAMATAS, | ) | CASE NO. 20-BK-17355 |
| | ) | |
| | ) | |
| DEBTOR. | ) | HON. A. BENJAMIN GOLDARN |

_____

**TRANSCRIPT OF TELEPHONIC 341(A) MEETING:**

**SESSION II**

**JAMES SAMATAS**

**NOVEMBER 19, 2020**

**11:30 AM**

1    *Speakers:  David Holtkamp, James Samatas, Eric Goldberg, Jeff Schwartz, Steven Blonder,*

2 *Bruce Cohen, Sarah Barngrover, Cole Heggi*

3    MR. HOLTKAMP: Okay, here we go.  Alright, so my name is David Holtkamp.  I'm a trial

4 attorney with the US Trustees Office here in the Northern District of Illinois.  We're here for the continued

5 341 meeting of James Samatas in the Chapter 11 case where he is the debtor.  The case number is

6 20BK17355.  The debtor is here present on the phone for our telephonic 341 meeting.  Mr. Samatas, if you

7 could please put your name on the record for us.

8    MR. SAMATAS: James Samatas.  Debtor.

9    MR. HOLTKAMP: Okay, and you are pro se, correct?

10   MR. SAMATAS: Correct.

11   MR. HOLTKAMP: Alright, so if we could just go around with, and have all the creditors put

12 their names on the record.  Let's just start with Eric, and then we can go to Jeff and then we can move on to

13 the people who have been, that I haven't heard so much from.  So, Eric, if you could put your name on the

14 record.

15   MR. GOLDBERG: Hi, good afternoon.  This is Eric Goldberg, I'm a lawyer with DLA Piper

16 in Los Angeles and I represent the debtor's ex-wife, Carlye Samatas.

17   MR. HOLTKAMP: Okay, Jeff?

18   MR. SCHWARTZ: Great.  Jeff Schwartz, on behalf of John Samatas and Cindy Thyme, and

19 their respective trusts.

20   MR. HOLTKAMP: Okay, and anybody else who wants to jump in?

21   [INAUDIBLE]

22   MR. BLONDER: Steve Blonder, on behalf of John Samatas, Cindy Thiem, and their

23 respective trusts.

24   MR. HOLTKAMP: I'm sorry, what was your name?

25   MR. BLONDER: Steve Blonder.

26   MR. HOLTKAMP: Okay, and you're, you represent the same parties as Jeff Schwartz?

27   MR. BLONDER: Yeah, I'm Jeff's partner.

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | Okay.  Alright, then we had, Mr. Cohen? |
| 2 | MR. COHEN: | Yeah, Bruce Cohen, for Cohen & Lord or now, BMCA, same entity. |
| 3 | MR. HOLTKAMP: | Okay, and I think we had a third person there trying to talk too? |
| 4 | MS. BARNGROVER: | Sarah Barngrover, on behalf Chase and Bank of America. |
| 5 | MR. HOLTKAMP: | Alright, great.  Did we miss anybody? |
| 6 | MR. HEGGI: | Yeah, this is Cole Heggi, on behalf of Cohen & Lord… |
| 7 | MR. HOLTKAMP: | Okay |
| 8 | MR. HEGGI: | Bruce's firm. |

9    MR. HOLTKAMP:    And, that's it?  Alright, not hearing anybody else, we're going to go

10    ahead and go forward.  Like I said this is the continued meeting of creditors for Mr. Samatas.  Mr. Samatas, if

11    you could raise your right hand, please.  Do you swear and affirm the testimony…?

12    MR. SAMATAS:    Yes.

13    MR. HOLTKAMP:    Do you swear and affirm the testimony you're about to give is the truth,

14    the whole trust, and nothing but the truth?

15    MR. SAMATAS:    I do.

16    MR. HOLTKAMP:    Okay, and we kind of went over this last time, but we'll do it again.  You

17    understand this is being recorded so we're going to need you to speak loudly and clearly in audible responses,

18    okay?

19    MR. SAMATAS:    Yes.

20    MR. HOLTKAMP:    And if you need a break to use the restroom or anything like that just let

21    me know, just I would ask that you answer any pending questions before we take a break, okay?

22    MR. SAMATAS:    Understood.

23    MR. HOLTKAMP:    And you're not under the influence of any drugs, alcohol, medication that

24    would impair your ability to testify here truthfully and honestly today?

25    MR. SAMATAS:    No.

1    MR. HOLTKAMP: Okay, and I didn't ask the last time, but I usually let the debtor or the

2 debtor's attorney give a brief statement about why they filed for bankruptcy and what their hopes are for the

3 case.  So, if you want to you can do that, or you could waive it.

4    MR. SAMATAS: I'll waive it.

5    MR. HOLTKAMP: Okay, and now, where do you, how do you see this bankruptcy case

6 ending?  What's a successful ending for you?

7    MR. SAMATAS: The acceptable ending would be essentially a liquidation of the property

8 in Los Angeles, California which has sufficient equity to eliminate all the secured creditors and would also

9 afford me enough funds to continue with, litigation with three of the parties that are on the phone.  So, I do not

10 see this thing being prolonged.  I believe there's plenty of equity.  I believe that COVID and actually, with my

11 wife which is part of the litigation contributed the illiquidity, I'm not insolvent, I'm illiquid and I do, I think

12 that some stroke of luck that the liquidation of the home in Los Angeles will be sufficient to address

13 JPMorgan, Bank of America, my ex-wife's claim from our divorce.  And in terms of the other two other

14 parties that Mr. Schwartz, and Mr. Blonder, and Mr. Cohen, and Cole, whoever he is, I will live to see another

15 day with them in court.  So, I do not think this is going to go on long, I've come very close.  I'm essentially

16 trying to get some equity out of the sale.  The sale offers so far are just a tad shy of taking out all the debtors

17 so I share that with you as opposed to an opening statement as any response, because even as you speak, even

18 within the last week I've had seven people come into the house.  I've been very close.  I have had offers but

19 after I pay the commission, I would be maybe a couple hundred thousand shy of taking care of it.  So, it's, it

20 really boils down to finding the right buyer that comes up with a little bit more money so I can pay my debts

21 and hopefully then just get dismissed in bankruptcy.  The problem is in sale of the house.

22    MR. HOLTKAMP: Okay, so if there's equity after the sale you plan on just, you plan on

23 taking that yourself?

24    MR. SAMATAS: I'm sorry, sir?

25    MR. HOLTKAMP: So, if there's equity…

26    MR. SAMATAS: If there's enough.

1          MR. HOLTKAMP:    So, if there's an equity, if there's equity after you sell the house, what do

2    you plan on doing with it, that money?

3          MR. SAMATAS:    I would, well, I would live.  There's a number of moving parts going on

4    and if I was able to pull enough equity out of there, and if I would probably at that, petition would be dismiss

5    the bankruptcy because I would have fulfilled my obligations to creditors.

6          MR. HOLTKAMP:    But you don't intend to use that money to pay any unsecured creditors or

7    any creditors that do not have a lien on that property?

8          MR. SAMATAS:    Well, my, no, no.  I, there's a couple of unsecured creditors, that there's

9    credit card companies.  You know, I need to reinstate to Bank of America, JPMorgan they would be

10    discharged.  And there is literally multimillion dollars involved in the litigation that I referred to early with the

11    two, four of the attorneys that are on the phone.  And part of that money would be utilized to recover funds

12    that I believe they owe me, and the court of law will determine that.  So, it's a continuation in the pursuit of

13    lost monies that I'm in litigation with.

14          MR. HOLTKAMP:    Okay, so if the property is sold you just intend to move to dismiss your

15    bankruptcy case then?

16          MR. SAMATAS:    In all likelihood, yes.

17          MR. HOLTKAMP:    Okay, so you don't intend to fund a plan or do, do anything like that?

18          MR. SAMATAS:    No, and as long as we're on the subject matter of what you're asking me,

19    Mr. Schwartz and Mr. Blonder are acutely aware of the sale that will happen within five months of one of the

20    assets that I've listed in the schedules that should afford me several millions of dollars on the conclusion of

21    that sale.

22          MR. HOLTKAMP:    What sale are you talking about?

23          MR. SAMATAS:    So, the asset that is known as Lexington Healthcare Center of Lombard,

24    Sambell of Bloomingdale.  On the schedule under Forbearance Agreements, right now I own that in

25    partnership with my brother and sister, they are being sold, they are being marketed right now.  I should

26    receive several million dollars from the sale of those assets.  So, to answer your question, definitely apart from

27    selling the house in Los Angeles, I will have enough liquidity to pursue a normal life.  And so therefore the

1  reorganization that I sought in Chapter 11 is simply, of being given the opportunity and the understanding

2  from the creditors to give me enough time to have these liquidations take place where liquidity comes back

3  into play for my life.

4          MR. HOLTKAMP:    So, if somebody is currently…

5          MR. SAMATAS:    And as I said, well, the two attorneys that on this call that are

6  representing my brother and sister are acutely aware of everything I'm saying and can validate my point.

7  They are well aware because we've been negotiating for months.

8          MR. HOLTKAMP:    So, you are, there's, somebody, you said that was currently trying to

9  market those businesses and sell them as a whole?

10         MR. SAMATAS:    Yes, sir, yes, sir.

11         MR. HOLTKAMP:    And you own a third…

12         MR. SAMATAS:    I own a third of that.  The lender that tells us and I, and again,

13  Mr. Blonder and Jeff, Mr. Schwartz, are, have been in communication with me as we negotiated very difficult

14  forbearance agreement with MidCap Financial which has compelled us to sell those facilities no later than

15  April 15th.  They are currently being marketed, the initial offering, the initial offering I believe went out

16  yesterday or today.  And there will be sufficient funds for me to live my life and to make sure that all my

17  debtors are properly, are properly paid off.  And to allow me the opportunity to pursue my wife and my claims

18  against Cohen & Lord, and also my wife, Carlye Samatas, in regards to interference.  And also, against

19  Mr. Blonder and Mr. Schwartz and my brother and sister for breach of fiduciary duties.  So, I literally have

20  three legitimate claims against the creditors, two of them are contingent.  My wife legitimately has a claim for

21  a trust deed under our domestic relations agreement that once these.  So, the bottom line, to answer your

22  question, not to be too repetitive here.  There's the sale of the house in Los Angeles and the sale of two of the

23  businesses that are being marketed as we speak that are going to allow me the opportunity to request a

24  dismissal for bankruptcy.  And this is all going to take place within the next four months.

25         MR. HOLTKAMP:    Okay, and you think the sale on those businesses will bring you

26  personally more than a million dollars?

27         MR. SAMATAS:    Yes, sir.

5

1          MR. HOLTKAMP:    How much did you say it was?  $1, $2, $3 million, something like that,

2    somewhere in there?

3          MR. SAMATAS:    Well, it's been so long since I've been able to [inaudible] the facilities, so

4    this is, I have a, I have a one-third interest in all eight of the facilities.  How much they come from the two

5    that I own personally, not in my Discretionary Trust.  I, I suspect more than several millions will come into

6    play within the next four to five months.

7          MR. HOLTKAMP:    So, the two that you are talking about now, the Lexington, the ones you

8    listed in your Schedules that are being sold, those are owned by you personally, those…

9          MR. SAMATAS:    Yes.

10          MR. HOLTKAMP:    Okay, and then there are seven other ones that are owned by the

11    Discretionary Trust which you have an interest in.

12          MR. SAMATAS:    Correct.

13          MR. HOLTKAMP:    And those are being sold too?

14          MR. SAMATAS:    Yes.  The option . . . the package is, the collective nature of the, sorry, the

15    eight facilities are as, are basically split between two different lenders and both lenders have requested and

16    we've entered into the forbearance agreement to start the sale of all the assets.

17          MR. HOLTKAMP:    Now when do you say eight facilities, you mean, eight like, nursing

18    homes?

19          MR. SAMATAS:    Yes, sir.

20          MR. HOLTKAMP:    Okay.

21          MR. SAMATAS:    That's correct.

22          MR. HOLTKAMP:    And they are going to sell all eight of them…

23          MR. SAMATAS:    Yes.  They have a choice of either to refinance, but because of COVID

24    that's not likely to happen, or to sell.

25          MR. HOLTKAMP:    Okay.

1          MR. SAMATAS:          Once again, as I said, everything I am saying should be validated by

2    Mr. Schwartz or Mr. Blonder, because they participated on behalf of my brother and sister John and Cynthia

3    as we negotiated the forbearance agreement and [inaudible]…

4          MR. HOLTKAMP:    I have…

5          MR. SAMATAS:          … they are well aware of it.

6          MR. HOLTKAMP:    I have no reason to doubt you on this.  So, how much are the eight

7    facilities in total worth?

8          MR. SAMATAS:          The only thing I could share, if you are asking me to be an appraiser, I

9    won't do that.  But, but one lender has requested that over a $100 million being acquired in sales.  There's a,

10    there's a threshold of that.

11          MR. HOLTKAMP:    How much do you think that, if are going to get a couple million out of

12    the two businesses you personally have an interest in it, how much is your Discretionary Trust to get from the

13    other ones?

14          MR. SAMATAS:          I could, I could, it would be inappropriate of me to give you an estimate

15    on that number.  I really don't know.  There's so many factors going into play in the market right now because

16    of COVID, because we are in the state of Illinois, what's going to happen to ObamaCare, so.  So, any

17    prospective purchaser is going to be a bit hesitant without having a crystal ball.  So, to answer to your

18    question more specifically, in terms of what could I look forward to, subject to whatever terms and conditions

19    and taxable events take place.  I really couldn't value.  I, I really don't know what that number is, cause I

20    don't know what the ultimate sale price is going to be.

21          MR. HOLTKAMP:    Is there any reason to believe that those facilities would, would bring in

22    less than the ones you personally own?

23          MR. SAMATAS:          No.

24          MR. HOLTKAMP:    Did you say no?

25          MR. SAMATAS:          No, this is still all of a similar nature and is a great package.  So, the

26    problem is similar to the home in Los Angeles which kind of got me into . . . the loss of income from the

27    operations and the divorce and numerous factors that led me to file for the bankruptcy.  And right now,

1    because of the uncertainty of real estate market in Los Angeles is really very sketchy, which is one of the

2    reasons why I haven't been able to sell and procure some of my equity out of there and it's, the banks, of

3    course have requested and we did receive an excellent brokerage firm to represent us, everything is on its way

4    to happen.  Hopefully, it will be a successful number.  You asked me, where did, could the number be similar

5    to the ones that I own personally, and, the answer is yes.  But again, I, I don't know how a particular buying

6    group is going to see valuation, either in a lump-sum or per facility, there are taxable event issues . . . I can't

7    really be more specific than what I have stated.

8              MR. HOLTKAMP:    Okay, but to have, have all of these properties, or all of these facilities

9    sold as a, as a group, you need to clear at least 100 million dollars, you said?  I mean, it needs to be sold for a

10   100 million.

11             MR. SAMATAS:      It might be.  It's rather strange because there are two different lenders.

12   One of them is [inaudible] Bank, and the other one is a company called, Mid-Cap.  Mid-Cap's forbearance

13   agreement has a threshold of 100 million, [inaudible] does not.

14             MR. HOLTKAMP:    What do you mean by threshold?

15             MR. SAMATAS:      They have a forbearance agreement that they want to package to be sold

16   in bulk, so lenders have, the terms and conditions are very similar but they're not exactly parallel.  But what

17   they wanted to do was to spend more timed contingencies like, by November 30th we had to have a broker,

18   and then we had to have a lot of the terms by 12/31 of this year.  And, we're supposed to close on one hand,

19   the one package by April 15th next year.  And the other bank, that is May 15th of next year.  So, even though

20   there are similar terms, it's actually, I think, for the purposes of what you want to know is all of the facilities

21   are, are being marketed as we speak.

22             MR. HOLTKAMP:    Okay.

23             MR. SAMATAS:      And it just started.

24             MR. HOLTKAMP:    Okay, I asked you about the, the threshold of 100 million dollars.  What

25   the word threshold means, do you, so it needs to be sold for 100 million dollars?

26             MR. SAMATAS:      That's what one of the lenders is looking for, yes.

1          MR. HOLTKAMP:    Okay, and the structure of the deal, is, is going to be a sale of, a sale by

2   the entities themselves of all of their assets in Going-Concern, or it is going to be a sale of your stock?

3          MR. SAMATAS:    Yeah, okay, and I, I believe it will be a sale of the assets, not my stock.

4          MR. HOLTKAMP:    Okay, and did you guarantee any of these companies debts?

5          MR. SAMATAS:    I believe, one package is guaranteed, yes.

6          MR. HOLTKAMP:    By you personally?

7          MR. SAMATAS:    And it's the bank.  I believe, it's a joint and several, my recollection is,

8   but I don't know remember if there's a limitation on that.  But I, I, I believe that only relates to five of the, or

9   four the eight are being sold, not all of them.  And, and, and they, the entity that, I think, that has that, is the

10   entity that I have listed in the Schedules, which [inaudible].

11          MR. HOLTKAMP:    Okay, but you didn't list that guarantee in your Schedules as a debt.

12          MR. SAMATAS:    No, I listed the facility.

13          MR. HOLTKAMP:    Right, but you didn't list the bank as a creditor.

14          MR. SAMATAS:    It's not a bank.  It's, it's Mid-Cap Financial which is under the heading of

15   Lombard in Bloomingdale.  That's, that's the institution.

16          MR. HOLTKAMP:    Okay, let's just move on here.  Let's just go over your, your Schedules a

17   little bit now that they have been filed.  Of, looks like you filed your Schedule A, B, which is Personal and

18   Real Properties; Schedule C, exemption; Schedule G, Executory Contracts and Leases; Schedule H, Co-

19   Debtors; Schedule I, Income; Schedule J, Expenses, and that's a Docket Number 22.  It looks like you filed

20   those on, November 2nd.  Do you recall filing those, sir?

21          MR. SAMATAS:    Yes.

22          MR. HOLTKAMP:    Okay, and it looks like on page 22 of 23, you signed and verified the

23   veracity of the statements in those, in those schedules.  Is that correct?

24          MR. SAMATAS:    Yes.

25          MR. HOLTKAMP:    And, that's your signature?

26          MR. SAMATAS:    Yes.

1           MR. HOLTKAMP:    Did you review the schedules, and, and provide the information contained

2   in those schedules before you filed them?

3           MR. SAMATAS:     Yes, to the best of my ability.

4           MR. HOLTKAMP:    Okay, is all the information contained in those schedules true and

5   correct?

6           MR. SAMATAS:     To the best of my knowledge, yes.

7           MR. HOLTKAMP:    Are there any correct, corrections, or omissions you'd like to bring to my

8   attention at this time?

9           MR. SAMATAS:     Not, not that I can recall.

10           MR. HOLTKAMP:    Okay, and did anybody, did anybody help you when completing those

11   schedules?

12           MR. SAMATAS:     No.

13           MR. HOLTKAMP:    You did those all by yourself?

14           MR. SAMATAS:     Yes.

15           MR. HOLTKAMP:    Okay, and it also looks like you filed your Statement of Financial Affairs,

16   Docket Number 20 on November 2nd, 2020.  Is that correct?

17           MR. SAMATAS:     Yes.

18           MR. HOLTKAMP:    And, it looks like you signed the last page of that.  Is that your signature

19   on there?

20           MR. SAMATAS:     Yes.

21           MR. HOLTKAMP:    Okay, and did you review the Statement of Financial Affairs and the

22   information contained in it, before you filed it?

23           MR. SAMATAS:     Yes.

24           MR. HOLTKAMP:    And, you provided the information contained in that document?

25           MR. SAMATAS:     Yes.

26           MR. HOLTKAMP:    And, do you believe that all of the information contained in the document

27   is true and correct today?

| | | |
|---|---|---|
| 1 | MR. SAMATAS: | Yes, to the best of my knowledge and ability, yes. |
| 2 | MR. HOLTKAMP: | Okay, and any errors or omissions that you would like to bring to my |
| 3 | attention, at this time? | |
| 4 | MR. SAMATAS: | Not that I am aware of. |
| 5 | MR. HOLTKAMP: | Okay, and then it also looks like on November 2nd, 2020, on the same |
| 6 | day, Docket Number 21 you filed your Chapter 11 Statement of current monthly income.  Is that correct? | |
| 7 | MR. SAMATAS: | That's correct. |
| 8 | MR. HOLTKAMP: | Okay, and you signed the second page of that document? |
| 9 | MR. SAMATAS: | Yes. |
| 10 | MR. HOLTKAMP: | And, did you review that statement before you filed it? |
| 11 | MR. SAMATAS: | Yes. |
| 12 | MR. HOLTKAMP: | And, is all of the information contained in that document true and |
| 13 | correct? | |
| 14 | MR. SAMATAS: | To the best of my knowledge, it is. |
| 15 | MR. HOLTKAMP: | Are there any omissions or corrections that you would like to bring to my |
| 16 | attention? | |
| 17 | MR. SAMATAS: | Not that I am aware of. |
| 18 | MR. HOLTKAMP: | Okay, and then, it looks, along with your petition that you filed, your 20 |
| 19 | largest creditors, Schedule D, Schedule E, F, you, you remember filing those with your petition? | |
| 20 | MR. SAMATAS: | Yes. |
| 21 | MR. HOLTKAMP: | Okay, and all the information contained in those documents is still correct |
| 22 | today? | |
| 23 | MR. SAMATAS: | To the best of my knowledge, yes. |
| 24 | MR. HOLTKAMP: | No errors, or omissions, or corrections you'd like to, to alert me to today? |
| 25 | MR. SAMATAS: | Not that I am aware of. |
| 26 | MR. HOLTKAMP: | Okay, let's just look at your, your filed Schedule A, B.  I don't know if |
| 27 | you have it front of you but I'll, I'll walk you through it, if you don't. | |

11

1          MR. SAMATAS:          I don't.

2          MR. HOLTKAMP:          Okay.  Okay.  Well, on Schedule A, B, that, that's the schedule that lists

3    all of your personal and real property.  Now, it looks like you listed two pieces of real property.  Your, your

4    house in Oak Brook, and then…

5          MR. SAMATAS:          Excuse me, Mr. Holtkamp, I am not sure if it's you or someone else but

6    there's an extremely, it's just that loud banging that I am hearing when you're talking

7          MR. HOLTKAMP:          I don't know if that's me.  Is it happening now?

8          MR. SAMATAS:          Yes.  I can, I can hear it, I don't know if you hear background noise

9    because I do.

10          SPEAKER 1:          No, I don't hear anything.

11          MR. HOLTKAMP:          I think everyone else just needs to, put their phone on mute so we don't

12    get the reverberation, and maybe that will help.

13          MR. SAMATAS:          Okay, thank you very much.

14          MR. HOLTKAMP:          Okay, so on Schedule A, B it looks like you, scheduled, your two pieces

15    of real estate, the Oak Brook Property and the California property, right?

16          MR. SAMATAS:          Correct.

17          MR. HOLTKAMP:          Alright, and you don't own any other real estate?

18          MR. SAMATAS:          I do not own any other real estate in my name, or in my revocable trust

19    alone.

20          MR. HOLTKAMP:          Is there other real estate that you own that's not in your name…

21          MR. SAMATAS:          [inaudible].

22          MR. HOLTKAMP:          …that's in somebody else's name?

23          MR. SAMATAS:          You know, sometimes being an attorney, is good and sometimes it's not.

24    If, if you want my objective comments about filling out forms, with all of us on the phone, with professional

25    form-fillers . . .  You can interpret, you know, as I went through the forms you can interpret it any way you

26    want, you may criticize me for what, for what I submitted but when, when I am asked a question about real

27    estate, those are the two properties that I own real estate in.  Now, if you ask me why I own other real estate, I

12

1    do but it's in a different section where it's in business interest.  So, again, I'm not trying to be cute.  I am just

2    trying to share with you that you may not be aware of it, because you do this every day in your life, but I'm

3    looking at this form, and, and I'm interpreting it to say, you asked me for real estate, real estate, and then later

4    on, on another form, do you have any interest in real estate, and in businesses?  And that's, I, I, it's just the

5    form as I interpreted the questions that were being posed.  So, please bear with me on…

6              MR. HOLTKAMP:          Okay.

7              MR. SAMATAS:          …I'm, I'm not, trying to be slighted.  So, go ahead and ask the question.

8              MR. HOLTKAMP:          Okay, now you said you owned real estate.  Is other real estate through,

9    through an entity?  Is that what you're saying?

10              MR. SAMATAS:          Yes, through business entities.

11              MR. HOLTKAMP:          Oh, so the business entities you have an interest in real estate?

12              MR. SAMATAS:          I'm, I'm sorry there was some banging there, I didn't quite hear the

13    question.

14              MR. HOLTKAMP:          Okay, so some of the business entities that you have an interest in, own

15    real estate?

16              MR. SAMATAS:          Correct.

17              MR. HOLTKAMP:          Okay, so you, these, these two properties are the only piece of real estate

18    you, or your trusts, own?

19              MR. SAMATAS:          Correct.

20              MR. HOLTKAMP:          Okay.

21              MR. SAMATAS:          Now, we are talking about my trusts, we're talking about my revocable

22    trust.

23              MR. HOLTKAMP:          Revocable or discretionary, I'm not talking about what companies own

24    though.

25              MR. SAMATAS:          My response is, these are the two properties that my Revocable Trust

26    own.

27              MR. HOLTKAMP:          Okay, what property does your Discretionary Trust own?

1        MR. SAMATAS:        Okay, I, I need, I'm, I'm, what I'm going to cite it, if I need to file a

2    motion, okay?  Pursuant to 11 U.S.C. § 541(c)(2), I have a Discretionary Trust, and the Discretionary Trust

3    has a spendthrift clause in it, spendthrift clauses are, are valid in the state of Illinois, and therefore, according

4    to my interpretation, not my interpretation.  It says the interest of the debtor becomes property of the state,

5    unless the property is subject to a restriction, that restricts transfer of the property by the grantors or the

6    debtors entrusted, or under applicable nonbankruptcy law.  Which is, essentially, if there's a Spendthrift Trust,

7    which I gave you a copy of the trust, there's a spendthrift clause in there, it is valid under Illinois law, and

8    according 11 U.S.C. § 541(c)(2), it's not part of the estate, the bankruptcy estate.

9        MR. HOLTKAMP:        Okay.

10        MR. SAMATAS:        And, if I had to file a motion for that, I will.

11        MR. HOLTKAMP:        That's fine, I'm, I'm…

12        MR. SAMATAS:        That's the code.

13        MR. HOLTKAMP:        I'm not fighting with you about whether or not these pieces of real estate

14    are property of your estate or not, I'm asking you what's in the Trust?

15        MR. SAMATAS:        I'm saying…

16        MR. HOLTKAMP:        And you're saying you're not going to tell me what's in the Trust?

17        MR. SAMATAS:        Which Trust?

18        MR. HOLTKAMP:        The Discretionary Trust?

19        MR. SAMATAS:        I'm saying that if I have to, I'll file a motion to object, because it's not to

20    be considered part of the bankruptcy estate.  Under that section I quoted.

21        MR. HOLTKAMP:        Is there real estate in the Discretionary Trust?

22        MR. SAMATAS:        Yes.

23        MR. HOLTKAMP:        Does the Discretionary Trust, does it own an interest in a company, that

24    then owns the real estate, or does the Discretionary Trust directly own the real estate?

25        MR. SAMATAS:        No.  They're all through companies.

14

1          MR. HOLTKAMP:    Okay.  Let's just skip to, while we're on the topic here, now I will ask

2   you on Schedule AB, do you own or have any legal or equitable interest in any of the following items, in

3   question number 25 ask "Trust", do you have a legal or equitable interest in any Trust?

4          MR. SAMATAS:    I forgot how I answered that.

5          MR. HOLTKAMP:    You answered it no.

6          MR. SAMATAS:    When did I say that I put this?

7          MR. HOLTKAMP:    You said no, you didn't list your Discretionary Trust or Revocable Trust.

8   It's not anywhere in any of these documents.

9          MR. SAMATAS:    I made an error, I should have put the Revocable Trust.

10          MR. HOLTKAMP:    But not the Discretionary Trust?  You shouldn't have put your interest in

11   the Discretionary Trust there?  This isn't talking about what interest is in the…

12          MR. SAMATAS:    I have a beneficial interest.  I'd have to ask my estate attorney if they can

13   figure out an apical interest, I know it's not illegal.

14          MR. HOLTKAMP:    Do you have any type of interest at all in a Trust?  You do in the

15   Revocable Trust.

16          MR. SAMATAS:    Yes.

17          MR. HOLTKAMP:    Yes.  Do you have any type of interest in the Discretionary Trust, are you

18   a beneficiary, are you a trustee, are you anything in that?

19          MR. SAMATAS:    Yes, yes, yes, the answer is yes.

20          MR. HOLTKAMP:    So why won't either of those Trusts listed here?

21          MR. SAMATAS:    I probably just simply was thinking about the Discretionary not the

22   Revocable, because the Revocable is part of my personal estate, it's just an error in my interpretation of the

23   question.

24          MR. HOLTKAMP:    But you still don't believe you should have to list the Discretionary Trust

25   there?

15

1        MR. SAMATAS:     Well I guess it's just a matter of interpretation, I can see where, well,

2    again, if you follow what's being asked, at the time it's being asked, in the form it's being asked, there is a

3    certain amount of latitude in the way these bankruptcy forms are prepared

4        MR. HOLTKAMP:    Well let me ask you this, do you see the length and specificity, and how

5    detailed these things are.  Don't you think that they want to get every interest and encompass every single

6    thing that you could possibly put down, they want you to put it down?  They want to know the entire world of

7    all of your interests.  Not play games.  Don't you think that, if you looked at these forms all together, that's

8    what you would get out of it?

9        MR. SAMATAS:     I don't, I don't, conceptually, I understand the point and I accept it and I

10   apologize if my interpretation of that came out the way it did.  Can I call back in, because there an immense

11   amount of banging out here?

12       MR. HOLTKAMP:    Yeah, go ahead, if you want to, I'll hang on, and you can call back in,

13   maybe try a different phone or something.  I don't know.  Okay.

14       MR. SAMATAS:     I'm isolated in a room, so I know it's not coming from me, but anyway I

15   promise I'm going to hang up and call right back in.  Okay.

16       MR. HOLTKAMP:    Okay.

17       MR. SAMATAS:     Thank you.  Thank you.

18       MR. HOLTKAMP:    Yeah.  I'm hearing banging from somebody so if you could all just put

19   your phones on mute, that would be great.  I don't know where that's coming from.  Hey, there we go it

20   stopped.  Maybe it was him.

21       MR. SAMATAS:     Hello.

22       MR. HOLTKAMP:    Jim are you back?

23       MR. SAMATAS:     I'm back.

24       MR. HOLTKAMP:    Yeah, I think it was somebody else.

25       MR. SAMATAS:     I redialed back in.  I'm here.

26       MR. HOLTKAMP:    Yeah, I'm saying I think the sounds were from somebody else, who

27   didn't have their phone on mute.

1    MR. SAMATAS:    Oh, there's no doubt on my mind, that it was horrible screeching and

2    banging.

3    MR. HOLTKAMP:    I heard it; it's just that it wasn't all that bad, so let's just move on.

4    MR. SAMATAS:    Okay.

5    MR. HOLTKAMP:    Okay, let's just go through your Schedules here a little bit, hopefully we

6    can move a little bit more quickly.

7    MR. SAMATAS:    Okay.

8    MR. HOLTKAMP:    You only own two vehicles, right?

9    MR. SAMATAS:    Correct.

10    MR. HOLTKAMP:    Okay, do you have any other vehicles that aren't listed here made

11    available to you?  Do you have possession of any other vehicles?

12    MR. SAMATAS:    I thought I listed three, there should be a Lexus, an HHR, and a Jeep

13    Wrangler.

14    MR. HOLTKAMP:    There is an HHR and Jeep Wrangler, and that's it.

15    MR. SAMATAS:    I'm sorry.  I technically own the car my daughter drives in Los Angeles

16    which is a 2009 Lexus R350, it's probably worth about $10,000.  My apologies, I forgot she had the car and

17    it's in my name.

18    MR. HOLTKAMP:    Okay, now all of these mistakes we're pointing out here, you're going to

19    need to amend your Schedules to add them.  I'm not keeping a list; you should probably keep a list, okay, so

20    you'll have to file these documents again.

21    MR. SAMATAS:    Okay.

22    MR. HOLTKAMP:    And make those corrections, okay.

23    MR. SAMATAS:    Okay, I hear you.  Do I have to literally go downtown and file them again

24    or can I, is there another way for me to do that.  Since I'm not a practicing attorney I can't use the electronic

25    filing.

26    MR. HOLTKAMP:    I don't know if you have to file them or you can mail them in to the

27    clerk's office, I just don't know.

17

1          MR. SAMATAS:          Okay.

2          MR. HOLTKAMP:          I'm not saying you can or you can't, I don't know, but if you're not an

3    attorney with CM/ECF then I got to get them to the clerk's office the way other people get them to the clerk's

4    office.  I don't know what the way to do that is.  Okay?

5          MR. SAMATAS:          Okay.

6          MR. HOLTKAMP:          But you're going to have to fix these.

7          MR. SAMATAS:          Okay.  Hello.

8          MR. HOLTKAMP:          Yeah, I'm here.  I'm just looking through.

9          MR. SAMATAS:          Oh.

10          MR. HOLTKAMP:          Okay, and this parcel of real estate that you have in California, we've

11    talked a lot about this, but you're currently trying to sell that, right?

12          MR. SAMATAS:          Correct.

13          MR. HOLTKAMP:          And do you have a broker?

14          MR. SAMATAS:          I'm actually dealing with five brokers and two developers.

15          MR. HOLTKAMP:          Okay, do you have contracts with any of them?

16          MR. SAMATAS:          No.

17          MR. HOLTKAMP:          No, how do you know how…

18          MR. SAMATAS:          I, well, um, uh, it's a very popular part of what they call the Bird Streets,

19    the Hollywood Hills, and first of all when I did list it, it was with one of the top brokers in L.A. who was

20    worthless, and then COVID hit 10 days after.  I was totally unhappy with the way they marketed the house

21    and what they did.  That listing expired the end of August prior to my filing for bankruptcy.  Now at that point

22    there had been a number of people, over 50, that had visited the house as the market was sliding because of

23    COVID, so of course people were, a lot of brokers were aware that the house was on the market, plus you can

24    see it on Redfin, and, so people cold called me, brokers that had clients, so I've had continuous showings

25    since I file bankruptcy I've had several that had numerous ones, but they're all bottom feeders right now, and

26    I would take a bottom feeder, but it's just out of how many deal with the debtors.  The creditors I owe, so I

27    don't think I'm losing much, because of the holidays and lack of travel, and normally this time of the year

18

1   L.A. gets a lot of travel time from people all over, because of the weather.  I would, I have two or three

2   particular brokers that I would probably list it for a very short period of time, but the activity is still there,

3   simply because it was out in the market, and it's a kind of location in the Bird Streets of L.A. that people are

4   pretty familiar with it.

5          MR. HOLTKAMP:   Okay, and if you get a contract?

6          MR. SAMATAS:   I'm not just sitting there.

7          MR. HOLTKAMP:   And if you get a…

8          MR. SAMATAS:   I'm sorry.

9          MR. HOLTKAMP:   And if you get a contract, you get that under a, okay so if….

10          MR. SAMATAS:   A contract in Los Angeles they have what they call escrow periods, and I

11   will put a contingency of course, it's an absolute necessity that escrow requires court approval, and every

12   broker knows that, that I've talked to.

13          MR. HOLTKAMP:   Okay, here on the question number eight, it looks like you answered on

14   jewelry you have watches, and I think we talked about this a little last time.  It looks like you list these, is it

15   more than one or just one watch valued at $25,000.

16          MR. SAMATAS:   No, no, no, I believe my recollection I said there are six watches worth

17   about $25,000 that were unique watches.  I also have a bunch of, what you would call, vintage Hamiltons and

18   stuff like that is probably worth $3-5,000, that's it.

19          MR. HOLTKAMP:   Okay, and who's in possession of those watches?

20          MR. SAMATAS:   I am.

21          MR. HOLTKAMP:   Okay, you're not trying to sale those on consignment or anything?

22          MR. SAMATAS:   I'm not that well versed on eBay to do that kind of stuff.  I did have the

23   watches out for over two years, and I just retrieved them about two or three months ago with a reputable

24   dealer, who took them to various shows around the country, just to get peoples' interest.  People use their

25   iPhone today, they're not as interested in unique watches

26          MR. HOLTKAMP:   Okay.

27          MR. SAMATAS:   The market is dried up.

1          MR. HOLTKAMP:     It looks like you have $200,000 worth of paper weights, artwork under

2     the collectables section, is that right?

3          MR. SAMATAS:     Correct.

4          MR. HOLTKAMP:     Okay, and who has possession of that stuff?

5          MR. SAMATAS:     I do.

6          MR. HOLTKAMP:     You've not tried to sell that on consignment?

7          MR. SAMATAS:     Yeah, of course I've tried, and uh, at the moment, I reviewed selling them

8     all, double checked with Sotheby's a year ago, the market again, millennials have a different sense of what

9     they like and don't like, so antiques and vintage material have been slow a period of time.  I did see if I could

10    liquidate it, very disappointing, so then I have one off, one here and there to gain some money, which it what

11    I'm still doing.

12         MR. HOLTKAMP:     Have you sold any of these, have you sold any of these during the

13    bankruptcy case?

14         MR. SAMATAS:     No.

15         MR. HOLTKAMP:     Nothing during the case.

16         MR. SAMATAS:     Not yet.

17         MR. HOLTKAMP:     Are you trying to sell them?  Do you have a contract with anybody to

18    help you try to sale any of this stuff?

19         MR. SAMATAS:     No, these are antique dealers, one of them is, probably the biggest one is

20    in Chicago, across the street from the Art Institute, it's known as LH Selman, that's just a person I know.  He

21    knows other interested collectors, and he's got a whole copy of what I have, and I'll say, "Can you raise $20,

22    $25, $30,000?" or something, and he picks one and he tries to connect with people he knows.

23         MR. HOLTKAMP:     Okay.

24         MR. SAMATAS:     That's the quickest way in the marketplace today.

25         MR. HOLTKAMP:     Okay, when was the last time you sold one of those collectables?

26         MR. SAMATAS:     A paperweight with him?

20

| | | |
|---|---|---|
| 1 | MR. HOLTKAMP: | Not just a paperweight, any type of these collectables, that you listed |
| 2 | here, paperweights, artwork, other collectables. | |
| 3 | MR. SAMATAS: | That's it. |
| 4 | MR. HOLTKAMP: | Okay, so when was the last time you sold one of those? |
| 5 | MR. SAMATAS: | Four or five months ago. |
| 6 | MR. HOLTKAMP: | Okay, and what was that? |
| 7 | MR. SAMATAS: | Paperweight. |
| 8 | MR. HOLTKAMP: | Just one? |
| 9 | MR. SAMATAS: | One and I think I sold one watch for about $4,000 that left me from seven |
| 10 | to six which is what I listed for 25. | |
| 11 | MR. HOLTKAMP: | Okay. |
| 12 | MR. SAMATAS: | Those were the last two sales preceding bankruptcy. |
| 13 | MR. HOLTKAMP: | Okay, so you sold a watch for $4,000, when was that? |
| 14 | MR. SAMATAS: | June. |
| 15 | MR. HOLTKAMP: | June of this year? |
| 16 | MR. SAMATAS: | Probably the same time with the paperweight, June, July of 2020. |
| 17 | MR. HOLTKAMP: | Okay, and then you sold a paperweight for how much? |
| 18 | MR. SAMATAS: | Like $30,000.  Pretty unique paperweight. |
| 19 | MR. HOLTKAMP: | Okay, and here it lists, on question number 17, we're talking about |
| 20 | deposits of money checking, savings, financial accounts, and you listed a Bank of America account, a | |
| 21 | Citibank account, and a West Suburban Bank account, does that sound right? | |
| 22 | MR. SAMATAS: | Correct. |
| 23 | MR. HOLTKAMP: | Do you have or does your trust, either of your Trusts have any interest in |
| 24 | any bank accounts other than those three? | |
| 25 | MR. SAMATAS: | Which Trust? |
| 26 | MR. HOLTKAMP: | Either of them. |
| 27 | MR. SAMATAS: | My Revocable Trust?  No.  No. |

21

1    MR. HOLTKAMP: Neither of them have their own bank accounts?

2    MR. SAMATAS: No, I believe I answered this before, but I am more than happy to answer

3 this again.  I essentially have used Bank of America since of 1996.  I have my James Samatas Revocable

4 Trust, which is my main one.  And then, for years, I do internet banking, so of course, I have separate

5 accounts for the house on Natoma, and the house on Tanager Way in Los Angeles.  I also have one for my son

6 and daughter.  And money would go into my Revocable and I would just transfer the money to pay my bills

7 and to give them some money.

8    MR. HOLTKAMP: So that's, and that is all through Bank of America?  Or those are those

9 three accounts?

10    MR. SAMATAS: Yes, no, no.  That's all through Bank of America.  The one at West

11 Suburban Bank and the one at CitiBank are just simple checking accounts.

12    MR. HOLTKAMP: So, you have more than one bank account at Bank of America?

13    MR. SAMATAS: Yes.

14    MR. HOLTKAMP: Okay.

15    MR. SAMATAS: And I just explained to you.  They are just internet banking, so I pay

16 [inaudible], it goes to my Natoma expense account.  That way I can tell how much money I am paying per

17 property.

18    MR. HOLTKAMP: Okay, so how many bank accounts, separate bank accounts do you have

19 at Bank of America?

20    MR. SAMATAS: Well, I'd say, I have one for my son, on for my daughter, two, one for

21 me, three, four, I have a housekeeper with a debit card, five, six or seven.  Eight, including the Debtor in

22 Possession account.

23    MR. HOLTKAMP: Okay, so what are you using the Debtor in Possession account for?

24    MR. SAMATAS: I haven't used it for anything yet, because I haven't had any income.  I

25 haven't paid any bills, other than, I had to pay my insurance company, Chubb, I mean AIG.

26    MR. HOLTKAMP: Okay, but you haven't transferred all of your other deposits into that

27 account so you could operate out of it exclusively?

1          MR. SAMATAS:    There's no money in them. I'm trying to sell a paperweight because I

2  have no money.

3          MR. HOLTKAMP:    Here it says that the Bank of America has $20,000 in it.

4          MR. SAMATAS:    Right now, it's down to four.

5          MR. HOLTKAMP:    And when it says Bank of America, is that an aggregate of all of your

6  Bank of America accounts? Or just one or two? Or?

7          MR. SAMATAS:    In my Bank of America Revocable Trust is about four. Collectively if

8  you add what's left in the rest of them, it's probably another thousand. So, you can say collectively it's about

9  $5,000.

10         MR. HOLTKAMP:    Okay, here on question 17, when it asks about deposits of money. It says,

11  "If you have multiple accounts with the same institution, list each." And you didn't do that did you?

12         MR. SAMATAS:    No. I guess I didn't.

13         MR. HOLTKAMP:    Okay, now CitiBank. Do you have multiple banks there?

14         MR. SAMATAS:    No.

15         MR. HOLTKAMP:    Just one?

16         MR. SAMATAS:    Yes.

17         MR. HOLTKAMP:    Now West Suburban Bank?

18         MR. SAMATAS:    Just one.

19         MR. HOLTKAMP:    Just one. And that's listed as "Other financial account." That is not a

20  savings or checking account.

21         MR. SAMATAS:    It didn't have enough forms, I just put it there. I think, it's probably got

22  like ten dollars in it. The other one probably has $200 dollars in it. I don't really use them. I really only

23  used, always used the Bank of America and the six or seven accounts to be able to, you know it's kind of like

24  an internal Quicken. You just open up an account, you pay your bills from this and you know what you are

25  paying and what you are doing.

26         MR. HOLTKAMP:    Okay. And then here on 19, it asks you about your interests in non-

27  publicly traded companies. And you listed Lexington Health Care Center of Lombard, Samball of

1    Bloomingdale and Omni Partners.  Now, I couldn't find Omni Partners.  Where is that incorporated?  Or

2    where is that partnership at?

3                    MR. SAMATAS:       It's not, it's what you would call an old general partnership, starting in

4    1986.

5                    MR. HOLTKAMP:     Okay

6                    MR. SAMATAS:       General Partners are my mother, successor to my father; my brother John;

7    and me.  That's owned personally.  It's a strip center in Lombard Illinois.  Built in 1987.

8                    MR. HOLTKAMP:     And who are the general partners?

9                    MR. SAMATAS:       My brother, John Samatas, one third, and my mother.

10                   MR. HOLTKAMP:     And what's her name?

11                   MR. SAMATAS:       Andigoni.

12                   MR. HOLTKAMP:     Samatas?

13                   MR. SAMATAS:       Yes.

14                   MR. HOLTKAMP:     Okay.  And then Lexington Health Care Center of Lombard, it says you

15   own 3,300 percent of that.  That's supposed to be 33% I take it?

16                   MR. SAMATAS:       You got it.

17                   MR. HOLTKAMP:     Okay.  And all of these where they say 3,300, that should be 33% right?

18                   MR. SAMATAS:       Correct.

19                   MR. HOLTKAMP:     Okay.  And the Lexington Health Care Center of Lombard, it says the

20   value of the portion you own is 3.3 million dollars, so that entire company's worth 10 million dollars?

21                   MR. SAMATAS:       Yes.

22                   MR. HOLTKAMP:     Okay and Sambell of Bloomingdale that says 2.5 million dollars, so the

23   entire company is worth 7.5 million?

24                   MR. SAMATAS:       The interest in the real estate, yes, to answer a simple question, yes.

25                   MR. HOLTKAMP:     Is that the value after the creditors of the company are paid or just the

26   total gross value?

27                   MR. SAMATAS:       No that's the net.

1       MR. HOLTKAMP:      Okay.  And those are just the companies that you own, you personally

2   own an interest in right?

3       MR. SAMATAS:      Correct.

4       MR. HOLTKAMP:      But they're also companies that your Discretionary Trust owns an interest

5   in, right?

6       MR. SAMATAS:      Let me explain to you real simple.  The Lombard facility and the real

7   estate of Bloomingdale preceded the family's estate planning that took place in 1988.  And so, anything after

8   that was done through the Discretionary Trust or a Grantor's Trust.  So those, that's, we kept a couple

9   intentionally in the estate planning in our names personally.  My brother and I did that, and my father.  So

10  that's why you're only seeing two of them, because that's all there is.

11      MR. HOLTKAMP:      But there are other Lexington and Samball entities that are owned by

12  your Discretionary Trust, right?

13      MR. SAMATAS:      Correct.

14      MR. HOLTKAMP:      Okay.  And you didn't think it was appropriate to list those here?

15      MR. SAMATAS:      For the reasons I've already stated, yes.

16      MR. HOLTKAMP:      Because you don't think that property is property of the estate?

17      MR. SAMATAS:      I don't, I don't believe according to my interpretation of bankruptcy code

18  that the Discretionary Trust assets are subject to a bankruptcy estate.  According to the spendthrift provision

19  and according to the bankruptcy code which I cited, that the, any of the assets of the Discretionary Trust are

20  not subject to the bankruptcy estate, it's, should be limited to my Revocable Trust and the individual, so I

21  didn't list it.

22      MR. HOLTKAMP:      Okay.  Well that's your interpretation, but my interpretation is, whether

23  or not it is property of the estate and whether it could be liquidated or it got, got after by one of your creditors,

24  it's different than I believe, what needs to be listed.  I think I've already told you, that these things are

25  supposed be everything.

26      MR. SAMATAS:      Oh, you told me but would you like to share a citation so I could

27  understand what you're coming from…

1    MR. HOLTKAMP:    This asks for, this asks for all legal and equitable interests and properties.

2   So I think you have an equitable interest in it.  We're trying to just disclose everything here.  This isn't an

3   argument about, right now, about whether or not something can be liquidated to pay creditors.  I think the

4   intent of all these forms is to get the entire universe of all your stuff, and not listing it doesn't help that.  So

5   it's my belief that you have to amend your schedules and add all those and if you think it's not really property

6   of the estate you could put that in there but I think it should be disclosed.

7    MR. SAMATAS:    Well, maybe we talk to the judge about that on Monday.

8    MR. HOLTKAMP:    We could talk to him about whatever you want.  Let's just move on then.

9   You don't have any retirement or pension accounts?

10    MR. SAMATAS:    Nope.

11    MR. HOLTKAMP:    Annuities?

12    MR. SAMATAS:    No.

13    MR. HOLTKAMP:    Interest in insurance policies?

14    MR. SAMATAS:    Nope.

15    MR. HOLTKAMP:    Any accounts receivable?  Anybody owe you money?

16    MR. SAMATAS:    I'm sorry, anybody owe me money?

17    MR. HOLTKAMP:    Accounts receivable.

18    MR. SAMATAS:    No.

19    MR. HOLTKAMP:    Okay.  Okay, if we just flip over to Schedule C here, which is property

20   you claim as exempt.  You claim nothing as exempt.

21    MR. SAMATAS:    Alright.

22    MR. HOLTKAMP:    You don't want to claim anything as exempt?

23    MR. SAMATAS:    At the moment I'd completed the form I didn't anticipate I'd need to.

24    MR. HOLTKAMP:    Okay now Schedule G, executory contracts and unexpired leases, you

25   don't have any contracts that aren't completed yet?

26    MR. SAMATAS:    No.

1       MR. HOLTKAMP:     You don't have any contracts with any attorneys that are still doing work

2   for you?

3       MR. SAMATAS:     Well I guess to that answer yeah, two of them are secured creditors.  I

4   didn't even think of the interpretation of that being a contract that should be listed, but yeah there are three

5   firms that I'm under, I'm technically under contract with, for legal services.  And they're all, they're all

6   secured creditors.  They're not on the phone.

7       MR. HOLTKAMP:     Okay, and are there any other service contracts where it hasn't been

8   completed on both sides?

9       MR. SAMATAS:     Are there?  No, there aren't any.

10      MR. HOLTKAMP:     No broker contracts, no leases, no…

11      MR. SAMATAS:     No.

12      MR. HOLTKAMP:     No consignment contracts?

13      MR. SAMATAS:     No.

14      MR. HOLTKAMP:     Okay let's move on to your Schedule 8 which is codebtors, you list you

15  don't have any codebtors, is that right?  Do you know what a codebtor is?

16      MR. SAMATAS:     Yes I do know what a codebtor is.  Technically the attorney representing,

17  which I didn't know before, Bank of America, could you have that attorney cite again if she's representing

18  both JP Morgan and Bank of America?  'Cause then I'll respond to the question?  Okay.  So if that's correct,

19  preceding my divorce from my wife several years ago, the loan with Bank of America has her as a codebtor.

20  However, I had them provide in the divorce decree an indemnification for that debt.  I assumed the debt, now

21  of course Bank of America doesn't give two hoots about that, but technically because of my obligations under

22  the divorce decree I am the sole debtor so to speak…

23      MR. HOLTKAMP:     Well not…

24      MR. SAMATAS:     …so I didn't listen to my wife for that reason.

25      MR. HOLTKAMP:     Okay, that probably needs to be listed there.  You don't have any other

26  codebtors?  Have you guaranteed any debt of the companies?

1    MR. SAMATAS:    Yeah, you've already asked me that, I've already referenced it.  I did with

2    this company called Mid-Cap Financial, and Lombard and Samball of Bloomingdale.

3    MR. HOLTKAMP:    Okay, then why aren't they codebtors with you on those debts?

4    MR. SAMATAS:    You mean my brother and sister?

5    MR. HOLTKAMP:    Your brother and sister, or the company, it's whatever debts you

6    guaranteed.

7    MR. SAMATAS:    Misinterpretation on my part.

8    MR. HOLTKAMP:    Okay, did you guarantee or co-sign on any other debts?

9    MR. SAMATAS:    I actually, well, hold on a minute because I'm trying to think why I wrote

10   the way I wrote it.  The real debtor is, it's a legal entity that's the debtor.  I'm not, they're not, I'm not a

11   debtor, I'm a guarantor.  So the real technical debtor is the Sub-S Corporation and the limited partnership.

12   That's the debtor, that's the borrower on these loans.

13   MR. HOLTKAMP:    Yes, but there…

14   MR. SAMATAS:    Now, when it comes to Bank of America and my home, I personally

15   borrowed the money.  So I, in my interpretation of that language, the reason why I didn't include it, because

16   there are no codebtors, the debtor is the Sub-S Corporation and the limited partnership, that's the debtor.

17   MR. HOLTKAMP:    Okay, well, I think we've gone over this, the point of the forms is to get

18   the whole universe of all your stuff, I mean it is intended to get everything, okay?  And a debt in bankruptcy is

19   defined in the code.  And I think a guarantee on a debt would make you a codebtor, so I think when in doubt,

20   the best thing to do is disclose, but you'll do what you want, but I have your explanation.  Did you co-sign or

21   guarantee any other debt?

22   MR. SAMATAS:    Not that I'm aware of.

23   MR. HOLTKAMP:    Now, Schedule I, you list no income whatsoever.  Is that right?

24   MR. SAMATAS:    That's correct.  And now, again, you're getting into, on my tax returns I

25   received, apparently received income.  Did you ask me, did I receive the money from that income, the answer

26   is no.  So I don't have any, you know, which way do you want me to answer your question?  Did I receive

28

1    income?  According to my tax statements and my tax attorney, yes.  Did I receive the money because of part

2    of the litigation with my brother and sister?  The answer is no, I couldn't even pay my taxes.

3                    MR. HOLTKAMP:    Well, let's just go through this.

4                    MR. SAMATAS:    I'm sorry to make it…

5                    MR. HOLTKAMP:    Let's just, let's just go through it.

6                    MR. SAMATAS:    Well, you're trying to get every little nook and cranny but I'm trying to

7    explain to you, sometimes these, what you think is simple to answer, is not so simple to answer.

8                    MR. HOLTKAMP:    I got it.  So do you have any wages, salary, or commissions?

9                    MR. SAMATAS:    No.

10                   MR. HOLTKAMP:    Okay, do you have any income from rental property or operations of a

11   business, profession or farm?

12                   MR. SAMATAS:    Technically, as I just explained, on the tax return, yes.  But I don't have

13   the money so…

14                   MR. HOLTKAMP:    Where did the money go?

15                   MR. SAMATAS:    That's the, the big issue that I'm in litigation with my brother and sister

16   about distributions, self-dealing, you know, it's a massive multi-million dollar action and you got two of the

17   attorneys on the phone or they got off the phone.  I haven't seen any income from my business for over three

18   years, yet I have to pay taxes with money I don't get.  You don't want to get into that nightmare of my life.

19                   MR. HOLTKAMP:    Okay, do you get any pension or retirement income?

20                   MR. SAMATAS:    No.

21                   MR. HOLTKAMP:    Interest or dividends?

22                   MR. SAMATAS:    No.

23                   MR. HOLTKAMP:    Social Security?

24                   MR. SAMATAS:    No.

25                   MR. HOLTKAMP:    Any other government aid or assistance?

26                   MR. SAMATAS:    Nope.

1              MR. HOLTKAMP:    Okay, and it looks like here, that you list a total on Schedule J of 50, over

2  $56,000 in monthly expenses.  Is that right?

3              MR. SAMATAS:    Yes, approximately.

4              MR. HOLTKAMP:    Okay, and you pay $15,000 a month on rental or home ownership

5  expense for your residence.  Is that right?

6              MR. SAMATAS:    I'm sorry, go a little slower on the question.  I pay $15,000 on…

7              MR. HOLTKAMP:    So you…

8              MR. SAMATAS:    Yeah, okay.  Yes, so what that is, is paying JP Morgan, paying Bank of

9  America, and the real estate taxes on both properties.  It'd be about $15,000.

10             MR. HOLTKAMP:    Per month?

11             MR. SAMATAS:    Yes.

12             MR. HOLTKAMP:    Okay, so when was the last time you made that payment, those

13  payments?

14             MR. SAMATAS:    I recall you've asked me that question before and I believe the answer is,

15  I'm more happy to respond again, somewhere early part of 2020 I made some payments to Bank of America, I

16  made some payments to JPMorgan.  That was the last time.

17             MR. HOLTKAMP:    Okay, and in the last, in 2019, how much did you pay on those

18  mortgages?

19             MR. SAMATAS:    I honestly don't recall.

20             MR. HOLTKAMP:    Were you making current payments on those mortgages in 2019?

21             MR. SAMATAS:    No, I wasn't, probably with JP, I think with both of them I was in default

22  for a period of months and then kind of worked something out and I paid some money I think to both of them

23  at least twice through '19 and early part of '20.  But since then, almost this entire year I haven't paid them

24  anything.

25             MR. HOLTKAMP:    Okay, and you list your, here on payments for alimony, maintenance, or

26  support, $20,000 a month.  Is that to your ex-wife?

27             MR. SAMATAS:    Correct.

1          MR. HOLTKAMP:     Is that court ordered?

2          MR. SAMATAS:       No, we entered into a lump sum settlement in lieu of maintenance so she

3    filed the trust deed and pushed a trust sale three times.  She wouldn't deal with me on a reasonable basis.  I

4    reduced it from $1.7 to $1.4 and that's why I ran out of funds, and under that agreement I'm supposed to pay

5    her, she has a lien on there of course, secured as trust deed, $20,000 a month until I believe July of the year

6    2022.  Though right now, I believe I am nine months in arrears, 10 months, coming up with December.

7          MR. HOLTKAMP:     Okay, so the agreement was she had…

8          MR. SAMATAS:       [inaudible] attorney.

9          MR. HOLTKAMP:     So the agreement was she had a lump sum and a lien on the California

10   residence, and you had to pay her $20,000 a month?

11         MR. SAMATAS:       No, no, no.  In lieu of normal maintenance, she agreed to take a lump

12   sum of $1.7, payable over a four-year period with no interest.

13         MR. HOLTKAMP:     Okay, so that equates to about $20,000 a month?

14         MR. SAMATAS:       Correct.

15         MR. HOLTKAMP:     Okay, and that was an agreed settlement, you agreed to that?

16         MR. SAMATAS:       That is correct.

17         MR. HOLTKAMP:     Is there a court order effectuating that, that settlement agreement?

18         MR. SAMATAS:       Yes, it's part of the divorce decree.

19         MR. HOLTKAMP:     Okay, when was that entered?

20         MR. SAMATAS:       Somewhere at the end of June of 2018.  Either June or July, I don't

21   remember.  It's not a day I want to remember.

22         MR. HOLTKAMP:     Okay, and did you think you had the income or cashflow available to pay

23   $20,000 a month?

24         MR. SAMATAS:       Yes.

25         MR. HOLTKAMP:     In June of 2018 you were making $20,000 a month or more?

26         MR. SAMATAS:       Yes.

27         MR. HOLTKAMP:     And where was that money coming from?

1    MR. SAMATAS:    Or I had sources, I don't remember how, but yes.

2    MR. HOLTKAMP:    Okay, and where was that money…

3    MR. SAMATAS:    I mean, I wouldn't enter an agreement if I didn't think I could make it.  I

4    mean, hello?

5    MR. HOLTKAMP:    Okay.  So you were making at least $20,000 a month back in 20, June of

6    2018?

7    MR. SAMATAS:    Well, let's just say I had sufficient assets to be able to make her payment,

8    that's a better way of putting it.  You're asking me if I was making income, as in contradiction to my claim

9    about what was being done in my business, which was my main source of income.

10    MR. HOLTKAMP:    Mm-hmm, so how did you think you were going to make this $20,000 in

11    monthly payments?

12    MR. SAMATAS:    I had other assets at the time.

13    MR. HOLTKAMP:    So you were going to sell assets?

14    MR. SAMATAS:    As far as the settlement.  I'm sorry?

15    MR. HOLTKAMP:    So you were going to sell assets to pay this?

16    MR. SAMATAS:    I had liquidity at a point that I could make it and I knew there was other

17    assets that were going to be sold or other income that would come separate and apart from the businesses, yes.

18    MR. HOLTKAMP:    Okay, back in June of 2018, when you entered into this settlement, where

19    were you receiving funds from?

20    MR. SAMATAS:    Can I ask you, what's the relevancy of that question?  I mean, we're now,

21    now we're getting into the domestic relations issues and the negotiated terms and conditions.  I believe one of

22    the forms asked me if I had absconded with the funds over a period of a year or two, avert any liability to

23    creditors.  Is that where you're going with this?  Because, you know, I mean, what do you want to know?

24    You want to spend another four hours, and I'm not trying to be rude, but you want to get into the nitty-gritty

25    of my wife and the fact that you want to take her deposition of me and the fact that she's been hospitalized

26    five times, she's crazier than a Looney Tune.

27    MR. HOLTKAMP:    Well, let's…

32

1           MR. SAMATAS:     Where do you want to go with this?

2           MR. HOLTKAMP:     I want to know where the money was coming from in June of 2018.

3           MR. SAMATAS:     I don't remember.

4           MR. HOLTKAMP:     But you had money coming in?

5           MR. SAMATAS:     I had money…

6           MR. HOLTKAMP:     You already had money?

7           MR. SAMATAS:     Hello, I sold a piece of property.

8           MR. HOLTKAMP:     A piece of real property?

9           MR. SAMATAS:     How do you think I settled with her?  Yeah, hello, if you want to know

10  the truth, the lady walked away with $7 million dollars, okay?

11         MR. HOLTKAMP:     Okay, in 2018 you sold a piece of real property?

12         MR. SAMATAS:     So I mean you can't take the snap, you can't take the snapshot out of my

13  life and, you know, look, David, not trying to be rude but if you want to spend 12 hours and know about my

14  life, I'm more than happy to tell you every little detail you want to know to dot your i's and cross your t's,

15  okay?

16         MR. HOLTKAMP:     We shouldn't have to, sir…you should have already put this all in your

17  schedules, is the problem, okay?  So we'll go through it.

18         MR. SAMATAS:     No.

19         MR. HOLTKAMP:     We'll go through it.

20         MR. SAMATAS:     Okay.

21         MR. HOLTKAMP:     Let's just go over to your Statement of Financial Affairs here.  Okay,

22  number four on your Statement of Financial Affairs says, Did you have any income from employment or

23  operating a business during this year or the two previous calendar years?  So it asks from January 1st to

24  December 31st, 2018, to the date you filed for bankruptcy, did you have any income from employment or

25  operating a business?  And you put "no."

26         MR. SAMATAS:     No.

27         MR. HOLTKAMP:     So…

1       MR. SAMATAS:    That's correct.

2       MR. HOLTKAMP:    Okay, number five asks you…

3       MR. SAMATAS:    So?

4       MR. HOLTKAMP:    Number five asks, did you receive any other income during that two-year

5 calendar period?  Other income would include alimony, child support, Social Security, unemployment, public

6 benefits, pension, rental income, interest, dividends, distributions, money collected from lawsuits, royalties,

7 gambling, lottery winnings.  You get where I'm going here, it's any other forms of funds that come in, and

8 you said, no.

9       MR. SAMATAS:    Are we talking about Section 61 of the Internal Revenue Code about

10 what's defined as income?

11      MR. HOLTKAMP:    No, I'm saying what's defined…

12      MR. SAMATAS:    Come on, I sent it.  Look, I mean really, I mean, you asked a question on

13 a form and again, I'm not trying to be argumentative but you're like…

14      MR. HOLTKAMP:    I'm just wondering how you can have $56,000 a month in expenses and

15 not have any income, zero dollars coming in since January 1, 2018.  I just want an explanation.

16      MR. SAMATAS:    Okay, real simple, you've got Bruce Cohen on the phone, he can answer

17 the question for you.

18      MR. HOLTKAMP:    He's not under oath, sir.

19      MR. SAMATAS:    Come on, Bruce.

20      MR. HOLTKAMP:    You're under oath.

21      MR. SAMATAS:    Okay, alright, look, there was litigation and I received income from that

22 litigation and the litigation also involves a malpractice suit against Mr. Cohen, who screwed up the case.  So I

23 did have some money, and I would have had a lot more money if he didn't screw the case up which is as far as

24 I can say, legally at this point which I'm in litigation with him.

25      MR. HOLTKAMP:    Okay, so you received money from litigation?

26      MR. SAMATAS:    But I .  Yes.

1          MR. HOLTKAMP:    Let's just try to just, you know, little baby steps here.  So you received

2   some money from litigation.  How much?

3          MR. SAMATAS:    Well, what I received, and I had to pay a lot of attorneys off after that

4   because of what Mr. Cohen did, so it was probably less than a million was left.

5          MR. HOLTKAMP:    Well, what was the total amount you received?

6          MR. SAMATAS:    I can't answer that quickly, because there was judgments against me

7   because of what Mr. Cohen did . . .

8          MR. HOLTKAMP:    Can we just leave the, we don't need to litigate.

9          MR. SAMATAS:    I can't give you a net, the net is less than a million, okay?  So you asked

10   me, how much did I receive?  I didn't really receive what money it started with because it went off to pay

11   judgment creditors, okay?

12          MR. HOLTKAMP:    So what was the gross?

13          MR. SAMATAS:    I think around a million four, million five.

14          MR. HOLTKAMP:    And what lawsuit was that?  What was the name of it?  You, James

15   Samatas vs.?

16          MR. SAMATAS:    Yeah, vs. Nile Niami.

17          MR. HOLTKAMP:    And where was that suit?

18          MR. SAMATAS:    It was filed in, believe it or not, 2011.

19          MR. HOLTKAMP:    Okay.

20          MR. SAMATAS:    It went through a 90-day trial in 2014, now, excuse me, do you want to

21   know all the details?  That's what you asked me, I said I could stay here all night, I don't care.  How much do

22   you want to know?  I mean you start getting into nitty-picky issues and then…

23          MR. HOLTKAMP:    When did you get the judgment?

24          MR. SAMATAS:    …you say, okay, we move on.

25          MR. HOLTKAMP:    When did you get the money?

26          MR. SAMATAS:    Excuse me?

27          MR. HOLTKAMP:    When did you get the money?

1          MR. SAMATAS:          I think it was in 2017.  2016, 2017, one of those periods, I don't

2    remember.

3          MR. HOLTKAMP:          And that's the money you lived off of?

4          MR. SAMATAS:          Yeah.

5          MR. HOLTKAMP:          Is there any other income you made in 2018, 2019, or 2020?

6          MR. SAMATAS:          Well, I had plenty of money before going through the divorce.  I had cash

7    in the bank and during the divorce when I had kept having to split it, we ended up selling some personal

8    property during the divorce.  The goniff, and I'm sure you know what the word "goniff" means, but the goniff

9    domestic relations attorneys were more concerned about ripping me off and I knew what they were doing and

10   my wife wouldn't stop.  So I paid them a shitload of money because we liquidated, I had a very, a lot of

11   antiques and vintage and Lalique vases well worth over $2 million.  It all got liquidated during the divorce

12   proceeding under court order.  So, I had money from that too.  If you're trying to figure out how the hell did I

13   make it this far with that kind expense, is because I had some money before.  I was receiving some income

14   back in '14 and '15 and '16 from the businesses before they went south.  I sold a couple.  I was forced to sell

15   some stuff.  I was going through a nasty four-and-a-half-year divorce.  I did have some money coming in, and

16   I won some money from litigation and essentially, you know, I strung it out.  So I here I am without a penny

17   to my name, at least not available at the moment.

18          MR. HOLTKAMP:          Okay.

19          MR. SAMATAS:          So what do you want to know?

20          MR. HOLTKAMP:          Now, within two years before you filed for bankruptcy, did you sell,

21   trade, or otherwise transfer any property to anyone other than in the ordinary course of business?

22          MR. SAMATAS:          No.

23          MR. HOLTKAMP:          No?  Selling all that stuff in the divorce proceeding?

24          MR. SAMATAS:          That proceeded more than three years ago, yeah.  My god, I could have

25   got, how do you think I got divorced?  Come on, use common sense, it started in '14 and ended in '18.  It cost

26   me, I don't even want to tell you how many millions it cost me to get divorced.  And that's where a lot of the

1   money went, that, I had money beforehand.  If you're trying to find a penny that got improperly transferred, in

2   what, anticipation of me filing bankruptcy?  Good luck.

3               MR. HOLTKAMP:    Okay, now on Schedule D here, and you filed this with your petition, you

4   listed, let me see, Parker Mills and Howard & Howard as secured creditors.  Do you remember that?

5               MR. SAMATAS:    Yes, of course I'll remember it.

6               MR. HOLTKAMP:    Okay, what's Parker Mills?

7               MR. SAMATAS:    Parker Mills are my attorneys suing Mr. Cohen's firmcovid.

8               MR. HOLTKAMP:    Okay, and…

9               MR. SAMATAS:    …in malpractice.

10              MR. HOLTKAMP:    And how did they, how did they get a lien on the California residence?

11              MR. SAMATAS:    Consensual lien.

12              MR. HOLTKAMP:    Okay, and…

13              MR. SAMATAS:    I owed them money.

14               MR. HOLTKAMP:    And you signed over a lien to them?  Is it recorded?

15              MR. SAMATAS:    Yes.

16              MR. HOLTKAMP:    And that's recorded in California?

17              MR. SAMATAS:    As far as I know it is, yeah.

18              MR. HOLTKAMP:    Okay, and it looks like the amount of the secured claim is $150,000.

19   Does that sound right?

20              MR. SAMATAS:    Correct, correct.

21              MR. HOLTKAMP:    Okay, so you owed them $150,000, or you anticipate owing them

22   $150,000?

23              MR. SAMATAS:    No, since we're still in arbitration on the legal malpractice suit that's

24   worth a significant amount of money, I incurred, I went along, until I hit the brick road and that was it.  So I

25   gave them a consensual lien because I incurred the debt, it's real debt, I owe them that money.

26              MR. HOLTKAMP:    You owe them $150,000 is what you're saying?

27              MR. SAMATAS:    Yeah.

1          MR. HOLTKAMP:    Okay, now, Howard & Howard, they're attorneys too, correct?

2          MR. SAMATAS:    They're representing me against two of my buddies on the phone here,

3 representing my brother and sister for breach of fiduciary duty amongst other things.  Lucky me.

4          MR. HOLTKAMP:    Okay, and…

5          MR. SAMATAS:    Really nice people I meet in the world.

6          MR. HOLTKAMP:    And they have a lien for $50,000.  That sound right?

7          MR. SAMATAS:    I think they put a lien for $50 because I was working my way up to that

8 knowing that Mr. Blonder, who's on the phone, just kept, kept throwing on more garbage that [inaudible]

9 garbage so he wanted a higher amount of money on the lien just to protect himself because he knew that

10 Blonder wasn't going to stop.

11          MR. HOLTKAMP:    Okay, and that was a consensual lien, I take it?

12          MR. SAMATAS:    Correct.

13          MR. HOLTKAMP:    Do you know if that lien's been recorded?

14          MR. SAMATAS:    Yes.

15          MR. HOLTKAMP:    Alright, I think I'm done.  Here, open up for the creditors.  I guess I'll

16 call on people and we'll just go around, if you don't have any questions just let me.  And we'll start with Eric,

17 representing the ex-wife, you can go ahead and ask questions.  Eric, you've got to unmute yourself.

18          MR. GOLDBERG:    Sorry about that, everyone.  Hi, Eric Goldberg, I represent Carlye

19 Samatas.  Mr. Samatas, I had some questions, mostly about differences between assets and liabilities as

20 recorded on your schedules, the documents that you filed with the bankruptcy court, and disclosures that were

21 made by you under penalty of perjury in connection with your divorce.  So first, I wanted to ask you some

22 questions about the Natoma house, I believe you mentioned early that you thought that house is worth about

23 $3 to $4 million currently.  Is that right?

24          MR. SAMATAS:    Could you please repeat that little statement you just made about

25 something relative to the divorce?  What…

26          MR. GOLDBERG:    Yes.

27          MR. SAMATAS:    I mean, what are you implying by that statement?

1          MR. GOLDBERG:    I'm not implying anything other than exactly the words I said.  I want to

2    ask you questions about the values ascribed to assets in your bankruptcy petition filed recently, and compare

3    that to some of the numbers that were included in documents you signed in connection with your divorce

4    proceedings.

5          MR. SAMATAS:    Okay, well, just keep one thing in mind, that was started in '14 and so,

6    unless the value of your Jaguar is worth the same thing five years later and things of that nature.  So I'll

7    answer your questions, but let's be practical here, okay?  What was…

8          MR. GOLDBERG:    My Jaguar went down in value the minute I drove it off the lot…

9          MR. SAMATAS:    You're right, well, maybe some of my assets …

10          MR. GOLDBERG:    Why don't you save that until we get to particular questions.  So first off,

11    on the Natoma house, you said that you thought that was worth $3 to $4 million currently.  Is that right?

12          MR. SAMATAS:    Yes.

13          MR. GOLDBERG:    Okay, and what's the basis for that number?  Where did you get that

14    from?

15          MR. SAMATAS:    Hello, the marketplace.

16          MR. GOLDBERG:    I don't know what that means, I'm assuming you didn't just call up the

17    marketplace…

18          MR. SAMATAS:    You're an attorney, you don't know what the real estate marketplace

19    means?

20          MR. GOLDBERG:    Mr. Samatas, one of us is under oath, it's not me, it's you.  I suggest you

21    answer the questions as they're asked.

22          MR. SAMATAS:    [inaudible].

23          MR. GOLDBERG:    So the question was …

24          MR. SAMATAS:    … from the real estate market.

25          MR. GOLDBERG:    How did you go about finding out what the real estate market …

26          MR. SAMATAS:    Redfin, Zillow, there's 20 easy ways any yo-yo could figure out valuation

27    out there without being a licensed real estate broker.  You do research, the information's readily available.

1         MR. GOLDBERG:   Okay, and the reason why I ask that question is because earlier today I

2    was on both Redfin and Zillow and they estimate that house as being worth than less than $3 million.

3         MR. SAMATAS:   Less than how much?

4         MR. GOLDBERG:   Less than $3.

5         MR. SAMATAS:   Okay, and?  Would you buy a house based on what Zillow says your

6    house is worth, would you sell your house based on what Zillow would?

7         MR. GOLDBERG:   Again…

8         MR. SAMATAS:   I know…

9         MR. GOLDBERG:   You're under oath here.  You just told me that you used those sources to

10   get the number…

11         MR. SAMATAS:   I didn't say that was the only, I didn't.  Look, can we not be

12   argumentative here?  And I'll answer your questions.

13         MR. GOLDBERG:   That's up to you.

14         MR. SAMATAS:   I'm being really short and to the point.  Well, I know it's up to me, and I

15   know where you're going, as you know, if all attorneys understand what is the questioning here.  There's

16   multiple sources,…

17         MR. GOLDBERG:   Do you have any…

18         MR. SAMATAS:   …there's real estate brokers.  Why don't you see for yourself, there are

19   sales that have taken place within the last two years and…

20         MR. GOLDBERG:   Mr. Samatas, I know…

21         MR. SAMATAS:   [inaudible].

22         MR. GOLDBERG:   Mr. Samatas, this is your 341, questions are going to be asked about

23   things you said.  One of the things you said was, you said the house was worth $3 to $4 million.  You said you

24   looked at sources.  I asked you which sources.  You gave me some.  And I told you that those sources don't

25   match the number that you just testified to.  So that's why I asked …

1    MR. SAMATAS:    And I said those weren't the only sources.  I also talked to real estate

2    brokers.  I also checked comps, which are not necessarily on Zillow or Redfin or anyone else.  So I do my

3    research.  I'm …

4    MR. GOLDBERG:    Which brokers did you use?  Which brokers did you speak with to give

5    you the $3 to $4 million number?

6    MR. SAMATAS:    [Long pause] Elaine Zanis is one.  I spoke to two other ones.  I can't

7    remember, they're brokers here in the Oak Brook area.

8    MR. GOLDBERG:    Okay, do you have any plans to sell or refinance the Natoma house if it's

9    got that much equity?

10    MR. SAMATAS:    I haven't made a decision yet.

11    MR. GOLDBERG:    Okay, let's switch gears now and talk about the Tanager house.  I believe

12    earlier when you were talking about what a successful resolution of the case would be, and I don't want to put

13    words in your mouth, so tell me if I'm wrong.  You said you wanted to sell the Tanager house and use that to

14    pay off the secured creditors and by my math that comes to about, needing a sale price of about $10 million.

15    Is that right?

16    MR. SAMATAS:    Wrong.  You need a calculator or you didn't learn math very well.

17    MR. GOLDBERG:    Why don't you tell me what the number is to pay off all the secured

18    creditors…

19    MR. SAMATAS:    I don't know, you tell me how you came up with 10.  You asked me the

20    question, I know it's and I know it's not 10.  I don't know how you came up with that.

21    MR. GOLDBERG:    Well, you said you wanted to sell Tanager to pay off the secured

22    creditors.

23    MR. SAMATAS:    How did you come up, you said my secured creditors are 10.  You're

24    looking at the forms, okay?  I can't answer your question, I just don't agree with you, it's not, I don't know

25    10, that's not what the forms show…

26    MR. GOLDBERG:    An hour ago you said you could sell off Tanager to sell, to pay off the

27    secured creditors but now you don't know what the secured debt is?

1        MR. SAMATAS:        No, I know what it is, they're there.

2        MR. GOLDBERG:    What is it?

3        MR. SAMATAS:        You're asking me to interpret the forms I submitted, I will not respond to

4    that.  Do you want the number?  I represented it …

5        MR. GOLDBERG:    Mr. Samatas, what I asked you was, what do you think the secured debt

6    against Tanager is?

7        MR. SAMATAS:        Eight.

8        MR. GOLDBERG:    Is that what you think you can sell it for?

9        MR. SAMATAS:        I know I can.

10       MR. GOLDBERG:    Okay, and you mentioned earlier that, I think you said you'd received

11   offers to buy the property.  What price were those offers at and were any of them written?

12       MR. SAMATAS:        Yes, and they're around eight and a half.  And they're, and that's pre-

13   commission so you end up back to zero and I believe I can pull my equity out of there at the right price at the

14   right time.  The market's gone bonkers out there.  That was the problem.

15       MR. GOLDBERG:    Were any of those offers written?

16       MR. SAMATAS:        Yes, I already said yes.  If you would've heard my comment, I said yes.

17       MR. GOLDBERG:    Okay, will you provide those offers to the US Trustee?

18       MR. SAMATAS:        If you so request.  A lot of them have gotten countered at verbal, I've

19   gotten emails.  Yeah, it's fine, I'll send you one just to prove I'm not lying.

20       MR. GOLDBERG:    I don't think you're lying, I'd just like to see the offer, and understand

21   why you haven't proceeded with those, and this goes to …

22       MR. SAMATAS:        I have money in there, that's just, just, just I can't pull out because of

23   what happened with COVID and what your client did, so again I am going to limit my comments to you,

24   because I am in litigation on tortious interference on the marketing based on, based on what your client did.

25   And so, if I start talking about the value and numbers, and contracts, it has a direct impact on the litigation I

26   am pursuing against your client, whether or not you're a bankruptcy attorney or the attorney representing her.

1   So, I'm walking on eggshells in responding to your question because they have direct impact on the litigation,

2   and the marketing, and the sale of Tanager Way, because of her tortious interference.  That's my answer.

3                 MR. GOLDBERG:   Okay, that's a nice answer.  But that's not an answer to the question that I

4   asked.  Let me ask a follow-up question…

5                 MR. HOLTKAMP: Guys, guys, guys, guys…

6                 MR. SAMATAS:   [Inaudible]

7                 MR. GOLDBERG:   No, you don't not get to give anymore speeches.

8                 MR. HOLTKAMP:   Hey, hey guys, this is David…

9                 MR. GOLDBERG:   The question now…

10                MR. HOLTKAMP:   Guys, guys, guys.

11                MR. GOLDBERG:   What do you think the property is worth?  And, what's the basis for that

12  opinion?

13                MR. SAMATAS:   I'm not going to respond to you, because that's directly …

14                MR. GOLDBERG:   You need to answer that.

15                MR. SAMATAS:   That is directly engaged with the litigations between me and your

16  client…

17                MR. GOLDBERG:   [Inaudible].

18                MR. SAMATAS:   [Inaudible], there is a damage provision penalty…

19                MR. GOLDBERG:   That's fine, and you're, you're refusing to answer a question that is…

20                MR. SAMATAS:   What I'm saying is, my answer to your question is a direct, or you can do

21  your own math, and you can make your own argument in a tortuous interference.  You're asking to pin me

22  down to a number, and I'm, I refuse to do that.  I made my disclosures. I'll sink or swim by them. Do

23  whatever you want.

24                MR. GOLDBERG:   Okay, let's go back to those disclosures again.  You mentioned that you

25  had three cars, a Jeep Wrangler, an HHR, and a Lexus RX350.  And, in connection with your divorce, your

26  financial disclosures indicated that you owned two Corvettes.  What happened to the two Corvettes?

27                MR. SAMATAS:   They went and paid lawyers.

1    MR. GOLDBERG:    When were they sold, is that what you're saying?

2    MR. SAMATAS:    No, they were sold.

3    MR. GOLDBERG:    When were they sold?

4    MR. SAMATAS:    Earlier this year.

5    MR. GOLDBERG:    Okay, and do you have paperwork to support that?

6    MR. SAMATAS:    No.  Of course not.  I got paper bags of cash.

7    MR. GOLDBERG:    How much did you sell each of those Corvettes for?

8    MR. SAMATAS:    What's the relevancy of that?  To your questioning, you're representing

9    my wife, please explain to me the relevance.  Look, you don't have carte blanche here to ask me anything.

10    You want to know what size underwear I wear, or what?  What does it matter?

11    MR. GOLDBERG:    Mr. Samatas, you're digging a very deep hole for yourself.  It's an

12    entirely reasonable question, just tell me, yes or no: Are you going to refuse to answer that one too?

13    MR. SAMATAS:    About the value of the cars?

14    MR. GOLDBERG:    About how much you received for selling your two Corvettes earlier this

15    year.

16    MR. SAMATAS:    80 thousand.

17    MR. GOLDBERG:    Total, or each?

18    MR. SAMATAS:    Total.

19    MR. GOLDBERG:    And to whom was each of them sold?

20    MR. SAMATAS:    I'm sorry?

21    MR. GOLDBERG:    Who did you sell the cars to?

22    MR. SAMATAS:    They were both sold to dealers.

23    MR. GOLDBERG:    What was the name of the dealer?

24    MR. SAMATAS:    One in Chicago, is D & M Corvettes, and I don't remember the name of

25    the dealer somewhere in the valley of L.A., I don't remember the dealer's name.

26    MR. GOLDBERG:    Okay, but do you have paperwork on both of those?

27    MR. SAMATAS:    Yes.

44

1        MR. GOLDBERG:    Okay.  You also mentioned in your divorce disclosures that at that time,

2 which was in March of 2018, you had approximately $115,000 in an IRA account.  What happened to that?

3        MR. SAMATAS:    I took the money, used it to live on.

4        MR. GOLDBERG:    When did you do that?

5        MR. SAMATAS:    Probably right after the divorce.

6        MR. GOLDBERG:    Did you do it all at once or in several transactions?

7        MR. SAMATAS:    I did it, I did it all at once.

8        MR. GOLDBERG:    Okay.  Now I want to switch a little bit and talk about some of the

9 businesses you listed as having interest in.  On your bankruptcy schedules you list three businesses:

10 Lexington Healthcare Systems of Lombard, Samball of Bloomingdale, and Omni Partners, you show each of

11 them as you having a one third interest in each.  Did I get that right?

12        MR. SAMATAS:    That is correct.

13        MR. GOLDBERG:    Okay, and then you value them in a total of 6.3 million dollars.  But in

14 your divorce disclosures you had two additional companies listed.  Lexington Healthcare Center of Lombard

15 Inc. and Lexington Healthcare Systems of Lombard LP.  What happened to those two, that weren't listed on

16 your bankruptcy schedule?

17        MR. SAMATAS:    Well I don't want to insult you, but you don't know very much about

18 corporate business and real estate.  Now how do you think that happened?  What did…

19        MR. GOLDBERG:    I asked you a question, are you going to answer the question?

20        MR. SAMATAS:    Yeah, yeah I'm going to, I'm going to answer it but I, I, I, I guess I have

21 to educate you on the simplicities of real estate.  One company has a licensed…

22        MR. GOLDBERG:    Explain . . .

23        MR. SAMATAS:    …well I'd be more than happy to because if you're trying to trick me into

24 thinking I did something illegal two years ago or now, good luck.  So, here's the answer, it's a simple answer

25 to your question.  There are three legal entities to the ownership of the nursing home.  There's the operating

26 S-corp tenant that leases it from a limited partnership, which the general partner is another sub-S corporation,

27 and then there is a limited partnership.  So, for one nursing home you have three legal entities.  Hello?  Okay.

1   Now, I already answered, do you have any partners, it's a simple general partner and as you know that's just

2   each individual and to Bloomingdale issue that is owned in a land trust, which you probably don't know about

3   because you're in California.  But it's a way of holding title here in Illinois and the beneficiaries are these

4   Discretionary Trusts.  I mean again, it's Samball of Bloomingdale Limited Partnership, which has two legal

5   entities meaning the general sub-S and then the limited partners as part of limited partnership.  That's my

6   personal holdings.  I hope you're satisfied with my answer.

7            MR. GOLDBERG:    That wasn't the question though.  The question was why were there more

8   entities listed in 2018 than there are in 2020?

9            MR. SAMATAS:    I don't know what you're talking about.

10           MR. GOLDBERG:    Those are …

11           MR SAMATAS:    Those are two entities I own…

12           MR. GOLDBERG:    You had two entities listed, in your divorce disclosures that were not

13   listed in your bankruptcy schedules two years later.

14           MR. SAMATAS:    But I don't, I don't even know what you're, I don't even know what

15   you're talking about.

16           MR. GOLDBERG:    I told you what they are, they're Lexington Healthcare Center of

17   Lombard Inc. and Lexington Healthcare Systems of Lombard LP.  Each of those is listed in your …

18           MR. SAMATAS:    Hello?  I just answered your question, did you not hear me?  Hello?

19           MR. GOLDBERG:    I heard you and it made no sense, and your attitude is not helping you.

20   Yes, everybody understands that partnerships have general partners.  So, then why weren't those other entities

21   listed in your bankruptcy schedules?

22           MR. SAMATAS:    Why?  I put, because I really didn't have the, I should have put it in an

23   attachment with the three entities because I've they've been, they're always like, in my mind, part of this one.

24   Okay?  So there is, if you're looking for the inconsistency between why didn't I list the limited and the

25   general, I already explained to you what's being refinanced, and what they really are, I just explained to you

26   what they are, it's totally consistent.  You could get the bankruptcy form does not have the technical landlord.

1          MR. GOLDBERG:    It's not about the form, Mr. Samatas.  It's about the fact that you had two,

2    entities that weren't listed on what you filed with the bankruptcy court as being a complete disclosure of your

3    assets.

4          MR. SAMATAS:    Because they're all interconnected.  They're, they're considered as one

5    by lenders and everybody else, okay?  Lexington Health Care Center Inc. is simply the tenant to the landlord,

6    it's all common ownership.  The banks…

7          MR. GOLDBERG:    So, you're saying, there's, let me try to shortcut this.  So, then you're

8    saying there's not been any sale or disposition of any entities since 2018, since 2020, but it's just how you

9    listed them, is that it?

10          MR. SAMATAS:    That's correct, yeah.

11          MR. GOLDBERG:    Okay, so let me ask a different question now.  In your bankruptcy

12    schedules you ascribe to those three businesses.  They're called Lexington Healthcare, Samball of

13    Bloomingdale and Omni Partners, you valued them at $6.3 million dollars in November of this year, and your

14    disclosures in connection with your divorce, you valued them at $2.7 million dollars.  But at the same time I

15    understand that you're no longer getting income from those properties, and so I would assume that they're in

16    some distress if you're in a forbearance agreement with your lenders.  So, how did the value double over that

17    time period?

18          MR. SAMATAS:    I don't know.  I don't know.  I don't know what factors, I don't know, I

19    mean you're talking about things that were reviewed possibly as long as four years ago.  I don't remember the

20    time of the day, I don't, I can't answer that, I don't know.

21          MR. GOLDBERG:    Well okay, let me ask you a more, something that's more recent.  How

22    did you come to this $6.3 million dollar figure that you ascribe to those entities in the bankruptcy schedules?

23          MR. SAMATAS:    That information was given to me from the CFO of the company.

24          MR. GOLDBERG:    Okay, let's talk about some of your personal property now.  In your

25    bankruptcy schedules, you valued the furniture in the Natoma house at $100,000, is that right?

26          MR. SAMATAS:    I don't know if I said 100 or 200.  I, I, I don't remember.  But anyway,

27    these are…

1        MR. GOLDBERG:    Well, I'll, I'll, I'll represent to you that it was 100 in your bankruptcy

2   schedules, and you…

3        MR. SAMATAS:    Okay.

4        MR. GOLDBERG:    In your divorce disclosures in March of '18, you valued the contents of

5   the Natoma house at 1.4 million dollars, 14 times that.

6        MR. SAMATAS:    Oh, okay.

7        MR. GOLDBERG:    What accounts for the difference?

8        MR. SAMATAS:    Are you aware from your client who is a prevaricator second to none, that

9   there was a line of credit between my Revocable Trust and my Discretionary Trust?  Did she explain that to

10  you along with anything else?

11       MR. GOLDBERG:    Mr. Samatas, let me stop you, right there.  No one is asking about your

12  trusts right now.  I'm simply asking…

13       MR. SAMATAS:    No, I'm…

14       MR. GOLDBERG:    Mr. Samatas.

15       MR. SAMATAS:    …answering your question.

16       MR. GOLDBERG:    Mr. Samatas.

17       MR. SAMATAS:    Right.

18       MR. GOLDBERG:    I'm going to ask the questions.  The question is what accounts for the

19  difference where you value your furniture, right now in bankruptcy in November of this year, at $100,000.

20  And then, two and half years earlier you valued the contents of the Natoma house at 1.4 million dollars.  And,

21  I haven't asked you anything about lines of credits or trusts.

22       MR. SAMATAS:    Yes, because you're wrong.

23       MR. GOLDBERG:    You're under penalty of perjury.

24       MR. SAMATAS:    You're wrong.  I'm not perjuring myself.  And, you're wrong in the

25  statement you made.  I've repaid the loan.

26       MR. GOLDBERG:    That's the, what are you saying, are you saying sold the contents of house

27  when you repaid the loan?

48

1          MR. SAMATAS:      I didn't sell the contents of the house.  You know, I'm sorry, I'm sorry

2   for really being upset, but you know, you guys think you're so blessedly smart, you ask, you know, it's typical

3   you ask questions, you want answers to them…

4          MR. GOLDBERG:      It's a real simple question.  If the answer is, you sold part of it…

5          MR. SAMATAS:      I didn't sell them I repaid the loan.  I did, no, there's a difference, guys

6   we're all attorneys.  I didn't sell it, and I'm not saying that I sold it.  I said that I repaid a loan…

7          MR. GOLDBERG:      How did you repay the loan?

8          MR. SAMATAS:      I, I pay rent…

9          MR. GOLDBERG:      [inaudible]

10         MR. SAMATAS:      Hello?  Can I not repay a loan with cash or kind, the answer is, yes.  So, I

11   repaid a loan with kind.

12         MR. GOLDBERG:      Do you repay all loans with…

13         MR. SAMATAS:      … understand that, it goes to…Discretionary Trust.  To my Discretionary

14   Trust.

15         MR. GOLDBERG:      Okay, so you've repaid the loan from your Discretionary Trust with…

16         MR. SAMATAS:      It's the other way around.  No, I paid, repaid a loan from my Revocable

17   to my Discretionary.

18         MR. GOLDBERG:      Okay, how…

19         MR. SAMATAS:      My wife got to enjoy all of the things that she did, okay?

20         MR. GOLDBERG:      Mr. Samatas, when, when you take some of these depositions, you can

21   ask the questions.  For now, this is a 341 hearing, creditors are entitled to ask these questions.  And you're

22   under oath, so you're going to answer my questions for now.  So, the question I have next is, where are the

23   contents that were listed in your divorce disclosures as being worth $1.4 million?  Are they still in the house?

24         MR. SAMATAS:      Yes.

25         MR. GOLDBERG:      Okay, you also showed on your bankruptcy schedules, paperweights and

26   artwork, as collectibles.  You said paperweights as collectibles and artwork, and you ascribed a value to them

27   in your bankruptcy petition as 200,000 dollars.  In your divorce disclosures, two and half years earlier, you

1    valued your paperweight collection at 2.5 million dollars.  What accounts for the difference between those

2    two numbers?

3    　　　　　MR. SAMATAS:　　First of all, I am not aware, I don't remember representing.  I don't

4    remember, and I don't recall the time that, that representation and what form.  So, I mean, I mean, you cold

5    cocked me, like two and half years, three years, four years later of the disclosure.  I don't know, I don't

6    remember…

7    　　　　　MR. GOLDBERG:　　Mr. Samatas, it's two and half years later.  And, it's your document.  If

8    you don't have your own divorce document, then you should contact your lawyer to get those, because these

9    contain things that provides serious inconsistencies to what you're telling the court, and your creditors…

10    　　　　　MR. SAMATAS:　　Not really.  What I'm telling the court is what you're getting into, which

11    you know, is suddenly, that there was personal property utilized to repay a loan to my Discretionary Trust.

12    　　　　　MR. GOLDBERG:　　How many paperweights have you sold between March of 2018 and

13    now?

14    　　　　　MR. SAMATAS:　　Three, two or three?  You also want to know the value?  I don't create the

15    marketplace, guys, you know?

16    　　　　　MR. GOLDBERG:　　Not asking you about the marketplace, again.  What I'm asking is…

17    　　　　　MR. SAMATAS:　　You're asking for an evaluation…

18    　　　　　MR. GOLDBERG:　　Mr. Samatas.  You need to let me ask the questions.  You're saying now,

19    in your bankruptcy petition that you had $200,000 worth of collectibles, including your paperweights and

20    artwork…

21    　　　　　MR. SAMATAS:　　Yes, yes.

22    　　　　　MR. GOLDBERG:　　…and then, two year earlier you said the paperweight collection itself

23    was worth more than 10 times that, two and half million dollars, but you only sold two or three?  So, unless

24    you sold them for about $700,000 each, I don't understand the math.  What accounts for the difference

25    between the paperweights in March of 2018 . . .

26    　　　　　MR. SAMATAS:　　The market is different.  The market is not the same.  So, it's as simple as

27    that.  And some of them, and some of the assets, personal property was transferred.  You don't believe it.  I'm

1   telling you what she had and what was disclosed in the divorce is what I purchased them for, which was two

2   and half.  That doesn't mean I was gonna acquire the evaluation.  I have a Lalique…

3           MR. GOLDBERG:   When they were worth two and half million, about how many paper

4   weights were there?

5           MR. SAMATAS:   No, no, no, hold on a minute, no, with, with two domestic relations

6   attorneys globbing onto on money.  There's two and half million dollars versus that which is disclosed in the

7   divorce about antiques, and Lalique vases.  I got less than 40 cents on the dollar, I can't control the

8   marketplace.  So, when you ask me…

9           MR. GOLDBERG:   Mr. Samatas.  I asked you a pretty simple question, about what explains

10   the change in value itself…

11           MR. SAMATAS:   The market itself…

12           MR. GOLDBERG:   … the market itself and there's two and a half.  Are you saying you sold

13   three, and the market decline explains the rest?

14           MR. SAMATAS:   For the most part, and some of it was also utilized for the repayment

15   loans to my existing Discretionary Trust.

16           MR. GOLDBERG:   So, when you used it to repay loans to the Discretionary Trust, how did

17   you determine the value of those in kind things?

18           MR. SAMATAS:   [Long pause] I, look at what the valuations are.  I mean, whatever they

19   are to me, they could be worth five dollars today, they could be worth fifty dollars tomorrow.  You know,

20   when you talk about collectibles, you never know what the value is, it's, it's just a guess to a degree.

21           MR. GOLDBERG:   Okay, and if, if you don't know what the value is, and you had to guess,

22   how did you come to the $200,000 number that's in your bankruptcy schedules?

23           MR. SAMATAS:   Because of what I have is paperweights.  I know what I paid for them and

24   I discounted them by a third, and I said, well that's what they're worth, a few hundred thousand, roughly two-

25   hundred thousand with the artwork.

26           MR. GOLDBERG:   And, I'm glad you mentioned that.  You meant the category of the

27   bankruptcy schedules, where you showed a value of $200,000, it's actually an aggregate.  It's from what you

51

1    said are paperweights and artwork, we just talked about the paper weights.  In your divorce disclosures, you

2    also indicated you have separately listed artwork, including a few Picassos, that you valued for $400,000.  Do

3    you still have all of that artwork?

4              MR. SAMATAS:        I didn't value two Picassos at 400, I gave them, again I gave her, and her

5    attorneys a list of what I paid for that.  Nobody ever did a valuation on the personalty, that she is now looking

6    at and telling her lawyers, who's now asking me these questions.  Even whatever is left, which she has copies

7    of, I can't even get ten grand for.

8              MR. GOLDBERG:        Well, I beg to differ about who said what because the value of $400,000

9    and $2.5 million, those are numbers in a document you signed, Schedule of Assets and Debts, that you signed

10    in March of 2018, saying that all those numbers were true and were correct.  So, they're not my numbers and

11    they're not Caryle's numbers, they are your numbers.

12              MR. SAMATAS:        Okay, so?

13              MR. GOLDBERG:        So, my question is…

14              MR. SAMATAS:        So?

15              MR. GOLDBERG:        …do you still have that artwork?

16              MR. SAMATAS:        Yes, it's been on consignment for four years.

17              MR. GOLDBERG:        And what value did you ascribe to that artwork in your bankruptcy

18    petition?

19              MR. SAMATAS:        50 of the 200

20              MR. GOLDBERG:        Okay, and how did it get to that number?

21              MR. SAMATAS:        Based on the proportion, what the numbers were and what the market

22    was doing, you know?

23              MR GOLDBERG:        Okay, you also listed in your divorce disclosures that you had a Baccarat

24    chandelier worth 40,000.  Do you still have that?

25              MR. SAMATAS:        No.

26              MR. GOLDBERG:        What happened to that?

27              MR. SAMATAS:        It got sold.

1        MR. GOLDBERG:        When did it get sold, and to whom?

2        MR. SAMATAS:        After '18, I don't remember exactly when.

3        MR. GOLDBERG:        Who did you sell it too?

4        MR. SAMATAS:        Some dealer.

5        MR. GOLDBERG:        Some dealer where?  Do you have paperwork on that?

6        MR. SAMATAS:        I don't know, if I do, it will take me a long time because it would be in

7    boxes from L.A., which are piled up, I haven't looked at them since I moved back to Chicago.

8        MR. GOLDBERG:        Okay, and do you, you were talking earlier, when you were being

9    questioned, by Mr. Holtkamp about the watches.  You said had, you know, and I'm paraphrasing, tell me if I

10    get it wrong.  You know, six or 10 watches, is that the [_____] of what you're talking about?

11        MR. SAMATAS:        No, you heard me.

12        MR. GOLDBERG:        What, what's the, I gave…

13        MR. SAMATAS:        You heard me.  So, why did you say six to 10?  I said six.  You know that

14    and I know that.  So, stop playing …

15        MR. GOLDBERG:        So, six.  Okay, now…

16        MR. SAMATAS:        Yeah.

17        MR. GOLDBERG:        …your ex-wife told me that you had, at one point, that you had about 150

18    watches.

19        MR. SAMATAS:        You know…

20        MR. GOLDBERG:        Where did the other ones go?

21        MR. SAMATAS:        I can't wait to take her deposition too, David because she's a

22    prevaricator, [inaudible]…

23        MR. GOLDBERG:        Mr. Samatas, you'll have your chance. But right now you're wasting

24    everyone's time.

25        MR. SAMATAS:        Mysterious …

26        MR. GOLDBERG:        Answer the question, yes or no.  At one point, did you have about 150

27    watches?

1          MR. SAMATAS:          The answer is no, no.

2          MR. GOLDBERG:          What was the, how many did you have in total?

3          MR. SAMATAS:          When?

4          MR. GOLDBERG:          2018.

5          MR. SAMATAS:          I said, earlier in the conversation that I had more than six watches, some

6     of them sold back in '18 and '19.  I also had a handful, of what you'd call, inexpensive, vintage Belgian

7     watches, which she knows because she took a video of the safe.  So, those I still have, they're not worth any

8     more than five grand.  Now, if you're telling me, I have 250 watches, then you know what, come and visit me.

9     Hello?  Hello?

10         MR. HOLTKAMP:          Hey Eric, are you still there?  This is David.

11         MR. SAMATAS:          And this is Jim.  What happened?

12         MR. HOLTKAMP:          Maybe, maybe he got dropped?  Hey Eric, are you there?  Alright, let's

13    just move on to on to Jeff, and if Eric has more questions we can, we can go back, I guess.  But Jeff, do you

14    have any questions?

15         MR. SCHWARTZ:          At this time, I don't.

16         MR. HOLTKAMP:          Alright…

17         MR. GOLDBERG:          Hey everybody, I am sorry this Eric Goldberg again.  I don't know what

18    happened, but I got cut-off.

19         MR. HOLTKAMP:          Okay, we just went to Jeff.  He didn't any questions.  How, how much

20    longer do you see your line of questioning going?

21         MR. GOLDBERG:          Give me another five minutes.

22         MR. HOLTKAMP:          Okay.  And I think I set a bad example here and apologize to everybody

23    making this a little bit combative, if we could just, for Mr. Samatas, you know, just answer the question and

24    try not to talk over each other Eric and Mr. Samatas because you know, we need to make a transcript.  It's

25    kinda hard to do that.  Okay?  So go ahead Eric.

1     MR. GOLDBERG: Sure.  Okay so, I think we were talking about the watches, there's

2 obviously a difference on how many watches there were.  Let's move on.  Mr. Samatas we understand that at

3 the Natoma house at one point you had a very elaborate model train layout.  Is that true?

4     MR. SAMATAS: Yes.

5     MR. GOLDBERG: Do you still have that?

6     MR. SAMATAS: Yes.

7     MR. GOLDBERG: And did you ascribe a value to that on your bankruptcy schedules?

8     MR. SAMATAS: It doesn't have a value.

9     MR. GOLDBERG: Do you know about how much you spent on it?

10     MR. SAMATAS: No.

11     MR. GOLDBERG: You don't have an idea?

12     MR. SAMATAS: No.

13     MR. GOLDBERG: Could be ten thousand could be ten million?

14     MR. SAMATAS: Sell my house or ask my wife, I don't have a value on it.

15     MR. GOLDBERG: You have no idea how much that cost?

16     MR. SAMATAS: I didn't keep track of that, it's just like building highway it's just, it's

17 buried into the cost of the house.

18     MR. GOLDBERG: Okay.  Would it surprise you that your ex-wife estimates there was about

19 a million dollars spent on that?

20     MR. SAMATAS: Knowing my ex-wife and her knowledge of anything?  No, I'm sorry but

21 I find that hysterical.

22     MR. GOLDBERG: Okay, but you still own it right?

23     MR. SAMATAS: I still own the house.

24     MR. GOLDBERG: Mr. Samatas, I'm talking about the trains, I know you still own the house.

25     MR. SAMATAS: No, no, no.  It's a...

26     MR. GOLDBERG: Just stop, you're doing it again, you're filibustering, you're answering

27 questions I'm not asking.  Do you still own the train set?

1        MR. SAMATAS:     It's real estate.  It's real estate, it's not personalty.

2        MR. GOLDBERG:    Okay.  It's off the list, move on.

3        MR. SAMATAS:     I can't help you if you don't ask the question right.  It's real estate, it's

4  integrated into the two by fours.

5        MR. GOLDBERG:    So, you haven't used it to repay any loans, it's still there, doesn't belong

6  to somebody else now?

7        MR. SAMATAS:     Could I take a chunk of my house and try to sell it, it's not personalty it's

8  realty.

9        MR. GOLDBERG:    That was a yes or no question?

10        MR. SAMATAS:     Hello?

11        MR. GOLDBERG:    Do you still own it?

12        MR. SAMATAS:     My answer is realty.  Do I still own the house?  Yes, I still own house.

13        MR. GOLDBERG:    Not the question.  Do you still own the train set was the question.

14        MR. SAMATAS:     What part of the train set are we talking about?  The choo-choo train, the

15  tracks, the buildings, the house, what?

16        MR. GOLDBERG:    Is there any part of it you do not own?

17        MR. SAMATAS:     No, I own it.  I own the train.

18        MR. GOLDBERG:    It's going, it's going to be very slow if we keep doing this.

19        MR. SAMATAS:     It'll go quicker if you ask any questions that are relevant.

20        MR. GOLDBERG:    I'll rely on my own judgment as to what's relevant, don't worry about

21  that.  In your bankruptcy schedules you said that you did not have any interest in any life insurance policies, is

22  that correct?

23        MR. SAMATAS:     Far as I know.

24        MR. GOLDBERG:    Do you have any life insurance on your mother?

25        MR. SAMATAS:     Oh my god, must be my brother telling you stuff.  Wow.  How about that

26  Jeff.  Do I have any …

27        MR. GOLDBERG:    Mr. Samatas.  Yes or no?

1           MR. SAMATAS:    I'm answering the question, I personally do not.  That's my answer.  I

2  personally do not.

3           MR. GOLDBERG:    Personally, does that mean one of your trusts does?

4           MR. SAMATAS:    I think maybe my trust does, not me personally.  I have no interest in it.

5           MR. GOLDBERG:    Which trust?  Which trust?

6           MR. SAMATAS:    My discretionary.

7           MR. GOLDBERG:    Your Discretionary Trust whose assets and  liabilities you've mixed in

8  with your own here in your bankruptcy filings?

9           MR. SAMATAS:    Excuse me, I object to the, I've mixed and comingled?  Give me a break,

10  watch your words.  I can't respond to those kinds of allegations.

11           MR. GOLDBERG:    Which trust has a life insurance policy on your mother?

12           MR. SAMATAS:    No trust has a life insurance policy on my mother.

13           MR. GOLDBERG:    Do either of your trusts have an interest in a life insurance policy on your

14  mother?

15           MR. SAMATAS:    I can't help it if you don't know how to ask the questions.  So let me just

16  answer it for you, okay?  There's a legal entity of which my Discretionary Trust has an interest in that owns

17  the policy.  That's the answer that will take us twenty minutes for you to figure out.

18           MR. GOLDBERG:    What's the amount of the policy?

19           MR. SAMATAS:    I don't know.

20           MR. GOLDBERG:    What is the amount of the policy?

21           MR. SAMATAS:    I don't know.  I don't know. I have no idea.

22           MR. GOLDBERG:    Do you know whether if it's a life or a term, I mean I'm sorry, a term

23  policy?

24           MR. SAMATAS:    No if it was term it would have termed a long time ago.  It's a life

25  insurance policy.

26           MR. GOLDBERG:    Okay.  Do you what if any cash surrender value is in that policy?

27           MR. SAMATAS:    I don't.

1          MR. GOLDBERG:    You don't know?

2          MR. SAMATAS:    We're going into my Discretionary Trust, again I object to responding to

3  this. This has nothing . . .

4          MR. GOLDBERG:    You can object all day long, but I don't have a robe, so . . .

5          MR. SAMATAS:    I am going to object because listen, the ...

6          MR. GOLDBERG:    Mr. Samatas, you can object all day long, go right ahead but right now

7  there is no question to object to, so let's move on and get this done.

8          MR. SAMATAS:    Woah, woah, woah, woah, woah, yeah I, I can't, even if I had an attorney

9  here I can object to it, and you can say "Go ahead and respond," I don't know. Do whatever you want.

10         MR. GOLDBERG:    Okay. What assets are in your non-Discretionary Trust?

11         MR. SAMATAS:    You have them in the forms.

12         MR. GOLDBERG:    Do I? Where?

13         MR. SAMATAS:    Yeah. They're everything I've given in all schedules. That's my

14  Revocable Trust and me personally.

15         MR. GOLDBERG:    So other than the two houses, nothing else?

16         MR. SAMATAS:    No. Hello? Am I going batty or something? We already talked about

17  Lombard, we talked about Bloomingdale.

18         MR. GOLDBERG:    The revocable trust, the revocable trust...

19         MR. SAMATAS:    If you read, excuse me, another lesson in lawyering and estate planning,

20  why don't you guys understand what a Revocable Trust is and that also includes whether or not it's held and

21  titled under Revocable Trust or under an individual. So, what you have in the bankruptcy forms ...

22         MR. GOLDBERG:    The question was, what assets are in the Revocable Trust now?

23         MR. SAMATAS:    Exactly what's been disclosed in the forms, in the Schedule forms.

24         MR. GOLDBERG:    Actually, I'm glad, I'm glad you said that because none of your

25  bankruptcy schedules indicate that the house is owned by the trust, you indicate that you own them

26  individually. So, the question is…

27         MR. SAMATAS:    Own what? Woah, woah, hold on a minute, that's a mistake.

1              MR. GOLDBERG:    Mr. Samatas, I've about had it.  Answer the question.  What assets are

2  owned by your revocable trust.

3              MR. SAMATAS:    Under my revocable trust, the terms and conditions of which you have a

4  copy of, my home in Natoma, my home in Los Angeles, ownership interest in a nursing home in Lombard and

5  a land interest in a nursing home in Bloomingdale.

6              MR. GOLDBERG:    Anything else?

7              MR. SAMATAS:    Well whatever personalty that we've talked about.

8              MR. GOLDBERG:    Which personalty? That's what I'm trying to nail down because you've

9  shown on your bankruptcy schedules that you have assets and indeed show them owned, owned by you, not

10  by the trust, but then there are other assets like the two houses that are titled in the name of the trust.  So that's

11  why I ask the last question.

12             MR. SAMATAS:    That's not true.  I don't know where you get your information.

13             MR. GOLDBERG:    But it is, but it is.

14             MR. SAMATAS:    The house, the house, the house in Oak Brook is not in the name of the

15  trust.  So excuse me, if you know it, it you'll make me...

16             MR. GOLDBERG:    You testified  that it was.  You testified that it was.

17             MR. SAMATAS:    Because I said if you read the revocable trust, an attorney said it's easier

18  if you put stuff under the name of a revocable trust.  So, if I have a checking account that says James Samatas

19  or if I have a checking account that says James Samatas revocable trust, under the terms and conditions of the

20  Revocable Trust agreement they're synonymous with each other so that's how I've always gone through life.

21  Talk to me, I met a very astute estate planner at Katten Muchin many years ago, and nothing has contradicted

22  that.  So sometimes something is held to my name alone, sometimes it's held to the name of a Revocable

23  Trust from the legal purposes.  They're one and the same.  Not alter ego here.

24             MR. GOLDBERG:    Do you owe any money to your revocable trust?

25             MR. SAMATAS:    Do I owe any money to my revocable trust?  How could I do that?  That

26  would be like owing money to myself if I, if you paid …

1         MR. GOLDBERG:    Yes or no question, we're actually running out of patience for the

2  soliloquies; it's a yes or no question.

3         MR. SAMATAS:    No.

4         MR. GOLDBERG:    Okay, same question for the Discretionary Trust.  Do you owe any money

5  to your Discretionary Trust?

6         MR. SAMATAS:    Yes.

7         MR. GOLDBERG:    How much?

8         MR. SAMATAS:    Started at 10 million and I'm not sure where the number is today.

9         MR. GOLDBERG:    In 2018 in connection with your divorce you stated that the amount owed

10  to the Discretionary Trust was about $24 million dollars.  Does that sound right?

11         MR. SAMATAS:    That's, I don't remember that number.

12         MR. GOLDBERG:    Well okay, you can confirm it, but it's what you wrote in your divorce

13  disclosures.  Does that sound about right?

14         MR. SAMATAS:    I, something's wrong, that doesn't sound right.

15         MR. GOLDBERG:    Okay.

16         MR. SAMATAS:    I don't know what that number was.

17         MR. GOLDBERG:    But you acknowledge that there's some liability that you owe to your

18  Discretionary Trust, right?

19         MR. SAMATAS:    I've already, I've stated that several times.

20         MR. GOLDBERG:    Yes or no question.

21         MR. SAMATAS:    Yeah, I don't know what that number is.

22         MR. GOLDBERG:    How come that debt wasn't listed on your bankruptcy schedules?

23         MR. SAMATAS:    Because I treated it as one and the same, almost.  It's my alter, that is an

24  alter ego.

25         MR. GOLDBERG:    The Discretionary Trust is your alter ego?

26         MR. SAMATAS:    Well the terms and conditions mean I'm gonna sue myself for this, you

27  know, I didn't perceive the interpretation in terms of a normal creditor.

1           MR. GOLDBERG:    But you're saying that you didn't list it because you had considered the

2  Discretionary Trust your alter ego?

3           MR. SAMATAS:    In a sense, yes.  That's why I didn't do it, it didn't, I didn't interpret it

4  like a normal creditor.

5           MR. GOLDBERG:    Okay.  Almost done here.  On the lawsuits you indicated in your

6  bankruptcy petition that you have several lawsuits that you value at a total of seven million dollars.  What's

7  the basis for the Cohen & Lord lawsuit?  And I'm just looking for, you know, couple things since I don't

8  need...

9           MR. SAMATAS:    Legal malpractice.

10          MR. GOLDBERG:    And Cohen & Lord represented you in connection with what?

11          MR. SAMATAS:    They represented me against the developer and two brokerage houses.

12          MR. GOLDBERG:    Is that a real estate brokerage house or stock brokerage house?

13          MR. SAMATAS:    I purchased the house that's still in my name and the guy who built it

14  represented it to us as a new house, it was a major remodel and the brokers involved pulled the wool over my

15  eyes.  I sued them all for construction defects and for fraudulent representation.  And Mr. Cohen and his firm

16  screwed the case up and I sued them for it and the value could be as high as four million in just that case

17  alone.

18          MR. GOLDBERG:    And are you represented by counsel on that case?

19          MR. SAMATAS:    Yes, which you've asked me which is Parker Mills.

20          MR. GOLDBERG:    I didn't ask you, somebody else might have.  And what's the status of

21  that case?

22          MR. SAMATAS:    It's in arbitration pending me paying my attorney to pursue it and get out

23  of bankruptcy so that's what's holding it up.

24          MR. GOLDBERG:    Okay and what's the status of your lawsuit against Cynthia and John?

25          MR. SAMATAS:    The same thing, it's being held up because of bankruptcy.

26          MR. GOLDBERG:    Is it also in mediation or supposed to be in mediation?

27          MR. SAMATAS:    Nope, nope.

1            MR. GOLDBERG:        Okay, in your divorce you listed as one of your assets a lawsuit against

2    the owners of 1420 Tanager.  What's the status of that lawsuit, because it's not listed in your bankruptcy

3    petitions.

4            MR. SAMATAS:        It doesn't exist.

5            MR. GOLDBERG:        What, how, well it sounds like it existed at one point, but it no longer

6    does.  What happened between 2018 and now?

7            MR. SAMATAS:        On a demurrer, it got dismissed, simple as that.

8            MR. GOLDBERG:        Okay.  Do you provide any support to your children?

9            MR. SAMATAS:        Yes.

10            MR. GOLDBERG:        And you did not, I believe, include that in your statement of income

11    expenses.  About how much support do you provide on a monthly basis?

12            MR. SAMATAS:        I don't think that's true.  I think that is a number I did and the only reason

13    why I'm doing that as part of the lawsuit my brother, I know you don't like soliloquies, but I can't answer

14    this.  My brother and sister did a nasty thing and took control over my kids' trust and have not given them any

15    distributions, so I needed to support my kids.  They have some serious illnesses.  How much do I give them?

16    Four thousand a month.  Four thousand a month each.

17            MR. GOLDBERG:        Four thousand, thank you, that's all I wanted to know.  And where do you

18    get the money to pay that?

19            MR. SAMATAS:        Wherever I can get it.

20            MR. GOLDBERG:        So, did you pay that this month?

21            MR. SAMATAS:        Yeah, I still had a little money from the twenty five I started a couple

22    months ago.

23            MR. GOLDBERG:        And did you pay it last month?

24            MR. SAMATAS:        Yes.

25            MR. GOLDBERG:        And do you have a plan to go forward going back to Tanager, to sign a

26    listing agreement with a broker, you mentioned a listing agreement expired and that you want to sell the

27    house.

1     MR. SAMATAS:  Yes.

2     MR. GOLDBERG:  Go ahead.

3     MR. SAMATAS:  Yes, yes, I answered that question yes.

4     MR. GOLDBERG:  Okay but you've been in bankruptcy now two months, when are you

5 planning on hiring a broker?

6     MR. SAMATAS:  If I don't succeed by the end of this year, I just pick one of the three guys

7 I've been working with.  I, as I said earlier, I still, I still I could end up petitioning next week with an offer.  I

8 don't know.  I mean, things are moving but they're just not quite clicking right but if not by the end of the

9 year I will expose it more, the timing will be diff-, it'll be past the holidays so.  That's, I'm sorry to be long

10 winded on that one but, yes.  If I can't within the next six to eight weeks I will go through a brokerage house

11 and list it.

12     MR. GOLDBERG:  And why, why wait so long?  That seems to be the lynch pin for getting

13 out of bankruptcy is selling Tanager.

14     MR. SAMATAS:  Because if talking to quite a number of the houses stuck between a rock

15 and a hard place in a very difficult time where buyers are looking to steal property and developers are too

16 scared because of COVID so it's really a timing issue.  It's just hoping to find the right buyer that's got.  The

17 house needs some improvements and/or it needs to be torn down and really make millions of dollars.  It's kind

18 of stuck in between and so with the market being what it is, it's kind of a hit or miss.  I've come very close but

19 not quite hit it.

20     MR. GOLDBERG:  But when you said it needed to be torn down, do you mean because

21 there's problems with the house or you think a higher value could be achieved by…

22     MR. SAMATAS:  No, no you could make…

23     MR. GOLDBERG:  …selling it to a developer?

24     MR. SAMATAS:  …you could make $10 million if you tore the house down, it's about,

25 with larger square footage.

26     MR. GOLDBERG:  Are you trying to make that happen now?

1            MR. SAMATAS:      No, I'm trying to find a guy or a developer to take that on but they're

2   scared because of what's happened to the marketplace and the uncertainty of COVID, so my developer

3   interests are like really sketchy.  They want it, they see how they can make it, but nobody wants to pull the

4   trigger.  They're like hesitating, that's the problem.

5            MR. GOLDBERG:     Okay, that's all the questions I had.  Thank you, Mr. Samatas.

6            MR. SAMATAS:      You're welcome.

7            MR. HOLTKAMP:    Alright, I just have two follow ups.  How many kids do you have?

8            MR. SAMATAS:      Two.

9            MR. HOLTKAMP:    Okay, how old are they?

10           MR. SAMATAS:      34 and 38.

11          MR. HOLTKAMP:    Okay.  Jeff you said you didn't have any questions so we're going to skip

12   over you.  Anybody else have any questions?

13           MR. COHEN:        Bruce Cohen…

14          MR. HOLTKAMP:    Bruce.

15          MR. COHEN:        …with MCA.  This has been revealing but it's also very contradictory

16   and frankly it's very difficult to understand in a linear fashion.  I would love to [inaudible] to the other folks

17   on call here.  There are, are you intending after we've received another set of revised schedules, presuming

18   that we do receive such a revised set of schedules, to continue this proceeding?  I know you have a motion on

19   for a 2004 deposition or a double depositions, but before I try to go through what I'm thinking, can you sort of

20   enlighten us as to how you think, just procedurally, things are, likely to go after today?

21         MR. HOLTKAMP:    Okay.  I assume nobody else has any questions, but, and you don't have

22   any questions, right?  I mean we could just, so what I intend to do is I am intended to conclude the meeting

23   today.  I don't think it's going to be particularly helpful to just keep doing this and not doing my 2004 exams

24   and I'm asking for authority for the debtor and the debtor's ex-wife and I'm just gonna go that route.  I'm not

25   gonna continue to do three hour 341 meetings.  And then I'll do…

26         MR. COHEN:        Sorry . . .

1    MR. HOLTKAMP:    … I'll do what I think, I'll do what I think is appropriate when I, you

2    know, in motion wise or motion practice so that's what I intend to do.

3    MR. COHEN:    I understand.  I understand.  I have quite a few questions.

4    MR. HOLTKAMP:    Okay.

5    MR. COHEN:    On how to clean up this area.  I don't want to put labor, this proceeding,

6    which has gone a couple hours now, I appreciate that, and obviously if we get to more structured 2004

7    proceedings we'll want to proceed there very substantively after you asked your questions.  I don't want to

8    waive any rights to question but I, I think that ...

9    MR. HOLTKAMP:    So, so, Mr. Cohen, what I would, you know, what I would advise you to

10    do, and you can do whatever you want obviously, is just file your own 2004 motion, right?  And get authority

11    to, you know, sit the debtor down himself.  Okay?  And then you can ask all the questions you need, that's

12    just, that's the route, you know, I would propose you take.  I mean you can, you're not waiving the right to

13    ask any questions you know, and you can go on ask your questions here I'm just not gonna do this, you know,

14    six more times.  And two things that you have, you know, your own personal question about your own

15    personal debts with the debtor, you know, you should probably pursue those with it your own 2004 exam.

16    And that would be for everybody too, I mean, go get your own 2004 authority and sit the debtor down

17    yourselves and ask him questions, okay?  But, you know, if you have question go ahead but, you know, that's

18    what I would advise you to do.

19    MR. COHEN:    Okay, let me ask just that a few here, with the understanding that that's

20    how things are going to proceed and you'll, you'll proceed the with 2004, I imagine I'm not the only one who

21    will want also to be involved with 2004 proceedings.

22    MR. HOLTKAMP:    Okay, just so you know how this, how this works is I'm doing my own

23    2004 exams, those aren't your 2004 exams, you have to do your own.

24    MR. COHEN:    I understand.

25    MR. HOLTKAMP:    Okay.

26    MR. COHEN:    Thanks, thank you that.

27    MR. HOLTKAMP:    Yeah.  So, go ahead.

1        MR. COHEN:      Okay.  We've gone back and forth with regards of this Discretionary

2  Trust today and also the first proceeding and we sort of poked holes into it and answered this issue, that issue,

3  because we don't really have the wholesale picture of the trust.  Who is the settler of the Discretionary Trust

4  that you've been referring in these proceedings?

5        MR. SAMATAS:     My father.

6        MR. COHEN:      What's his name?

7        MR. SAMATAS:     George.

8        MR. COHEN:      Did he have any nickname other than George or only goes as George?

9        MR. SAMATAS:     Again, Bruce you're going into the depo and I'm going to object based on

10  the code citation, you want a what, you know what, nail me all you want on a 2004 as David just said but I'm

11  going in to protect the trust so I'm trying to be cooperative and it's irritating is the way I have to deal with it

12  and I'm sure I'm irritating to everyone on this phone and there's a global apology to it all but so, go ahead.

13  David I'm sure, you know, you said, that he already explained to you, you've got your rights to do whatever

14  you want independent of what he does and just to conclude today.  Because obviously, I'm not trying to be

15  uncooperative although that may appear to be the case.  My dad's middle name, my dad was the settler, the

16  trust was executed on 09/08/88.  It's a Discretionary Trust, [inaudible] from the settler's trust, grantee's trust.

17  So, what else you wanna know because that's about as far as I'm going.  The assets are excluded from the

18  bankruptcy court unless Judge Goldgar tells me otherwise.

19        MR. COHEN:      Well, I understand your position, that's . . .

20        MR. SAMATAS:     Oh you, I'll, I'll…

21        MR. COHEN:      …proceeding.

22        MR. SAMATAS:     You're not even, you're not even a secured creditor, okay?  I hope

23  someday I get to chase you for what money you owe me, okay?  That's, that's of course not within the

24  purview of today's conversation.  According to David, you have a contingent claim against me so, that grants

25  you the right to sit at the table and ask me the questions so, go for it buddy.

26        MR. COHEN:      Alright.

27        MR. SAMATAS:     What do you wanna know?

1       MR. COHEN:      So, your father's name was George and then had a middle name, you

2  didn't mention the name.

3       MR. SAMATAS:    He doesn't have it.  Eastern, I mean Mediterraneans don't believe in

4  middle names.

5       MR. COHEN:      Alright, so his first name is George and then his last name was what?

6       MR. SAMATAS:    Samatas.

7       MR. COHEN:      Alright, is he alive or is he dead?

8       MR. SAMATAS:    He is long dead.

9       MR. COHEN:      Alright.  And he created this trust and the name of the trust is what?

10      MR. SAMATAS:    The James Samatas Discretionary Trust.

11      MR. COHEN:      Alright, It's a written document?

12      MR. SAMATAS:    Yeah.  Yes.

13      MR. COHEN:      Do you have a copy of that document?

14      MR. SAMATAS:    Yeah.

15      MR. COHEN:      Who are the beneficiaries under that trust?

16      MR. SAMATAS:    I'm going to object at this point, you're getting into nitpicky stuff that I

17  think is outside of the scope of your creditor rights about what I owe stuff, again that I think it's excluded.  So,

18  I'm not going to respond to it.  Do whatever you want.  That's an absolutely worthless question to the issue of

19  this creditors' meeting.  And whether or not you have the right to review the trust and whether or not the trust

20  was subject to the bankruptcy estate is something that I shared with David and everybody else and the

21  citations and I'm going to pursue that because I don't believe that the Discretionary Trusts as I played so

22  therefore would not grant you the right to review it or ask the questions you're asking.  So, based on that, I'm

23  gonna object to it and not respond.

24      MR. COHEN:      Okay.  I take it is correct that  you are a beneficiary.  There may be

25  others, but you are a beneficiary...

26      MR. SAMATAS:    I'm not responding.  I'm not responding to Discretionary Trust questions.

27      MR. COHEN:      Who are the trustees of this trust?

1           MR. SAMATAS:     I'm not responding to specific trust   again, I'm going to say, it's not part

2  of the estate therefore it's not subject to the questions that the creditors gave me.  I'm going to hold that line.

3  I'm sorry.  I read the code, the code says it, and I know it's a spendthrift clause in the provision and therefore

4  it's irrelevant in Illinois law and is excluded.

5           MR. COHEN:     Is the trust represented by counsel?

6           MR. SAMATAS:     You're talking to him.

7           MR. COHEN:     Alright, you're the attorney for this Discretionary Trust?

8           MR. SAMATAS:     I'm the attorney for me, my revocable trust, my Discretionary Trust.

9  Yeah, it's me.  Lucky me.

10           MR. COHEN:     Okay, you represent your father's Discretionary Trust?  Is that correct?

11           MR. SAMATAS:     I didn't say that.  The answer is no.

12           MR. COHEN:     Does that trust have an attorney?

13           MR. SAMATAS:     You know, the problem with you guys is sometimes you don't even know

14  what the hell you're talking about.  That question doesn't make any sense.  I can't answer it.  I love when

15  lawyers ask questions and they don't know what they're talking about.

16           MR. COHEN:     What does…

17           MR. SAMATAS:     That's a question I don't understand.  David, I'm making a comment

18  again.  I know you think I'm being obstinate and difficult.  Bruce…

19           MR. HOLTKAMP:     You know he's asking about the James Samatas Discretionary Trust.

20  You can answer his question.  When he says your fathers, he means, James Samatas Discretionary Trust.  You

21  know what he's asking.

22           MR. SAMATAS:     I can't answer.  No, I don't know because that question doesn't make

23  any…

24           MR. HOLTKAMP:     Well now that I've clarified it, you know.

25           MR. SAMATAS:     Okay.  It needs clarification because I have no idea what he's asking.

26           MR. HOLTKAMP:     Well…

1     MR. COHEN:  Is there any attorney you know who has ever served as counsel for that

2 trust?

3     MR. SAMATAS:  Which trust?

4     MR. COHEN:  The Discretionary Trust.

5     MR. SAMATAS:  Well, there's several.  There's fifty, a hundred of them in my family.

6 You talking about the James, do you want to be more specific?

7     MR. COHEN:  Well, let's go back to that.

8     MR. SAMATAS:  Which are you talking about?

9     MR. COHEN:  Okay, thank you.  As I understand your testimony, your father is the

10 grantor of a Discretionary Trust, of which you are a beneficiary.  There may be others, you don't want to

11 discuss that.  Is that correct?

12     MR. SAMATAS:  No, that's not true what you said.  That's not an accurate statement.  I

13 can't answer an inaccurate question.

14     MR. COHEN:  Well let's go back part by part.

15     MR. SAMATAS:  Oh God.

16     MR. COHEN:  You did your testimony that your father is the…

17     MR. SAMATAS:  Honest to God, Bruce, you don't know what you're talking about.  Ask

18 the right question.  I can't answer a question that doesn't make any sense.

19     MR. HOLTKAMP:  Hey.

20     MR. SAMATAS:  I can't, I can't answer.  It doesn't make any sense.

21     MR. HOLTKAMP:  Okay...

22     MR. COHEN:  When you refer to a Discretionary Trust, what trust are you referring to?

23     MR. SAMATAS:  I don't know, I'm only referring to my Discretionary Trust.  That's all I

24 ever have referred to.

25     MR. COHEN:  What do you mean when you say your Discretionary Trust?

26     MR. SAMATAS:  Mine.

27     MR. COHEN:  Who is the grantor of your Discretionary Trust?

1       MR. SAMATAS:        George Samatas.  Already asked and answered.

2       MR. COHEN:          Alright.  And you are a beneficiary of that trust, correct?

3       MR. SAMATAS:        I'll say yes to that and that's about as far as I'm going.

4       MR. COHEN:          You're not going to tell us who else is or may be a beneficiary?

5       MR. SAMATAS:        It's not my Discretionary Trust.  I'm absolutely refusing  and objecting

6   based on the code section I have cited at the commencement of this, that the Discretionary Trust is not subject

7   to bankruptcy estate as I filed it.  That's my position.  You want to object to it, fight me on it.  Read the code

8   yourself.

9       MR. COHEN:          Do you have any interest in any trust other than, one, this Discretionary

10  Trust you just described, which your father is the grantor and your own trust, which you described earlier in

11  this proceeding.  Those two, do you have interest in any other trust?

12      MR. SAMATAS:        I don't recall.

13      MR. COHEN:          Do you have an interest in any business entity which itself has any

14  interest in any trust?

15      MR. SAMATAS:        Nice try, but if I have a trust and it's got a spendthrift clause on it, the

16  same will apply.  So, where are you going?  I've answered the question.  I'm not going to answer it because

17  it's not subject to the bankruptcy estate.  I've given you all, you have all the information on the revocable

18  trust, me individually, which are one in the same under the Revocable Trust agreement.  That's as far as I'm

19  legally obligated to provide you.

20      MR. COHEN:          What does it mean when you say you don't know whether you have any

21  other trust interests?  Does that mean you may have in the past but you don't recall…

22      MR. SAMATAS:        There could be, look, hypothetically there could be 20 trusts all over the

23  damn place that are derivatives of one original.

24      MR. COHEN:          Alright.

25      MR. SAMATAS:        You know, if you had a holding company and you had 20 derivative

26  companies from that, okay?  My Discretionary Trust rules that, that's it, that's all and it's not subject to

27  questioning your answering.  It has nothing to do, what are you trying to figure out?  If you successfully kick

1    my ass in litigation that you have some source of money?  Good.  Prove it.  If you don't believe that this is not

2    part of the bankruptcy or, you know, let's wait and see what happens in arbitration, Bruce.  And I'm not

3    answering these questions.  They're absolutely, I have legitimate objections to and I'm sticking to them.  I

4    don't know how long David wants to continue this ludicrous response between you and me.  I don't know.

5    I'll stay here all night if he wants and say the same thing.

6        MR. COHEN:        Does the Discretionary Trust that you've identified have an accountant?

7        MR. SAMATAS:        Not responding.

8        MR. COHEN:        Has the Discretionary Trust that you've identified ever had an

9    accountant?

10        MR. SAMATAS:        Not responding.  Outside the purview of the bankruptcy estate.

11        MR. COHEN:        Do you have an accountant?

12        MR. SAMATAS:        Who, me personally?

13        MR. COHEN:        Yes.

14        MR. SAMATAS:        Yes.

15        MR. COHEN:        Who is that?

16        MR. SAMATAS:        His name is Craig Lavus.

17        MR. COHEN:        What is his address?

18        MR. SAMATAS:        I don't know.

19        MR. COHEN:        What city does he practice in?

20        MR. SAMATAS:        I don't know.  In the world today, people practice all over.  I don't know

21    if he's in an office, at home, I have no idea.

22        MR. COHEN:        Is he a CPA?

23        MR. SAMATAS:        Yes.

24        MR. COHEN:        Where is he licensed?

25        MR. SAMATAS:        State of Illinois.  Land of Lincoln.

26        MR. COHEN:        Do you know his telephone number?

27        MR. SAMATAS:        No.

1          MR. COHEN:         Do you know his license number?

2          MR. SAMATAS:     No.  Right, why would I keep my CPA's license number?  What world

3 are you living in, Bruce?

4          MR. COHEN:         Where would we find…

5          MR. SAMATAS:     David?  Hello?  Look, David, you said you were going to just, this

6 happened last time, you said you were going to give him a few questions and this is just going nowhere.

7          MR. COHEN:         Where would you find…

8          MR. SAMATAS:     I'm asking Mr. Holtkamp for some assistance with this line of

9 questioning, it's going, just where I have no idea.

10         MR. HOLTKAMP:   Giving him a little latitude here.  Mr. Cohen, if you could wrap it up

11 though.  I'll give you five more minutes.  We're going on two and a half hours here.  So, go ahead.

12         MR. COHEN:         Who maintains the business records of the Discretionary Trust?

13         MR. SAMATAS:     I don't know.

14         MR. COHEN:         Do you receive written material concerning the trust from any person or

15 entity?

16         MR. SAMATAS:     No.

17         MR. COHEN:         Have you ever received written information concerning that trust from

18 any person or entity?

19         MR. SAMATAS:     No.  Alright, you got three minutes to go.  Make them good.

20         MR. HOLTKAMP:   Mr. Samatas, I could extend that if you would like.

21         MR. SAMATAS:     I really appreciate that, David.  That's extremely thoughtful of you.

22         MR. HOLTKAMP:   Well let's just answer the questions, okay?  Let's just answer, yes, no.

23 Just answer the questions.  Or if you want to not answer the questions, just say that and we'll deal with it.

24 Okay?

25         MR. SAMATAS:     Okay.

26         MR. COHEN:         Thank you.  Have you ever signed any documents concerning that trust?

27         MR. SAMATAS:     Can't answer that question.  Too broad.

1        MR. COHEN:           Does that mean that you have signed…?

2        MR. SAMATAS:         I don't, I can't answer.  The statement was brief as Mr. Holtkamp advised

3   me.  I can't.  I don't know.

4        MR. COHEN:           Have you ever filed any information, your federal tax returns concerning

5   those trusts?

6        MR. SAMATAS:         I don't understand the question.

7        MR. COHEN:           Have you ever filed any of your federal tax returns, any information

8   concerning the Discretionary Trust?

9        MR. SAMATAS:         I don't understand that question.  It doesn't make any, I can't answer it

10   because it doesn't make any sense to me what you're asking.

11        MR. COHEN:           So, if I understand your testimony here, all of your knowledge

12   concerning the Discretionary Trust, you've learned orally.  Is that correct?  Nothing in writing, all orally?

13        MR. SAMATAS:         No.

14        MR. COHEN:           Never made the representation as your interpretation.  You know, if you

15   can't answer the question.  So, what documents have you received concerning the trust…

16        MR. SAMATAS:         Tax returns.

17        MR. COHEN:           …at any time?

18        MR. SAMATAS:         Tax returns.

19        MR. COHEN:           Okay.

20        MR. SAMATAS:         Tax returns.  That help?

21        MR. COHEN:           Okay.  Anything beyond tax returns?

22        MR. SAMATAS:         Relative to what?

23        MR. COHEN:           Relative to the Discretionary Trust.

24        MR. SAMATAS:         And what about it?  It's existence?  What?  What is it you want to know?

25        MR. COHEN:           Anything and everything.

26        MR. SAMATAS:         Can't answer it.  Too broad.  I have no idea what you're asking.

1      MR. COHEN:      So, does that mean you have received documents concerning the trust

2  other than tax returns?

3      MR. HOLTKAMP:    Hey, let's just, guys, I'm going to cut it off.  Okay.  Let me just, I think I

4  can ask a few questions that might be able to clarify this and then we can be done.  Mr. Samatas, you have

5  copies of the Discretionary Trust and the Revocable Trust.  Correct?

6      MR. SAMATAS:     Correct.

7      MR. HOLTKAMP:    Okay.  And you are the beneficiary of the Discretionary Trust.  Correct?

8      MR. SAMATAS:     Yes.

9      MR. HOLTKAMP:    Okay.  Are you the trustee…

10     MR. SAMATAS:     Current beneficiary.

11     MR. HOLTKAMP:    Yes, current beneficiary.  Are you…

12     MR. SAMATAS:     I'm a co-trustee.

13     MR. HOLTKAMP:    And who else, who is the other trustee?

14     MR. SAMATAS:     Craig Lavus.

15     MR. HOLTKAMP:    Okay, and there's no other questions?

16     MR. COHEN:     How do you spell that, please?

17     MR. HOLTKAMP:    It's in the schedules.  So, do, are there any other trustees?

18     MR. SAMATAS:     No.

19     MR. HOLTKAMP:    Okay.  Now Mr. Cohen, I think we're done with your line of questioning.

20  I would just, you know, tell you to do your own 2004.  I think we have US Bank and Chase, maybe, on the

21  line.  I'm really hoping they don't have any questions but if they do, speak up now.  Okay, I don't hear

22  anything.  So, I'm going to go ahead and conclude the meeting of creditors.  And, you guys, if anybody needs

23  a copy of the recording, let me know and we'll get that out as soon as possible.  Okay?  And, alright…

24     MR. COHEN:     Thank you David, I'll, I'd like a copy of this transcript...

25     MR. HOLTKAMP:    Email me.  I need it in writing so email it to me.

26     MR. COHEN:     That's fine.

1          MR. HOLTKAMP:    Okay.  Anybody else that needs it, send me an email and we'll get it out

2      to you, okay?  So that's it for today.  I'm concluding the 341 meeting, there won't be a continued one.  Good

3      luck, Mr. Samatas.

4          MR. SAMATAS:    Thank you.

5          MR. HOLTKAMP:    Yes.

6

7                              ###