## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 20-17355 |
| JAMES SAMATAS, | ) | |
| | ) | Hon. A. Benjamin Goldgar |
| Debtor. | ) | Hearing Date: March 8, 2021 |
| | ) | Hearing Time: 9:30 a.m. |

**DEBTOR'S COMBINED RESPONSE TO:** *(A) UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS CASE PURSUANT TO 11 U.S.C. 1112(B) (RECOMMENDING CONVERSION) (DKT. NO. 33); (B)  MOTION OF CARLYE GOLDBERG SAMATAS TO CONVERT CASE TO CHAPTER 7 (DKT. NO. 36); AND, (C) COHEN & LORD, P.C.'S MOTION TO JOIN THE MOTION OF CARLYE GOLDBERG SAMATAS TO CONVERT CASE TO CHAPTER 7 (DKT NO. 53)*

NOW COMES Debtor, James Samatas ("Debtor" or "Samatas"), by his attorneys, Ariel Weissberg and the law firm of Weissberg and Associates, Ltd., and as *Debtor's Combined Response to (a) United States Trustee's Motion to Convert or Dismiss Case Pursuant to 11 U.S.C. 1112(b) (Recommending Conversion) (Dkt. No. 33); (b)  Motion of Carlye Goldberg Samatas to Convert Case to Chapter 7 (Dkt. No. 36); and, (c) Cohen & Lord, P.C.'s Motion to Join the Motion of Carlye Goldberg Samatas to Convert Case to Chapter 7 (Dkt No. 53)*; Samatas states as follows:

## I.    INTRODUCTION

1.    On September 21, 2020, the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division seeking to reorganize under Chapter 11 of the Bankruptcy Code.

2.    Samatas, an attorney licensed to practice law in the State of Illinois, has not actively practiced law for many years; and when he did, Samatas never concentrated in matters

involving creditor's rights, let alone insolvency or bankruptcy. Rather, for at least the past 10 years, Samatas was a businessman focusing on the family business of owning and operating healthcare businesses and the real estate where these businesses operated.

3.      Through various affiliated companies, the Samatas family owns and operates eight nursing homes. Since the passing of Samatas' father, Samatas and his two siblings are the principals of these businesses. Typically, the ownership of each nursing home is structured with each nursing home having three affiliates: one to own the real estate where the nursing home operates (or "propco"); one to own the company operating the nursing home (or "opco") and a management company tasked with managing the "back-office" operations of each nursing home.

4.      The eight (8) nursing homes (i.e., there were 10 but two of the nursing homes were sold)[1] operate under the common name of Lexington Healthcare Systems, with each facility identified by the municipality where the facility is located. Thus, the facility in Bloomingdale, Illinois has as its key affiliate, "Lexington Healthcare Centers of Bloomingdale, Inc." (collectively, the "Lexington Nursing Homes").

5.      In addition, Samatas is affiliated with five companies,[2] which manage one or more of the Lexington Nursing Homes or the following healthcare businesses to which Samatas has an affiliation, including the following entities: Curatess, LLC, a telemedicine company; (b) Merit Sleep Technologies, Inc. and Merit Sleep Centers, LLC, that own and operate centers involved in conducting sleep studies for sleep apnea; (c) Merit Private Duty Nursing Services,

---

[1] The eight nursing homes operate as Lexington Healthcare Centers of Bloomingdale, Lexington Healthcare Centers of Chicago Ridge, Lexington Healthcare Centers of Elmhurst, Lexington Healthcare Centers of LaGrange, Lexington Healthcare Centers of Lake Zurich, Lexington Healthcare Centers of Lombard, Lexington Healthcare Centers of Orland Park and Lexington Healthcare Centers of Schaumburg.
[2] Those management companies are Lexington Financial Services, LLC, Lexington Financial Services II, LLC, Lexington Financial Services III, LLC and Vesta Management Group, LLC ("Vesta"). The first four companies are principally self-insurance companies. Vesta is the principal management company over all healthcare businesses and their facilities.

LLC, a home healthcare company; (d) Merit Center for Sleep Health of Chicago Lake Shore,

LLC, another sleep center business; and (e) Lexington Private Care Services, Inc., a provider of

home healthcare services.

6.     Samatas' affiliation with these healthcare companies is through the James

Samatas Discretionary Trust under Trust Agreement dated September 8, 1988 ("Discretionary

Trust"), which owns the equity interests in these companies, except for Lexington Healthcare

Systems of Lombard, Inc., Lexington Health Systems of Lombard, L.P., Sambell of

Bloomingdale, L.P., Sambell of Bloomingdale, Inc. and Lexington Healthcare Center of

Lombard, Inc.  Samatas' affiliation with these five companies is through ownership by the James

Samatas Revocable Trust, under Trust Agreement dated May 6, 1997 ("Revocable Trust").

7.     Thus, Samatas, individually does not own the equity security interest in these

healthcare affiliates.  The Discretionary Trust owns one-third of the equity security interest in all

of these healthcare companies, except for the five companies noted in paragraph 6, above, in

which the Revocable Trust owns a one-third interest.

8.     The other two-thirds are owned by Samatas' siblings ("Siblings") or the Sibling's

trusts: (a) John Samatas; and (b) Cynthia Theim.

9.     The Discretionary Trust is not a "self-settled" trust.  The Grantor of the

Discretionary Trust is Samatas' father, George Samatas, with Samatas being the sole beneficiary

during his lifetime.  The original trustees of the Discretionary Trust were Samatas and George P.

Colis, with the latter succeeded as co-trustee by Craig Labus, a certified public accountant.  The

Discretionary Trust was created by a written Trust Agreement that was prepared by Katten

Muchin and Zavis dated September 8, 1988 ("Discretionary Trust Agreement").  The

Discretionary Trust Agreement contains a spendthrift provision (Discretionary Trust Agreement

Article IX).  There are no facts to show that the grantor, George Samatas, established the

Discretionary Trust – or the nearly-identical discretionary trusts that George Samatas established

for each of the Siblings – in bad faith.  Samatas and the Siblings inherited the healthcare

businesses after George Samatas' passing, which at the time of George Samatas' death, were

thriving, cash-flow positive businesses.

        10.     The Revocable Trust is a "self-settled" trust.  The Revocable Trust was

established through a written Trust Agreement dated May 6, 1997, which was amended twice

with the second amendment executed on February 13, 2015, and the first amendment executed

on December 9, 2004.  These documents were prepared by Katten, Muchin and Zavis.  Samatas

is the grantor, trustee and beneficiary of the Revocable Trust.

        11.     On July 2, 2018, a Judgment of Dissolution of Marriage ("Divorce Decree") was

entered by the Superior Court of California, County of Los Angeles, in the dissolution of

marriage action captioned as, *James Samatas, Petitioner v. Carlye Samatas, Respondent*, as Case

No. BD 604 752 ("Divorce Case"), through which Samatas dissolved his marriage to Carlye

Samatas ("Carlye"), and the parties equalized their personal and real properties in their marital

estate.  A copy of the Divorce Decree is  appended hereto as **Exhibit 1**.  As indicated in the

Divorce Decree, Samatas and Carlye were married on August 19, 1979, separated on June 15,

2014, with the Petition to initiate the Divorce Case filed on July 9, 2014, and Carlye's Response

to the Petition filed on July 2, 2014 ("Divorce Decree, Stipulated Facts para. 1A).

        12.     Also, according to the Divorce Decree: (a) prior to executing the Divorce Decree,

Carlye "took possession of considerable personal property of the parties, including but not

limited to extensive jewelry, furs, furnishings and art. [Carlye] also purchased and furnished a luxury condominium home with more than $3 million in funds provided by [Samatas] (Divorce Decree, Stipulated Facts at para 1G); (b) prior to executing the Divorce Decree, Carlye engaged in extensive discovery, including through Samatas' production of approximately 8,000 pages of documents regarding Samatas' interests in business entities (*Id.* at para. 1H1); (c) Carlye investigated and Samatas disclosed and cooperated in Carlye's investigation of the assets of the Revocable Trust and the Discretionary Trust, including the businesses owned by these trusts, and the credit facilities encumbering the assets of these trusts (*Id*. at 1H2-5); (d) in particular, Carlye investigated and was advised concerning the values of two residential real properties, 9 Natoma, Oak Brook, Illinois (the "Natoma Property"), and 1424 Tanager, Los Angeles, California ("Tanager Property") (*Id*. at 1H2);l (e) in particular, Carlye investigated and was advised with specificity to Samatas' jewelry, collectables, antiques and artwork contained in the Natoma Property and the Tanager Property, including the purchase prices of these personal properties from specifically-identified vendors-dealers (*Id*. at 1H3)

13.     Importantly, through the Divorce Decree, Carlye released and resolved any possible claims that Carlye had or may have to assets owned by the Discretionary Trust, including any income or funds that Samatas derived or may derive from or through the Discretionary Trust (*Id*. at para. 1L) ("All such contentions and disputes are fully released and resolved by this Settlement" *Id*.).

14.     Also, according to the Divorce Decree, and specifically relating to the values of the Tanager Property and the Natoma Property, the parties acknowledged and represented that the value of each real property "may be significantly reduced or increased in the future,

depending on many different factors including, but not limited to, the present and future real

estate market "and the condition of the property (*Id*. at paras. 1M and 1O), with another material

factor impacting the value of the Tamager Property being the resolution or outcome of litigation

against the downslope neighbor and the up-slope neighbor (*Id*. at para. 1M).

15.     Also, according to the Divorce Decree, Carlye was awarded spousal support in the

amount of $1,740,000, payable in equal monthly installments of $20,000 ("Spousal Support").

Samatas' obligations for Spousal Support were secured by a second mortgage on the Tanager

Property, subordinate to the first mortgage indebtedness of $6,200,000 to JPMorgan Chase

("Chase") (Divorce Decree, Spousal Support).

16.     Finally, according to the Divorce Decree, Samatas was awarded specific assets,

free and clear of any rights of Carlye, except for the second mortgage on the Tanager Property

and, Carlye was awarded specific assets, free and clear of any rights of Samatas (*Id*. Divorce

Decree, Property).  The list of Samatas' assets was enumerated in the Divorce Decree with

specificity, including gemstones, automobiles, financial accounts,3 pens, watches, collectables,

artwork and causes of action (*Id.*).

17.     One of the causes of action that Samatas retained through the Divorce Decree was

the legal malpractice claim that Samatas was asserting through the action captioned as, *James

Samatas v. Cohen & Lord, et al.*, that was pending in the Circuit Court of California, County of

Los Angles, as Case No. BC-672323 ("Cohen & Lord Action").

18.     Samatas' pre-petition relationship with the Siblings is contentious: individually

and through their respective trusts, Samatas and the Siblings are parties to hotly-contested

---

3

The Divorce Decree identified 11 financial accounts, including a Roth IRA, four accounts owned by the Revocable
Trust and three accounts relating to expenses for the Tanager Property and the Natoma Property.

litigation pending in the Circuit Court of Cook County, Illinois, relating to the business and

financial affairs of their healthcare businesses.  Part of this dispute is driven by Samatas and the

Siblings' continuing obligations as guarantors of the indebtedness owed to certain credit facilities

of these businesses: namely, Mid-Cap Financial Services, LLC ("Mid Cap") and Fifth Third

Bank.  Mid-Cap is owed approximately $32,000,000, which is secured by first mortgages on four

of the Lexington Nursing Homes real properties.

19.    Pursuant to the forbearance agreement with Mid-Cap, four of the Lexington

Nursing Homes and their assets were to be marketed for sale and sold to satisfy the mortgage

indebtedness owed to Mid-Cap on or before April 1, 2021.  Presently, a Letter of Intent has been

tendered for the purchase of the assets of four of the Lexington Nursing Homes; but those terms

cannot be discussed because of pending confidentiality agreements.

20.    Presently, the Siblings and Samatas are engaged in settlement discussions to

resolve their respective claims against the other to foster the sale of the assets of the four

Lexington Nursing Homes.  Those discussions are unresolved, but are ongoing.

21.    Prior to the initiation of this bankruptcy case, Samatas initiated an action against

Carlye in the Circuit Court of California, County of Los Angeles captioned as, *James Samatas v.*

*Carlye Samatas,* Case No. 20 STCV 35064 ("Carlye Action").  Through the Complaint that

Samatas filed to initiate the Carlye Action, Samatas alleged that Carlye had tortiously interfered

with Samatas' rights in the Tanager Property.

22.    On February 24, 2020, Carlye tendered to Samatas a written notice of default,

claiming that Samatas had defaulted in his obligation to pay Carlye the Spousal Support.  On or

about May 28, 2020, Carlye filed a notice of default, setting a foreclosure sale of the Tanager Property for September 22, 2020 ("Foreclosure Sale").

23.    On October 22, 2020, the Office of the United States Trustee convened the initial First Meeting of Creditors in this bankruptcy case ("Initial Session").  As of that date, Samatas was unrepresented by counsel, and he had not fully complied with the filing requirements of a Chapter 11 debtor.  Specifically, on October 22, 2020, Samatas had not filed Schedules A/B, C, G, H, I or J, his Statement of Financial Affairs and the reports required pursuant to F.R.B.P. 2015.3.

24.    Notwithstanding, at the Initial Session, Samatas was examined at length concerning his financial affairs, including the Revocable Trust and the Discretionary Trust, the Natoma Property, the Tanager Property, the Samatas family healthcare businesses and Samatas' sources of income.

25.    On November 2, 2020, Samatas filed his Statement of Financial Affairs (DE 20), Schedules A/B, C, G, H, I and J (DE 22), and his Chapter 11 Statement of Your Current Monthly Income (DE 21).

26.    On November 19, 2020, Samatas attended the second session of his First Meeting of Creditors ("Second Session").  At the time, Samatas was still unrepresented by counsel.  At the Second Session, Samatas again testified to his financial affairs in response to questions posed by the United States Trustee, Carlye's lawyer and Bruce Cohen, the principal of Cohen & Lord. At the conclusion of the Second Session, the United States Trustee concluded the First Meeting of Creditors.

27.     On November 23, 2020, this Court granted the United States Trustee's Motion for 2004 examination of James Samatas and Carlye Samatas (filed on November 13, 2020, as DE 26) (Order DE 29).  Pursuant to this Order, the United States Trustee served a Subpoena on Samatas that was returnable on January 8, 2021, requiring Samatas' production of documents, and subsequently another examination ("Subpoena").

28.     On or about December 30, 2020, Samatas contacted Ariel Weissberg, seeking representation of Samatas in the Bankruptcy Case.  On January 7, 2021, Ariel Weissberg filed his Appearance for Samatas (DE 43).

29.     On January 8, 2021, Samatas sent a timely letter to the United States Trustee objecting to the scope and the time given to respond to the Subpoena pursuant to Federal Rule of Bankruptcy Procedure 9016 and Federal Rule of Civil Procedure 45(d)(2)(B) and (3).

30.     On January 17, 2021, Samatas filed his Monthly Operating Reports for September, October, November and December, 2020 (DE's 47, 48, 49 and 50).

31.     On January 20, 2021, Samatas filed his Amended Schedules A/B, C, G, H and I (DE 60), his Amended Statement of Financial Affairs (DE 63) and his Amended Schedules D, E and F (DE 61).

32.     On January 24, 2021 and February 4, 2021, Samatas filed eight Reports mandated by Federal Rule of Bankruptcy Procedure 2015.3, reporting on the financial affairs of the Discretionary Trust and other affiliates (DE's 70-71, 82-87).

33.     Also, on January 24, 2021, Samatas tendered to the United States Trustee a written response to the documents requested from Samatas pursuant to the Subpoena.

34.     On January 27, 2021, Samatas tendered all of the documents that the United

States Trustee and Samatas resolved that Samatas should tender, subject to several unresolved

email communications.  The discussions between Samatas and the United States Trustee relative

to Samatas' production of certain email correspondence remains in process.  Samatas intends to

be examined pursuant to the Subpoena.

## II.     THE CLAIM OF THE ESTATE AGAINST COHEN & LORD

The legal malpractice action involves claims for professional negligence and breach of

fiduciary duty against Cohen & Lord APC, and his former attorneys James Boyle and Bruce

Cohen (collectively referred to as "Cohen & Lord") arising out of legal services pertaining to the

investigation, work up, and litigation of a lawsuit related to the purchase of real property, as well

as related events and consequent disputes arising from the same.  The subject real property is the

Tanager Property, and the purchase and sale of the Tanager Property is referred to as "Sale."

The lawsuit in which Samatas was a Plaintiff  both as Trustee and an individual, along with his

ex-wife, Carlye, was captioned as, *Carlye Samatas, et. al.  v. Nile Niami, et al.*, Los Angeles

Superior Court, Case Number BC456738, and was handled, fully, by Cohen & Lord.

("Underlying Lawsuit" or "Underlying Case" or "Underlying Action.")

### A.     *Samatas' Key Legal Malpractice Allegations Against Cohen & Lord*

Cohen & Lord held itself out publicly and so represented to Samatas that it specialized

and had great expertise in construction defects claims, including residential construction cases.

Cohen & Lord further represented to Samatas that it was a highly seasoned and experienced law

firm in the area of construction defects and had taken similar cases to that which it was retained

by Samatas, to trial.  These representations were not true yet, had been made to Samatas prior to

his retainment of Cohen & Lord on October 11, 2010.

Cohen & Lord failed to adequately investigate matters related to the strength and weaknesses of Samatas' potential claims in the Underlying Case, despite having been retained approximately three months prior to the filing of the Underlying Lawsuit. Specifically, Cohen & Lord failed to conduct their due diligence in the Underlying Case, in terms of exploring and properly analyzing the likelihood of success for certain causes of action, including but not limited to those for intentional and negligent misrepresentation against named defendants who were seller's brokers in the Underlying Case. Cohen & Lord further failed to name the appropriate parties and identify the appropriate causes of action. For instance, causes of action for professional negligence and breach of fiduciary duty existed against certain parties, particularly Samatas' own broker Bridget Martens, and her firm Sothebys, who ultimately were not named. In addition to failing to apprise Samatas of the strength of potential claims against Martens, Cohen & Lord failed to prepare adequately for Ms. Martens' deposition. Then, at the time of Ms. Martens' deposition, Cohen & Lord failed to adequately react and rehabilitate or clarify her damaging deposition testimony. Thereafter, Cohen & Lord compounded their failings relating to Martens by failing to immediately report to Samatas, her adverse testimony, and by failing to adequately re-evaluate Samatas' claims, including his claims against Seller's Brokers, and apprise Samatas of the increased risks he now faced, instead, choosing to dishonorably trudge their way towards trial, despite knowing Samatas' claims were becoming more and more unlikely each day. It is Samatas' position that Cohen & Lord purposely did so simply to generate more fees for their firm. Cohen & Lord was also negligent in failing to preserve Samatas' claims against Martens by timely seeking a tolling agreement and, if need be, by failing to initiate an action against Martens, separately or in connection with the Underlying Lawsuit. As a result of the aforementioned, Cohen & Lord allowed for the statute of limitations against Ms. Martens to expire. If Samatas had been properly advised regarding Ms. Martens, the potential claims against her, and her damaging testimony, this would have influenced his strategy in relation to causes of action against the seller's brokers for negligent and intentional

misrepresentation, in that, Samatas would have dropped the same [and avoided seven figures worth of legal fees], and he would have brought claims against her for negligence and breach of fiduciary duty.  Claims against Martens, unlike the previously mentioned claims against Seller's brokers for intentional and negligent misrepresentation, would have allowed for damages to be allocated based on percentage of fault which given a key issue in the dispute regarding whether Samatas knew or did not know whether the house was "brand new" prior to the time of its purchase (Samatas vehemently denies having knowledge immediately prior to the time of purchase that the Tanager Property was brand new), would have significantly impacted the result of the Underlying Matter in Samatas' favor.

Cohen & Lord also failed to adequately prepare their own witnesses for deposition, and altogether for trial.  Cohen & Lord failed to adequately prepare and examine witnesses, including Samatas, submitted erroneous, inconsistent, and confusing jury instructions, and submitted erroneous, inconsistent, and confusing special verdict forms.  As Samatas' attorneys, Cohen & Lord also failed to exercise due care and render legal services, which were reasonably required to protect Samatas' interests in avoiding, or dismissing, or settling causes of action which Cohen & Lord knew, or should have known, had little to no likely chance of success.  Also, Cohen & Lord failed to advise Samatas of the risk of proceeding with such claims, including the risk of the costs of prosecution and the risks of losing on such claims, such as exposure to taxable costs and/or prevailing party attorneys' fees awards, and so on.

In addition to the above, Cohen & Lord breached their fiduciary duties to Samatas in various ways, including but not limited to the following:  First, Cohen & Lord failed to disclose and kept secret from Samatas, the fact that Ms. Martens' testimony was damaging to his Underlying Lawsuit, until months down the line, when it was too late and the damage to his claims had already been done.  Cohen & Lord's failure to notify Samatas regarding Ms. Martens' damaging deposition testimony, as well as other failures related to Martens, as mentioned herein, are reasonably believed to be the result of a pre-existing relationship which the Cohen & Lord

had with Martens, in that she was Samatas' referral source to the Cohen & Lord, prior to the commencement of the Underlying Lawsuit.  Next, Cohen & Lord failed to disclose and kept secret from Samatas, the fact that they had allowed the statute of limitations period for which Samatas could have brought causes of action against Martens to expire.  Cohen & Lord also fraudulently concealed their own negligence, so that Samatas would continue to believe that Cohen & Lord had, and were, competently representing his interests, and so that Cohen & Lord could continue to realize a pecuniary benefit for their legal services to Samatas.

To add insult to injury, both Samatas, as an individual, and Carlye, as an individual, had been named as plaintiffs in the Underlying Lawsuit, yet the Court ultimately ruled that neither one should have been named, because the only appropriate plaintiff with claims against the Underlying Lawsuit's defendants, was Samatas, as the Trustee of the Revocable Trust.  Indeed, neither Samatas, as an individual, nor Carlye, as an individual, had standing to bring claims against defendants in the Underlying Lawsuit because it was the Revocable Trust (as opposed to the Samatas' as individuals) who had purchased the Tanager Property; and therefore, had a right to pursue legal claims against the Underlying Lawsuit's defendants.  As a result of Cohen & Lord's errors in naming them as individual plaintiffs in the Underlying Lawsuit, prevailing party attorney's fees were awarded against both Samatas and Carlye, as individuals, and defendants in the Underlying lawsuit won a partial verdict.

In addition to Cohen & Lord's rendering of legal services well below the standard of care, they billed Samatas for the Underlying Case, approximately $3.9 million while logging thirteen thousand, six hundred, and forty (13,640) hours by sixteen (16) timekeepers including lawyers (partners and associates) and legal assistants.  Cohen & Lord failed to provide Samatas with the requisite services or standard of services necessary to justify the approximately $3.9 million dollars in attorney's fees and costs, which they charged him.  To be clear, Cohen & Lord breached their fiduciary duty to Samatas by charging excessive legal fees for services not reasonably required with respect to the Underlying Case.  Cohen & Lord grossly overcharged, as

well as inflated and padded the time charged to Samatas for work they performed in relation to

claims which Cohen & Lord knew or should have known, had little to no viability for success.

Cohen & Lord also manufactured work not to advance Samatas' cause, but instead solely to

increase their fees, and even charged Samatas for work which was not performed and/or he had

not been authorized.

**B.**    ***Procedural History of Mr. Samatas' Legal Malpractice Claims***

    **a.**    **Legal Malpractice Lawsuit Originally Filed in Los Angeles Superior Court**

Given the previously mentioned actions by Cohen & Lord, on August 15, 2017 Jim

Samatas, as an individual, as well as Trustee of the Revocable Trust (collectively "Samatas"),

filed a lawsuit alleging causes of action for legal malpractice and breach of fiduciary duty against

Cohen & Lordin Los Angeles Superior Court, Case Number BC672323. (See LASC Complaint

attached hereto as **Exhibit 2**).  On November 20, 2017, Cohen & Lord's Petition to Compel

Arbitration was heard and granted, and shortly thereafter, this matter was transferred to JAMS.

There have also been two mediations, both of which were unsuccessful.

    **b.**    **Legal Malpractice Claims Subsequently Transferred to JAMS for Arbitration, and Subsequent Filing of Cross-Claims by Cohen & Lord for Attorneys' Fees**

Following the issuance of an order compelling arbitration, and on November 27, 2018,

Cohen & Lord filed a counter-claim for attorney's fees in the amount of nearly $3 million plus

interest. (See Notice of Counter-Claim attached hereto as **Exhibit 3**).  Subsequently, on

December 4, 2018, the matter was assigned to Arbitrator Hon. Gaile Andler (Ret.)  While Cohen

& Lord conveniently claims they are owed additional fees, Samatas contends that he does not

owe Cohen & Lord anything, and to the contrary, is entitled to a refund of the fees paid.  By

reason of Cohen & Lord's herein-mentioned breaches of fiduciary duty, all fees charged to

Samatas by Cohen & Lord are tainted such that any unpaid fees charged should be forfeited.

Samatas is also entitled to disgorgement by Cohen & Lord of fees already paid.

### i.    Arbitrator's Orders Regarding Discovery

After briefing by all sides, Arbitrator Andler issued two Orders regarding discovery, essentially allowing for Samatas to take one deposition – that is – for defendant James Boyle, and Cohen & Lord to take one deposition only, of plaintiff, Samatas. (See Orders in Arbitration regarding depositions, respectively issued on September 6 and October 25, 2019 attached hereto as **Exhibits 4 and 5**, respectively).

### ii.    Arbitrator's Order Regarding Cohen & Lord's Request for Leave to File Dispositive Motion, and Parties' Key Arguments

Further, on or about January 31, 2020, parties submitted a joint briefing letter in arbitration regarding whether an order should be issued allowing Cohen & Lord to file a dispositive motion against Samatas' claims. (See Joint Letter regarding Dispositive Motion attached hereto as **Exhibit 6**). The parties' anticipated positions for the dispositive motion are summarized immediately below:

### 1.    Dispositive Motion – Cohen & Lord's Arguments

Cohen & Lord's, who would be the moving party shall argue that the requested dispositive motion would focus on Samatas' assertion that Cohen & Lord committed legal malpractice and breached their fiduciary duties to Samatas when—during their handling of the underlying lawsuit surrounding Samatas's purchase of an 8.25-million-dollar home in the Hollywood Hills (i.e., the Tanager Property) —they allegedly failed to assert (1) fraud, negligent misrepresentation, and general negligence claims against Samatas's real estate broker, Bridget Martens, and her agency; and (2) general negligence claims against the seller's real estate brokers. These allegations are based on the assertion that Martens and the sellers' brokers failed to inform Samatas that the Tanager Property was not new, but instead was almost completely remodeled. Cohen & Lord improperly believes these claims can be completely eliminated as a matter of law in light of undisputed evidence already elicited during the underlying case

regarding disclosures by various parties to Samatas regarding whether the home he purchased was "brand new." It is Cohen & Lord's position that after hearing many hours of evidence on the topic, the jury found that Samatas was aware that the house he purchased was not, in fact, new construction from the ground up, but instead consisted of remodel of and additions to an existing structure. This finding led the jury to conclude that although material misrepresentations had been made by certain defendants other than Martens—including the sellers' brokers—there was no reliance on the misrepresentations by Samatas, and thus the negligent and intentional misrepresentation claims failed against those defendants. (See Joint Letter regarding Dispositive Motion, Pages 1-2 attached hereto as **Exhibit 6**).

## 2.      Dispositive Motion – Samatas' Position

Cohen & Lord's dispositive motion will fail because it does not address all claims being made by Samatas.  For instance, Cohen & Lord's arguments do not ascertain whether Samatas' *own broker*, Bridget Martens, and her agency were at fault, and the elements and standards used to determine the misrepresentation causes of action against seller's brokers are completely different than those which would have been used to determine negligence and breach of fiduciary duty against Martens/Sothebys.

To be clear, the central purpose of Samatas' malpractice action is not to challenge the trial court's findings in the underlying litigation. Instead, Samatas argues that the Cohen & Lord's attorneys breached their duties, culminating in unfavorable decisions against Samatas in the underlying action. Had Cohen & Lord asserted general negligence claims against Martens -- that is, specifically, that but for Cohen & Lord's failure to name Martens and Sotheby's International Realty and allege causes of action for negligence and breach of fiduciary duty, Samatas would have had the opportunity to prosecute and collect, at least some portion of the damages he sought (minus any potential findings of comparative negligence.) In other words, if

Page **16** of **36**

causes of action had been pled and Ms. Martens and Sothebys named, at the very least, the jury would have had the opportunity evaluate breach of fiduciary and negligence claims, and if necessary, apportion damages on the basis of comparative negligence. The negligence claims would not have been altogether defeated like the misrepresentation causes of action against the seller's brokers were, if Martens and Sothebys had been named. (See Joint Letter regarding Dispositive Motion, Pages 9-10 attached hereto as **Exhibit 6**).

Another reason for why Cohen & Lord's dispositive motion will fail is that in *Ruffalo v. Patterson* (1991) 234 Cal. App. 3d 341, 344, the sole issue before the Court of Appeal was whether Plaintiff was collaterally estopped, by the court's determination in the marital dissolution action, from raising issues with respect to the community or separate character of the certain property in the legal malpractice action. Plaintiff's contention in *Ruffalo* was that the court's decision therein would have been different absent the negligence of the attorney, who was the defendant in the action. The Court of Appeal ultimately agreed with Plaintiff stating that "To hold otherwise would be to rule that where an attorney's negligence has caused a court to make an erroneous adjudication of an issue, the fact that the court has made that adjudication absolves the attorney of all accountability and responsibility for his negligence. That cannot be and is not the rule." *Id.* The court's reasoning in *Ruffalo* is equally applicable here because it shall be Samatas' contention that the Jury's decision in the underlying matter would have been different, absent the negligence of his attorneys, which caused the erroneous adjudication of certain issues. (See Joint Letter regarding Dispositive Motion, Pages 9-10, attached hereto as **Exhibit 6**).

    **c.**    **Arbitrator's Briefing Schedule Prior to Samatas Filing Bankruptcy, Current Procedural Posture, and need to Coordinate New Arbitration Dates**

At the time of Samatas' filing for bankruptcy, and prior to initiating a stay in the arbitration proceedings, the following litigation schedule had been set: Parties' depositions were to take place by no later than October 31, 2020; Cohen & Lord's dispositive motion was to be

filed by February 22, 2021; Samatas' opposition to Cohen & Lord's dispositive motion was to be

filed by March 22, 2021; Cohen & Lord's reply to Samatas' opposition to their dispositive

motion was to be filed by March 29, 2021; there was to be a hearing date set for the dispositive

motion, and; the Arbitration Hearing was scheduled to commence August 4, 2021.

Subsequent to Samatas' bankruptcy filing, all previously set dates became subject to stay.

Thus, a newly modified arbitration schedule will have to be implemented.

**C.**    ***Samatas' Various Claims Against Cohen & Lord Must Be Pursued***

Given the above-mentioned, and aside from the highly excessive fees which Cohen &

Lord charged, it is Samatas' position that his claims against Cohen & Lord are viable and should

be pursued to their full extent.

### III.    THE SAMATAS BANKRUPTCY CASE SHOULD NOT BE CONVERTED OR DISMISED PURSUANT TO 1112(b) FOR "CAUSE"

This Court should not exercise its discretion under Section 1112(b) to dismiss or convert

this bankruptcy case for cause, *Matter of Woodbrook Associates*, 19 F.3d 312 (7th Cir. 1994)

(Held: a bankruptcy court has broad discretion under 11 U.S.C Section 1112(b) to dismiss a

Chapter 11 case for cause).  The Movants cannot sustain their burden of proof, *Id*. at 317, that it

is in the "best interest" of creditors and the estate that this bankruptcy case is dismissed or

converted to a case under Chapter 7 of the Bankruptcy Code, See, *In Re: Jartram, Inc.*, 886 F.2d

859, 867 (7th Cir. 1989) (emphasizing that a bankruptcy court "may" convert or dismiss a

bankruptcy case under section 1112(b)).

In essence, the central issue for adjudication on the pending Motions is whether Samatas'

non-compliance with the requirements of a Chapter 11 debtor is sufficiently egregious that

Samatas should not be allowed to reorganize as a Chapter 11 debtor.  This is a complicated issue,

founded on the principle that a Chapter 11 debtor, with the accompanying "breathing spell" to

reorganize, is a privilege and not a right.  Admittedly, the uninitiated often fail to recognize that a

Chapter 11 case is a multi-textured legal proceeding, with many statutory and rule-based

requirements that are time- and accuracy-sensitive, that often challenge even the most

experienced bankruptcy lawyer.  To succeed, a Chapter 11 debtor must respect the system.  That

"system" has as its primary constituent, the Office of the United States Trustee, a policy-driven

organization that acts to protect the integrity of the bankruptcy system.  While a Motion to

Convert or Dismiss is a very unfortunate event when filed by the United States Trustee, typically

this Motion is more of a "cudgel" to spur a Chapter 11 debtor into compliance.  Typically, the

Motion to Convert or Dismiss remains on the Court's calendar throughout the process of

reorganization as a "tip of the spear in the back" of a debtor to ensure the debtor's attentive

compliance with the requirements of a Chapter 11 debtor, and brisk progress toward

reorganization.  This characterization is not to diminish the negative impact of the United States

Trustee's Motion to Convert or Dismiss in a pending Chapter 11 case.  But the reality is that this

Motion is a very effective device utilized by the United States Trustee to police the bankruptcy

system, and is a dramatic means of forcing a less-than-compliant Chapter 11 debtor to become

fully compliant and on the direct path to reorganizing, or failing that, suffering the serious

consequences of conversion or dismissal.

     The foregoing sacrosanct principles(including the need for compliance), and the key role

of the United States Trustee, is fully understood by Samatas.  No doubt, Samatas was arrogant in

perceiving that he could perform as a Chapter 11 debtor without experienced bankruptcy

counsel, especially when his primary creditors are an actively angry ex-wife, a former lawyer

that he is suing for legal malpractice and two disgruntled siblings. Admittedly, the first Motion

to Dismiss or Convert filed by the United States Trustee should have been a good indication to

Samatas that he should retain immediately experienced bankruptcy counsel, among other things,

to carefully prepare the Schedules and Statement of Financial Affairs. But Samatas' arrogance,

his failure to appreciate the depth and complexity of a Chapter 11 bankruptcy case and his

misunderstanding of the bankruptcy system – do not equate to dishonesty or bad faith. Any

mistakes or omissions by Samatas were innocent and unintentional, and certainly not calculated

to mislead, deceive or harm any of the constituents to this bankruptcy case.

True, Samatas is a lawyer; and thus, he must be held to a high standard of observing the

rule of law. But he is not a dishonest debtor, and he has worked diligently to correct his non-

compliance and the unintentional omissions that inevitably result when a person representing

himself becomes a "fool for a client."

While "compliance" is mission-critical in a Chapter 11 bankruptcy case, equally

important is a Chapter 11 debtor's laser-sharp attentiveness to the requests of the United States

Trustee for information. Prior to retention of counsel, Samatas tendered documents to the United

States Trustee, including proof of insurance, he attended an Initial Debtor Interview and opened

a DIP Account. Since retention of counsel: (a) Samatas filed accurate and detailed Amended

Schedules and an Amended Statement of Financial Affairs that indicate no pre-petition

dishonestly; (b) Samatas filed all Monthly Operating Reports that were in arrears, with no

indication of post-petition dishonestly; (c) Samatas filed the Reports concerning his affiliated

business organizations pursuant to FRBP 2015.3; (d) Samatas timely responded to the Subpoena,

and has timely produced documents in response to the Subpoena; (e) Samatas has communicated

with the United States Trustee to advance reorganization; (f) Samatas has communicated with

the Siblings to advance reorganization, including engaging in material settlement negotiations;

(g) Samatas has communicated with Carlye to advance reorganization, including engaging in

material settlement discussions; and, (h) Samatas has communicated with his two primary credit

facilities, Bank of America and Chase to advance reorganization, including offering to pay post-

petition payments.

     In short, Samatas has been deeply humbled and has attentively corrected his attitude,

perceptions, omissions and his prior lack of appreciation of the sanctity of the bankruptcy

system.  This "turnaround" is clear and convincing evidence of an <u>excused</u> failure to satisfy

timely any filing or reporting requirement established by the Bankruptcy Code or the Federal

Rules of Bankruptcy Procedure, Section 1112(b)(4)(F).

     While the United States Trustee's Motion to Convert or Dismiss is not taken lightly, it is

the false allegations and purposeful mischaracterization in Carlye's Motion to Convert that need

special attention.  Contrary to the assertions of Carlye, Samatas did not testify dishonestly at

either session of the First Meeting of Creditors.  Through more than five hours of testimony,

Samatas testified truthfully on every issue, including concerning his assets, liabilities, income

and expenses.  As a witness in a confrontational examination, especially when examined by

long-standing adversaries in hotly contested pre-petition litigation, Samatas was entitled to be

guarded, and even "chippy" when examined by a hostile and confrontational interrogator.

Remarkably, Samatas hesitancy to respond to questions concerning the Discretionary Trust were

resolved through Mr. Holtkamp's skillful and cordial explanation that questions on this topic

were "fair game" for an examination in a Chapter 11.  In contrast to Carlye's counsel, Mr.

Holtkamp's calm and non-confrontational explanations elicited a free-flow of truthful testimony from Samtas concerning the Discretionary Trust, and other salient issues, that might not have been as easily adduced through a consequent "power struggle" between an overly-aggressive interrogator and Samatas. In fact, the truthfulness of Samatas' testimony at the First Meeting of Creditors is borne out by the information in the Amended Schedules, the Amended Statement of Financial Affairs and the numerous documents Samatas produced to the United States Trustee pursuant to the Subpoena. Samatas stands ready to continue this standard of truth with testimony at an examination pursuant to the Subpoena, and at an evidentiary hearing on the pending Motions, to which Samatas asserts he is entitled to allow this Court to properly adjudicate the pending Motions.

In an attempt to discredit Samatas, Carlye asserts that Samatas is dishonest because in a side-by-side comparison of the information in Samatas' Financial Disclosure Document (Carlye Motion at Exhibit E) ("FDD") and the assets to which Samatas declared ownership in this Bankruptcy Case, there is a strong and suspicious difference. This is a pernicious assertion. What Carlye purposely failed to explain in her Motion is that in Samatas' FDD, Samatas disclosed assets comprising the <u>total</u> marital estate, as is required in the community-property State of California—that is, those property rights that existed <u>before</u> the entry of the Divorce Decree and before the equalization of those property rights. Thus, Carlye purposely failed to explain in her Motion that through the equalization of property between Carlye and Samatas pursuant to the Divorce Decree, there is an obvious and logical diminution of pre-Divorce Decree property of Samatas: namely, because a portion of the property in Samatas' FDD was transferred to Carlye pursuant to the Divorce Decree. Logically, this transfer to equalize

property would diminish the amount of property Samatas disclosed in the FDD, leading to

Samatas reporting in this bankruptcy case less  property than originally disclosed in the FDD.

Further, Carlye's assertions concerning the diminution of property ignore the testimony of

Samatas at his First Meeting of Creditors, where he explained any diminution when he repaid the

Discretionary Trust $3,000,000 through a transfer of paperweights and artwork, and when he

sold other personal property <u>after</u> the entry of the Divorce Decree in July, 2018 (See also,

Amended Statement of Financial Affairs pp. 5-6 for these post-Decree, pre-petition transfers).

Further, in Carlye's Motion, Carlye misstated that Section 1112(b) mandates conversion

if the Debtor fails to pay pre-petition spousal support.  To the contrary, Section 1112(b)(4)(P)

provides that "cause" exists if the Debtor fails to pay spousal support that "first becomes payable

<u>after</u> the date of the filing of the petition."  *Id*. (emphasis added).  Here, Samatas' spousal support

requirement first become payable in 2018, and not after September 21, 2020.

Contrary to Carlye's false assertions in her Motion, Samatas has made no unauthorized

pre- or post-petition transfers of property; Samatas has not caused or allowed diminution of the

estate; Samatas has not mismanaged the estate; Samatas is capable of reorganizing and

confirming a Chapter 11 Plan of Reorganization; and Samatas intends to pay all post-petition

taxes, including real estate taxes, on the Natoma Property and the Tamager Property.  The truth

of these statements will be proven conclusively at an evidentiary hearing on the pending

Motions.

The cornerstone of Carlye's assertions is based on the incorrect assertion that the

Discretionary Trust is "property of the estate" pursuant to Section 541 of the Bankruptcy Code.

The Discretionary Trust is not a "self-settled" trust, has a valid spendthrift provision and was not

created in bad faith.  There is no law in Illinois that supports Carlye's supposition that the

Discretionary Trust is an alter-ego of Samatas, and thus, the Discretionary Trust can be pierced

to become "property of the estate."  See, *Gierum v. Glick*, 568 B.R. 634 (Bankr. N.D.Ill. 2017)

That incorrect proposition fuels <u>all</u> of Carlye's accusations of alleged (yet completely

unsubstantiated) unpermitted transfers from and to Samatas, including pre- or post-petition

transfers between the Discretionary Trust and Samatas.  Besides, considering that Carlye

released all rights or claims to the Discretionary Trust in the Divorce Decree, after an exhaustive

investigation into the Discretionary Trust, Carlye cannot now argue competently that she has

rights in the Discretionary Trust.  See Divorce Decree, Stipulated Facts at para. 1L).  As such,

Carlye's arguments that these transfers are a diminution of the bankruptcy estate are false.

Samatas can reorganize, he has a firm strategy for reorganization, he will file a

confirmable Plan of Reorganization and he will otherwise continue to advance reorganization

pursuant to the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code.  The key to

reorganization is the sale of the Tanager Property at fair market value to the highest and best

offeror.  Since the filing of the petition, Samatas has actively marketed the Tanager Property,

without employing a broker, but through "sale by owner."  Recently, Samatas procured a written

offer through a Real Estate Contract from a prospective purchaser of the Tanager Property for a

gross purchase price of $9,300,000.  That offer provided for the immediate payment of

$1,500,000 in non-refundable earnest money, and was structured like an installment agreement

for warranty deed: that is, initially as a six-monthly lease, with the balance of the purchase price

paid at the conclusion of the sixth month from the date of execution of the Real Estate Contract,

as a final closing.  While the gross purchase price of $9,300,000 was favorable, Samatas

continued to explore whether other prospective purchasers of the Tanager Property existed at a higher gross purchase price and preferably with a final closing within 30 to 60 days from the execution of the Real Estate Contract.  Through these efforts, on February 13, 2021, Samatas procured another written offer pursuant to a Real Estate Contract for a purchase price of $9,000,000, without any material contingencies.  Presently, Samatas is negotiating with both prospective purchasers of the Tanager Property to better the terms of these written offers (including an increase of the gross purchase price), while he still combs the market for other prospective purchasers to offer even better terms.  Those discussions are ongoing and material. Presently, the sale of the Tanager Property is Samatas' central focus, and the key to why this Court should not dismiss or convert this bankruptcy case.  Samatas strongly asserts that shortly he will file a Motion in this Court to approve the sale of the Tanager Property for a gross purchase price in excess of $9,000,000.  This gross purchase price or a higher purchase price, if achieved, will substantially benefit the creditors of this estate.  Specifically, the total secured claims encumbering the Tanager Property equal $8,100,000.[4]  If the Tanager Property were sold at a gross purchase price of $9,300,000, the net proceeds of sale after payment of these secured claims encumbering the Tanager Property would equal approximately $900,000.

Pursuant to Court approval, Samatas would use these remaining funds for a number of purposes to advance reorganization.  First, Samatas would reinstate and become current on the first mortgage indebtedness due to Bank of America encumbering the Natoma Property, including the payment of any post-petition real estate taxes (the real estate taxes accruing on the Natoma Property equal approximately $27,000 per year).  Once Samatas becomes current on the

---

4 Chase is owed approximately $6,200,000; Carlye is owed approximately $1,400,000; Howard and Howard is owed approximately $30,000; Parker Mills is owed approximately $150,000 and Wolf Wallenstein is owed approximately $300,000 on their respective secured claims encumbering the Tanager Property.

Bank of America mortgage credit facility, Samatas would seek to refinance the mortgage

indebtedness due to Bank of America to cause the release of Carlye as a co-obligor on this

mortgage indebtedness.

In Carlye's cynical view, this Court should derail these good faith efforts to maximize the

proceeds of sale of the Tanager Property, among other reasons, arguing that Samatas cannot be

trusted to consummate this sale quickly and effectively. One of the bases for this argument is that

Samatas cannot be trusted in his valuation of the Tanager Property.  This argument rings hollow

considering that Carlye stipulated in the Divorce  Decree that the value of the Tanager Property

"may be significantly reduced or increased in the future, depending on many different factors…"

(Divorce Decree, Stipulated Facts at para. 1M).  Through much good faith effort, Samatas has

now substantiated that the value of the Tanager Property is at least $9,000,000, and these efforts

should not be derailed through the conversion of this case.

Samatas is hopeful that in the near future, that he can negotiate a settlement of all claims

that he has or may have against the Siblings, and any claims that the Siblings have or may have

against Samatas.  Those settlement discussions, while difficult, and sometimes contentious, are

ongoing.  Samatas believes that this settlement with his Siblings can be achieved, and once

achieved, will catalyze payments to Samatas, individually, and to his Discretionary Trust from

the sale of four of the Lexington Nursing Homes and their assets.  Currently, four of the

Lexington Nursing Homes and their affiliated companies, together with the Siblings and

Samatas, are involved in a prospective sale of the assets of these nursing home facilities.  The

terms of this sale cannot be disclosed because the parties are subject to confidentiality

agreements, but if this transaction were consummated, it will pay off in full Mid-Cap on its first

mortgage credit facility encumbering the subject Lexington Nursing Homes.  Samatas expects

that if this sale is consummated, that he could start to receive revenue either directly or through

the Discretionary Trust, or both, as soon as July 1, 2021, with that income stream continuing at

approximately $31,000 per month with substantial increases over a three-year period.

 Samatas is prepared to fund a Plan of Reorganization and otherwise advance

reorganization from his future income and from possible distributions from the Discretionary

Trust.  These funds would not be available to the estate if the case were converted to a Chapter 7.

Also, Samatas is hopeful that once the sale of the Tanager Property is consummated, as part of

the payment of Carlye's secured claim against the Tanager Property, that Carlye and Samatas

can amicably resolve any outstanding issues between them, including possible claims.

 Unfortunately, Samatas has less hope of being able to resolve the Cohen & Lord Action.

As previously discussed in this Response, Samatas asserts that he has valid and meritorious

claims against Cohen & Lord, with a substantial likelihood of success on the merits.  Samatas

will seek an Order of this Court modifying the automatic stay to allow Samatas to continue to

litigate the Cohen & Lord Action, and Samatas will seek the appointment of Parker Mills as

special counsel to represent Samatas and the Revocable Trust in that litigation.

 Also, Samatas is continuing to explore the means of liquidating any artwork, antiques,

collectibles (including pens, watches and paperweights) and any gemstones that he or the

Discretionary Trust own.  These proceeds will be used, if available, for the support of Samatas,

and possibly to resolve claims of this estate. Again, these funds would not be available to a

Chapter 7 Trustee if this case were converted.

 One of the major assets of this estate is the Natoma Property, Samatas' primary

residence.  Samatas is investigating resolving any deferred maintenance at the Natoma Property.

The Natoma Property is improved with a 15,000 square foot residence on four acres of land, with

a creek, a dam, a private island, a pool and extensive landscaping.  The private island is on Salt

Creek.  Presently, the Natoma Property has a fair market value of $3,000,000, but that value

could be substantially increased if Samatas were to perform the deferred maintenance at this

property.  None of the deferred maintenance impacts the habitability or structural integrity of the

improvements at the Natoma Property.  The deferred maintenance is as follows: (a) redoing the

outdoor lights; (b) fixing the pool; (c) improving the landscaping; (d) upgrading parts of the

HVAC; (e) replacing carpeting on the lower level of the residence; and (f) minor tuckpointing

and painting.  Samatas is willing to pay for the cost of resolving this deferred maintenance to

increase the value of the Natoma Property, if this case is not converted to a Chapter 7.

Considering all of these things, the question is whether it is in the best interest of the

creditors and the estate to allow Samatas to proceed with his reorganization.  With Samatas'

remarkable change in attitude/perspective and the material progress he has made recently, this

question must be answered in the affirmative.  It is not in the best interest of creditors to convert

this bankruptcy case.  Specifically, it is not in the best interest of creditors to substantially delay

in the sale of the Tanager Property through the appointment of a Chapter 7 Trustee.  The

appointment of a Chapter 7 Trustee will delay by at least four months, the sale of the Tanager

Property, and conversion will probably trigger lower offers for this property through the

perception in the marketplace that a Chapter 7 Trustee  would accept a purchase price that is less

than $9,300,000.  This delay is almost assured:  Any competent Chapter 7 Trustee would wait

until the debtor filed post-conversion reports required pursuant to the Federal Rules of

Bankruptcy Procedure, and after the Trustee's lengthy investigation of the Debtor's financial

affairs, including through a post-conversion First Meeting of Creditors and perhaps an

examination and production of documents pursuant to F.R.B.P. 2004.  The typical

"workmanlike" effort of a Chapter 7 Trustee (which is attendant to the Trustee's investigation

into the value of assets and the viability of the marketplace for the sale of assets), adds

substantial additional time to the administration and liquidation of assets.  No such delays of the

sale of the Tanager Property will be experienced if this Court were to allow Samatas to pursue

this sale as a debtor-in-possession.

The opposition of Cohen & Lord and Carlye to allowing Samatas to continue to

reorganize is based on their hope that this Court will convert this bankruptcy case, and once

appointed, a Chapter 7 Trustee will settle on more favorable terms any claims that Samatas has

against them.  That is especially true in the case of Cohen & Lord, who falsely perceive that a

Chapter 7 Trustee will not pursue the claims that Samatas is pursuing in the Cohen & Lord

Action.

It is doubtful that the Discretionary Trust will assert any rights against Samatas for any

loans outstanding by Samatas to the Discretionary Trust.  Thus, once the Tanager Property is

sold, the claims of the secured creditors with mortgages against the Tanager Property are

satisfied, Mid-Cap is paid in full on the sale of the assets of the Lexington Nursing Homes and

the first mortgage of Bank of America encumbering the Natoma Property is reinstated--with all

outstanding real estate taxes paid -- the only claim of any consequence of the Estate is the highly

disputed claim of Cohen & Lord.

Samatas is sincerely hopeful that this Court will not convert this case.  All of these

reorganization events are achievable, feasible and reasonable without a conversion of this case to

a case under Chapter 7. On the other hand, Samatas would suffer greatly, as would the creditors,

if this case were converted to a case under Chapter 7.

### IV.   THERE IS NO BASIS FOR CONVERSION OR DISMISSAL OF THIS CASE UNDER SECTION 1112(b) FOR BAD FAITH FILING

Carlye argues that the filing of the petition by the Debtor violates §1112(b) of the

Bankruptcy Code, and the associated "good faith standard." The Debtor disagrees and asserts

that the filing of its bankruptcy case was not in "bad faith," and did not violate the requirements

of §1112(b).

Carlye has the burden of proving that cause exists to dismiss this case. *Matter of*

*Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994). Mere allegations do not warrant dismissal.

Unless facts appearing in the record clearly warrant a finding of bad faith, dismissal is not

appropriate. See, *Matter of Little Creek Development Co.*, 779 F.2d 1068, 1074 (5th Cir. 1986).

Also, the earlier it is in a bankruptcy case, the more reluctant Courts are to dismiss the case. *In re*

*4 C Solutions, Inc.*, 289 B.R. 354, 364 (Bankr. C.D. Ill. 2003); *In re Dilling*, 322 B.R. 353, 360

(Bankr. N.D. Ill. 2005). Additionally, the Court must assess the issue of a "bad faith" filing by

objective factors or "guidelines" rather than the Debtor's subjective intent or the alleged motive

of the Debtor, as alleged by the moving party. See, *In re HBA East, Inc.*, 87 B.R. 248, 262

(Bankr. E.D.N.Y. 1998). Also, the imposition of the automatic stay as a derivative benefit of a

reorganization proceeding is not justification for dismissal due to bad faith. *Matter of Levinsky*,

23 B.R. 210, 221 (Bankr. E.D.N.Y. 1982); *In re Schlangen*, 91 B.R. 834, 838 (Bankr. N.D. Ill.

1988). Accordingly, a Court must be cautious to avoid dismissing cases filed by debtors whose

legitimate efforts at financial rehabilitation would benefit from the "breathing spell" provided by

the Bankruptcy Code. See, *In re Schlangen*, 91 B.R. 834, 837 (Bankr. N.D. Ill. 1988). With these standards in mind, Carlye cannot prove that cause exists to dismiss the Debtor's Chapter 11 case.

In determining whether to dismiss a bankruptcy case for lack of good faith, courts do not focus on whether the filing was made in subjective bad faith, see, *In re McCormick Road Associates*, 127 B.R. 410, 415 (Bankr. N.D. Ill. 1991), but rather seek to determine whether the filing presents a legitimate reorganizational objective within the scope of the Bankruptcy Code as opposed to merely providing the debtor tactical advantages unrelated to reorganization. *In re N.R. Guaranteed Retirement, Inc.*, 112 B.R. 263, 271 (Bankr. N.D. Ill. 1990); *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 750 (Bankr. N.D. Ill. 2004).

When evaluating whether a bankruptcy filing presents a legitimate reorganizational objective, Courts consider the totality of the circumstances, Original IFPC Shareholders, 317 B.R. at 750, focusing on whether the filing is likely to serve the dual purposes of preserving a going concern and maximizing the property available to satisfy creditors. Id.; see 4 C Solutions, 289 B.R. at 364. If continuing a chapter 11 case would promote these goals, a Court should not dismiss that case. 4 C Solutions, 289 B.R. at 364.

When determining whether a bankruptcy case was filed in bad faith, Courts should not consider a list of factors, but rather should analyze the filing in light of distinct, common grounds upon which Courts have dismissed cases for bad faith. N.R. Guaranteed Retirement, 112 B.R. at 272. Courts consider four scenarios in which a motion for bad faith dismissal may be granted: (i) improper impact on non-bankruptcy rights; (ii) a filing preceded by a recent transfer of assets to a newly-formed debtor entity, known as the "new debtor syndrome;" (iii) the debtor has no ability to reorganize; and (iv) the debtor was proceeding in bankruptcy simply to delay creditors.

Id. at 272-78; see also, *In re Liptak*, 304 B.R. 820, 830-38 (Bankr. N.D. Ill. 2004) (analyzing two grounds identified in N.R. Guaranteed Retirement). In N.R. Guaranteed Retirement, the Court dismissed the debtor's case based solely on the fact that it involved the new debtor syndrome; the Court refused to dismiss the petition based on (i) the impact of the filing on creditors' non-bankruptcy rights, (ii) the debtor's ability to reorganize, or (iii) whether the bankruptcy was filed simply to delay creditors. Id. at 277.

Here, there is no contention that the Debtor received his assets shortly before bankruptcy, so the new debtor syndrome is inapplicable. Also, none of the other grounds for bad faith dismissal identified by the Court in N.R. Guaranteed Retirement is applicable. Thus, the Motion to Dismiss should be denied.

A bankruptcy case improperly impacts a creditor's non-bankruptcy rights if it was filed without need for relief. N.R. Guaranteed Retirement, 112 B.R. at 272. If a debtor has a business justification for filing bankruptcy, that filing does not improperly impact creditors' non-bankruptcy rights. Liptak, 304 B.R. at 830. A debtor's attempt to stay a creditor's collection efforts by filing a Chapter 11 petition does not improperly impact that creditor's rights so long as a reorganization is needed and feasible. Id. at 273 n.8; see also, *In re McStay*, 82 B.R. 763, 768 (Bankr. E.D. Pa. 1988) (cited favorably by N.R. Guaranteed Retirement, 112 B.R. at 273 n.7). The burden rests on the creditor to establish both that the debtor has no need for bankruptcy protection and that the bankruptcy filing substantially impacts the creditor's non-bankruptcy rights. N.R. Guaranteed Retirement, 112 B.R. at 273.

In N.R. Guaranteed Retirement, the Court emphasized that dismissal for inability to reorganize was cause for relief separate and apart from a bad faith filing. 112 B.R. at 276. At that

time, the Bankruptcy Code explicitly provided in former Section 1112(b)(2) that "inability to effectuate a plan" was cause for dismissal. However, in enacting the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress amended Section 1112(b)(2) to remove "inability to effectuate a plan" as an express cause for dismissal. Congress' apparent intent was to prevent Courts from dismissing a debtor's bankruptcy case without giving the debtor a chance to propose and confirm such a plan. *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); see also, Norman J. Singer, IA Sutherland Statutory Construction, § 22.29 at 264 (5th ed. 1993) ("When the statute is amended and words are omitted, the general rule of construction is to presume that the legislature intended the statute to have a different meaning than it had before the amendment"). Because Congress has removed "inability to effectuate a plan" as cause for dismissal, it would be inappropriate to consider this issue separately in the context of a debtor's purported bad faith.

Notwithstanding, even if the inability to reorganize was a legitimate factor for this Court to consider, the Debtor has shown that he has an ability to reorganize and that he initiated the bankruptcy case for the specific purpose of stabilizing the value of the Tanager Property for the benefit of all creditors—and not to the detriment of Carley or Carlye's rights. See, *Woodbrook Assocs.*, 19 F.3d at 316-17. In the early stages of a bankruptcy case, a motion to dismiss should prevail only if the moving party can establish that the "whole scheme is no more than a pipe dream-an utterly hopeless and unrealistic prospect totally devoid of any factual basis to support the Debtor's rehabilitation." *In re Lykes Bros. S.S. Co., Inc.*, 196 B.R. 586, 595 (Bankr. M.D. Fla. 1996). As such, through a prospective Plan of Reorganization and the need to use the

Bankruptcy Court's powers (specifically to preserve the equity in the Tanager Property), the

Debtor has a business justification and can show the ability to reorganize to defeat the possible

dismissal of a case pursuant to §1112(b)—and this Court should consider that the debtor is at the

earliest stage of this case.

      BAPCPA also amended Section 1112(b)(2) to remove "unreasonable delay by the debtor

that is prejudicial to creditors" as an express cause for dismissal. Because "unreasonable delay"

is no longer cause for dismissal, it would be inappropriate to consider this issue separately in the

context of the debtor's purported bad faith. Thus, whether the Debtor caused Carlye

unreasonable delay should be irrelevant to the Motion. Debtor did not cause unreasonably delay

prejudicial to Carlye.


## V.      CONCLUSION

      In light of the foregoing, this Court should deny the Motions, after affording the Debtor
an evidentiary hearing.


                  **JAMES SAMATAS,** Debtor


                  By:_____/s/ Ariel Weissberg_____
                    One of his attorneys

Ariel Weissberg, Esq.
Weissberg and Associates, Ltd.
564 W. Randolph St., 2nd Floor
Chicago, Illinois  60661
T. 312-663-0004
F. 312-663-1514
Email: ariel@weissberglaw.com
Attorney No. 03125591

## <u>CERTIFICATE OF SERVICE</u>

 I, Ariel Weissberg, certify that on February 15, 2021, I caused ***Debtor's Combined Response to (a) United States Trustee's Motion to Convert or Dismiss Case Pursuant to 11 U.S.C. 1112(b) (Recommending Conversion) (Dkt. No. 33); (b)  Motion of Carlye Goldberg Samatas to Convert Case to Chapter 7 (Dkt. No. 36); and, (c) Cohen & Lord, P.C.'s Motion to Join the Motion of Carlye Goldberg Samatas to Convert Case to Chapter 7 (Dkt No. 53)*** to be filed electronically.  Notice of this filing was sent to all parties registered with the court's ECF electronic transmission, including to the following parties:

Patrick S. Layng, Esq.
Office of the U.S. Trustee, Region 11
219 S Dearborn Street, Room 873
Chicago, IL 60604-2027
**Email: <u>patrick.layng@usdoj.gov</u>**

David Holtkamp, Esq.
Office of the U.S. Trustee, Region 11
219 S Dearborn Street, Room 873
Chicago, IL 60604-2027
**Email: <u>David.Holtkamp@usdoj.gov</u>**

Eric D. Goldberg, Esq.
DLA Piper LLP (US)
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, California 90067
**Email: <u>eric.goldberg@us.dlapiper.com</u>**
*(Counsel for Carlye Goldberg Samatas)*

Gina Krol, Esq.
Cohen & Krol
105 W. Madison Street - Suite 1100
Chicago, IL 60602
**Email: <u>Gkrol@CohenAndKrol.com</u>**
*(Counsel for West Suburban Bank)*

Umair M. Malik, Esq.
Sarah E. Barngrover, Esq.
Adam B. Hall, Esq.
Manley Deas Kochalski LLC
P.O. Box 165028
Columbus OH 43216-5028
**Email: <u>ummalik@manleydeas.com</u>; <u>sebarngrover@manleydeas.com</u>;
<u>abhall@manleydeas.com</u>**
***(Counsel for Bank of America, N.A.* and JPMorgan Chase Bank, N.A.*)***

Timothy R. Herman, Esq.
Gordon & Rees Scully Mansukhani
One North Franklin, Suite 800
Chicago, IL 60606
**Email: therman@grsm.com**
*(Counsel for Cohen & Lord P.C.)*


　　　/s/ Ariel Weissberg　　　
Ariel Weissberg