**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Proceeding |
| | ) | Case No. 20-BK-17355 |
| JAMES SAMATAS, | ) | |
| | ) | Hon. A. Benjamin Goldgar |
| Debtor. | ) | Hearing Date:  March 8, 2021 |
| | ) | Hearing Time:  9:30 a.m. |
| | ) | |

**REPLY IN SUPPORT OF MOTION BY CARLYE GOLDBERG SAMATAS TO**
**CONVERT CASE TO CHAPTER 7**

WEST\293319069.2

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. DISCUSSION .................................................................................................. 2

     A.     The Opposition is Based on Lies and Misrepresentations .......................... 2

     B.     Carly Has Met Her Burden to Establish Cause for Conversion................ 11

III. CONCLUSION ............................................................................................. 16

WEST\293319069.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re All Denominational New Church*,
  268 B.R. 536 (B.A.P. 8th Cir. 2001) ........................................................... 15

*In re Berryhill*,
  127 B.R. 427 (Bankr. N.D. Ind. 1991) ....................................................... 14

*In re Green Box NA Green Bay, LLC*,
  579 B.R. 504 (Bankr. E.D. Wis. 2017) ...................................................... 15

*In re Groves*,
  120 B.R. 956 (Bankr.N.D.Ill.1990)............................................................... 9

*In re Hawley*,
  2004 WL 330098 (Bankr.C.D.Ill.2004) ........................................................ 9

*Lunkes v. Gecker*,
  427 B.R. 425 (N.D.Ill.2010) ......................................................................... 9

*In re McCoy*,
  274 B.R. 751 (Bankr.N.D.Ill.2002), *aff'd,* 2002 WL 1611588
  (N.D.Ill.2002) ............................................................................................... 9

*In re Odom*,
  2015 WL 3749828 (Bankr. D. S.C. 2015) ................................................... 7

*In re Olde Prairie Block Owner, LLC*,
  467 B.R. 165 (Bankr. N.D. Ill. 2012).......................................................... 13

*Matter of Perkins*,
  902 F.2d 1254 (7th Cir.1990) ....................................................................... 9

*In re Rammreddy*,
  440 B.R. 103 (Bankr. E.D. Pa. 2009) ........................................................ 13

*In re Repurchase Corp.*,
  *332 B.R. 336* (Bankr. N.D. Ill. 2005), *aff'd* 2008 WL 4379035 (N.D. Ill
  2008)............................................................................................................ 13

*In re Rey*,
  2006 WL 2457435.......................................................................................15

*In re Rowland*,
  2012 WL 3010215 (Bankr. C.D. Ill) .............................................................. 9

WEST\293319069.2

*In re West*,
507 B.R. 252 (Bankr. N.D. Ill. 2014) ........................................................................... 8

**Statutes**

11 U.S.C. § 541 ........................................................................................................... 8

11 U.S.C. § 541(c)(2) ................................................................................................... 8

11 U.S.C. § 1112(b) ............................................................................... 6, 7, 11, 12, 13

11 U.S.C. § 1112(b)(1) ............................................................................................... 15

11 U.S.C. § 1112(b)(2) .......................................................................................... 12, 14

11 U.S.C. § 1112(b)(4)(A) ..................................................................................... 11, 12

11 U.S.C. § 1112(b)(4)(F) ........................................................................................... 11

11 U.S.C. § 1112(b)(4)(P) .................................................................................. 7, 12, 15

11 U.S.C. § 1121(b)(2)(A) ........................................................................................... 12

11 U.S.C. § 1121(b)(2)(B) (i) ...................................................................................... 12

11 U.S.C. § 1121(b)(2)(B) (ii) ..................................................................................... 12

11 U.S.C. § 1129(a)(11) .............................................................................................. 13

WEST\293319069.2

Carlye Goldberg Samatas ("**Carlye**") respectfully submits this Reply brief in support of the *Motion of Carlye Goldberg Samatas To Convert Case To Chapter 7* (Dkt. #36, "**Motion**"), and in response to the arguments raised by Debtor James Samatas ("**Debtor**") in his Debtor's *Combined Response, etc.* (Dkt. #90, "**Opposition**").

**I.**
**INTRODUCTION**

1.      This Debtor just doesn't get it.  First, he filed for chapter 11 on September 21, 2020 ("**Petition Date**"), but then failed to file complete schedules on time, thus drawing a motion to dismiss from the U.S. Trustee.  Second, when he eventually filed the rest of his schedules a month late, they were replete with false statements, as well as inaccurate and incomplete information.  Third, at his 341a meeting he admitted he had filed chapter 11 to stall the foreclosure of one of his two mansions; planned to use the automatic stay to give him time to sell his Hollywood mansion; intended to use the balance of the sale proceeds to repay some secured creditors while using the rest to cover his exorbitant personal living expenses; and had no intention to file a plan of reorganization or to pay any of his unsecured creditors.  The Debtor's actions predictably led to the filing of two motions to convert; one from the U.S. Trustee and the Motion from Carlye.

2.      In January of this year, the Debtor finally engaged bankruptcy counsel.  The Debtor subsequently filed amended schedules, in which he corrected some, but not all, of the false statements and omissions in in his original schedules.  But in his Opposition, the Debtor takes the position that filing amended schedules somehow absolves him of his prior perjury and wipes the slate clean of all his many prior misdeeds in this case.

3.      The Opposition devotes almost half its length to touting the merits of the Debtor's malpractice suit against his former real estate counsel (an issue wholly irrelevant to the pending motions to convert), but fails to address any of the most salient issues

1

relating to conversion, such as the Debtor's: false statements in his Schedules; failure to disclose assets; lack of any source of income; unauthorized post-petition transfers to his adult children; failure to pay Court-ordered spousal support to Carlye after the Petition Date; failure to take any tangible steps to sell the Hollywood mansion during almost 6 months in bankruptcy; and the bad-faith behavior he exhibited both before and during his marathon, five-hour 341a meeting.   As a result, even if everything in the Debtor's Opposition were true (and it is far from that), there is still more than ample cause to convert this case to chapter 7.   Again, this Debtor just doesn't get it.

## II.
## DISCUSSION

### A.    The Opposition is Based on Lies and Misrepresentations.

4.    In his Opposition, the Debtor sets up an elaborate strawman, misrepresenting Carlye's contentions in the Motion, and replacing them with no less than 10 false claims and misrepresentations, which he then attempts to rebut to show that the Motion lacks merit.  But when the falsity of these claims is revealed by the truth, it is clear that the Debtor's "defenses" have no merit, and that the Motion should be granted.

5.    False Claim #1:  In his Opposition, the Debtor contends that *"the central issue for adjudication on the pending Motions is whether Samatas' non-compliance with the requirements of a Chapter 11 debtor is sufficiently egregious that Samatas should not be allowed to reorganize as a Chapter 11 debtor."*  Opposition at 18.  While there is no dispute that the Debtor failed to comply with many of the Code's disclosure and reporting requirements when he filed his Schedules and MORs late, that is far from the crux of the problem.  Indeed, given the Debtor's documented dishonesty, lack of any income, post-petition diminution of estate assets, failure to pay post-petition Court-ordered spousal support to Carlye, and his unwillingness and inability to propose and confirm a plan, the

2

WEST\293319069.2

central issue raised by the Motion is: Which of the many fact-based grounds available should form the basis for the Court's decision to convert this case to chapter 7?

6.      <u>False Claim #2</u>: The Opposition attempts to excuse the Debtor's multiple false statements and material failures to disclose assets and liabilities, in documents signed under penalty of perjury, as simple technical "mistakes" or foot-faults. Specifically, in his Opposition the Debtor states that "*the uninitiated often fail to recognize that a Chapter 11 case is a multi-textured legal proceeding, with many statutory and rule-based requirements that are time- and accuracy-sensitive, that often challenge even the most experienced bankruptcy lawyer.*" Opposition at 19. That is just plain nonsense.

7.      There is no dispute that in his original Schedules (Dkt. ## 1 and 22), the Debtor failed to disclose significant assets (a car, 5 bank accounts, an interest in a life insurance policy, and two trusts holding interests in more than a dozen businesses worth millions of dollars); failed to disclose millions of dollars in liabilities (his debt to Carlye, debts he owes to his brother and sister, his liability to Cohen and Lord, and his guarantee of millions of dollars in debts owed by the businesses held by his trusts); and failed to disclose multiple transfers of cash made to his children both before and after the Petition Date. This has nothing to do with "texture" or "nuance," or even accuracy - the Debtor plainly committed perjury when he signed his Schedules.

8.      A few examples make the point. The form *Schedule A/B* asks: "Do you own or have any legal or equitable interest in any of the following?"

> #25 – Trusts, equitable or future interests in property (other
> than anything listed in line 1) and rights or powers exercisable
> for your benefit?

*This Debtor, the beneficiary under two separate trusts holding interests in more than a dozen entities worth millions of dollars, answered "No." See* Schedule A/B (Dkt. #22 at

3

11). This is a simple question that requires no "texture" or bankruptcy expertise to answer accurately or honestly. The fact is that the Debtor, a lawyer, gave a false answer and then declared under penalty of perjury attesting that his Schedules were true and correct.

9. The schedules also require the Debtor to list all his creditors and codebtors. The Debtor, a lawyer and businessman, knows very well what the words "creditor" and "codebtor" mean. Yet the Debtor in his original Schedules failed to list creditors to whom he owed millions of dollars (Carlye, his brother and sister, the Cohen & Lord firm, and his own Discretionary trust), and failed to disclose he was co-liable with Carlye and others for millions of dollars of debt owed to Bank of America and Mid-Cap Financial Services. *Compare* original Schedules E/F (Dkt. #1 at 22-23) and Schedule H (Dkt. #22 at 15), with amended schedules D and E/F (Dkt. #61) and Schedule H (Dkt. #60 at 14-16).

10. These aren't complex questions about the "fair & equitable" standard, or *Till*, or the §1111(b) election; there is no "texture" or complexity here. The fact is that the Debtor lied, and only sought to amend after he got caught.

11. <u>False Claim #3</u>: Notwithstanding the Debtor's multiple false statements and material omissions, the Opposition asserts that Mr. Samatas *"is not a dishonest debtor."* Opposition at 20. But that too is untrue; honesty requires more than re-writing falsehoods only after you've been caught telling lies. Here, there is no dispute that the Debtor made *multiple false statements*, and *omitted material information* (millions of dollars in assets and liabilities) from his Schedules, which he signed under penalty of perjury. While the Debtor corrected some of his falsehoods through his amended schedules (after he was caught in his 341a), the fact remains that *he did lie*, and that *he is not an honest debtor*.

12.     <u>False Claim #4</u>:  The Debtor in his Opposition states that:

*Carlye asserts that Samatas is dishonest because in a side-by-side comparison of the information in Samatas' Financial Disclosure Document (Carlye Motion at Exhibit E) ("FDD") and the assets to which Samatas declared ownership in this Bankruptcy Case, there is a strong and suspicious difference.  This is a pernicious assertion.  What Carlye purposely failed to explain in her Motion is that in Samatas' FDD, Samatas disclosed assets comprising the total marital estate, as is required in the community-property State of California—that is, those property rights that existed before the entry of the Divorce Decree and before the equalization of those property rights.  Thus, Carlye purposely failed to explain in her Motion that through the equalization of property between Carlye and Samatas pursuant to the Divorce Decree, there is an obvious and logical diminution of pre-Divorce Decree property of Samatas:  namely, because a portion of the property in Samatas' FDD was transferred to Carlye pursuant to the Divorce Decree.*

Opposition at 22 (emphasis added).

13.     This is pure fiction.  The valuation arguments that Carlye raised in the Motion relate to only 3 specific categories of assets:  furnishings, artwork, and collectibles.  Specifically, Carlye asserts that when the Debtor listed these assets in his original Schedules in November of 2020, he ascribed to them values that are much lower than the values the Debtor ascribed to those same assets 2 years earlier in his FDD.

14.     But Carlye didn't get any of these assets in the divorce; they all went to the Debtor.  *See* Divorce Decree at p.18, section 3.A(3), lines 14-18, attached as Exhibit 1 to the Opposition (Mr. Samatas "shall have awarded to him as his sole and separate property . . . *[a]ll furniture, furnishings, artwork, personal property and effects*, *including but not limited to jewelry, watches and collectibles* in his possession and/or control" from both the Natoma and Tanager homes) (emphasis added).  Accordingly, the "equalization of property" between the Debtor and Carlye per the Divorce Decree does *not* explain why assets that the Debtor valued at $4.3 million in his 2018 FDD are valued at only $300,000 in his Schedules.  The Debtors' "explanation" of his lie here is simply another lie.

5

15.     False Claim #5:  The Debtor argues in his Opposition that:

*Further, Carlye's assertions concerning the diminution of property ignore the testimony of Samatas at his First Meeting of Creditors, where he explained any diminution when he repaid the Discretionary Trust $3,000,000 through a transfer of paperweights and artwork, and when he sold other personal property after the entry of the Divorce Decree in July, 2018.*

Opposition at 23.  This is completely false.  At his *second* Section 341a, the Debtor attempted to explain away the sudden reduction in the value of his assets by saying he had transferred some assets to his Discretionary Trust to repay a loan.  But the assets he was asked about, and that he said were transferred, were furnishings from the Natoma house, not paperweights or artwork.  See Transcript of Second 341a (Dkt. #37-4), at 50:18-20 ("The question is what accounts for the difference where you value your furniture, right now in bankruptcy in November of this year, at $100,000.  And then, two and half years earlier you valued the contents of the Natoma house at $1.4 million dollars.")  The Debtor never mentioned the $3 million figure (indeed, he testified that he did not even know how much he owed his own trust), and clearly indicated that the assets he allegedly transferred in partial repayment of a loan to himself from the Discretionary Trust were the Natoma furnishings, not "paperweights and artwork."  Id.

16.     False Claim #6:  The Debtor contends in his Opposition that "*in Carlye's Motion, Carlye misstated that Section 1112(b) mandates conversion if the Debtor fails to pay pre-petition spousal support . . . Here, Samatas' spousal support requirement first become [sic] payable in 2018, and not after September 21, 2020.*"  Opposition at 23.  This is simply untrue:  it is *not* Carlye's argument and is *not* what the Motion says.

17.     What the Motion actually says is that "Carlye has not received any spousal support from the Debtor since the Petition Date.  Accordingly, cause exists to convert the

WEST\293319069.2

case to chapter 7 pursuant to Bankruptcy Code Section 1112(b)(4)(P)." Motion at 26.[1]

While it is true that the Debtor's failure to pay spousal support to Carlye predates the

Petition Date, Carlye did *not* say that Section 1112(b)(4)(P) mandates conversion as a

sanction for the Debtor's failure to pay *pre-petition* spousal support.    Section

1112(b)(4)(P) mandates conversation when a debtor fails to pay spousal support that

comes due *post-petition*, which is exactly, indisputably, what has happened here.

18.    <u>False Claim #7</u>: The Debtor asserts that "*Contrary to Carlye's false*

*assertions in her Motion, Samatas has made no unauthorized pre- or post-petition*

*transfers of property; Samatas has not caused or allowed diminution of the estate* . . .*"*

Opposition at 23.  Not true.

19.    First, Carlye never asserted that the Debtor made any unauthorized pre-

petition transfers; there is no such thing.  Rather, what Carlye said about pre-petition

transfers was that the Debtor improperly failed to disclose them, either in his Schedules

or in the First 341a.  Motion at 7-8.  Specifically, the Debtor answered "No" when the US

Trustee asked at the First 341a "Now, have you gifted or given any property to anyone in

the last four years worth more than $600?" *See* Motion at 7, ¶18.

20.    Later, when questioned further by Carlye's counsel, the Debtor admitted

making multiple post-petition $4,000 gifts to each of his adult children.  *See* Second 341a

Transcript, (Dkt. 37-4 at 62:8-24).  And when the Debtor finally started filing MORs months

after they were due, they revealed that his post-petition gifts were even larger than he

had admitted at the 341a and totaled $28,000 during the period between September and

---

[1] *See also In re Odom*, Case No. 15-00623-HB, 2015 WL 3749828 (Bankr. D. S.C. June 12, 2015) (noting that "[t]he obligations in question are clearly owed to a spouse or former spouse and were established before the date of the bankruptcy filing," and holding that "it does not appear that there is any dispute that this payment fits squarely within the definition of a domestic support obligation.  Therefore, it must be paid to avoid dismissal pursuant to § 1112(b)."

7

December 2020.  *See* MORs filed at Dkt. ##47, 49, and 50, each at p. 4.

21.   Second, regarding diminution, the Debtor's contention that he "has not caused or allowed diminution of the estate" defies the laws of mathematics and common sense.  The Debtor has stated under oath that:

- He has no job and no income;
- His living expenses are $57,050 per month (excluding the Tanager mortgage); and
- He is making no payments on the Tanager mortgage, which accrues interest, penalties, taxes and fees at the rate of more than $30,000 per month.

*See* amended Schedule J (Dkt. # 60 at 19-20); Claims Register, Claim 8-1 at 4-5.  So of course the estate is diminishing in value!

22.   <u>False Claim #8</u>:   The Opposition claims "*the cornerstone of Carlye's assertions is based on the incorrect assertion that the Discretionary Trust is 'property of the estate' pursuant to Section 541 of the Bankruptcy Code*," and that "*There is no law in Illinois that supports Carlye's supposition that the Discretionary Trust is an alter-ego of Samatas*".  Opposition at 24.  Carlye never said the Discretionary Trust was an alter ego of the Debtor; *the Debtor said that.  See* Second 341a Transcript, (Dkt. #37-4 at 63:1-3).

23.   Second, Carlye never said that the Discretionary Trust was property of the estate.  What Carlye said in the Motion was that: (a) "it is the *Debtor's burden* to prove that the Discretionary Trust is a true spendthrift trust", and (b) one of the benefits of converting the case is that it would result in the appointment of a trustee who could objectively investigate whether the Discretionary Trust really is a "spendthrift trust" that satisfies the requirements of Bankruptcy Code Section 541(c)(2).  Motion 24.

24.   Finally, since the Debtor raised the issue ("There is no law in Illinois that supports Carlye's position that the Discretionary Trust is an alter-ego of Samatas, and

8

thus, that the Discretionary Trust can be pierced to become property of the estate")
(Opposition 24), it should be noted that the Debtor's contention here is false as well. "It is
well-settled that a beneficiary's right to access trust property overrides and nullifies the
protective effect of an otherwise enforceable spendthrift provision." *In re Rowland*, Case
No. 11-81717, 2012 WL 3070215 (Bankr. C.D. Ill, July 30, 2012); *Lunkes v. Gecker,* 427
B.R. 425, 431 (N. D. Ill. 2010); *In re Hawley*, Case No. 02-83674, 2004 WL 330098
(Bankr. C. D. Ill., Feb. 20, 2004); *In re McCoy,* 274 B.R. 751, 762 (Bankr. N. D. Ill. 2002),
*aff'd,* Case No. 02 C 3258, 2002 WL 1611588 (N. D. Ill. July 22, 2002); *In re Groves,* 120
B.R. 956, 960– 61 (Bankr. N. D. Ill. 1990).  The 7th Circuit has recognized this principle
as a matter of Illinois law.  *Matter of Perkins,* 902 F.2d 1254, 1257 n. 2 (7th Cir.1990).

25.     Underlined False Claim #9: The Opposition states that "*Importantly, through the
Divorce Decree, Carlye released and resolved any possible claims that Carlye had or
may have to assets owned by the Discretionary Trust including any income or funds that
Samatas derived or may derive from or through the Discretionary Trust.*"  Opposition at
5.  This is both untrue and irrelevant.

26.     First, in the Divorce Decree, Carlye only waived claims that the division of
assets in the divorce was unfair, or that she had any ownership rights to assets in the
Discretionary Trust.  Nothing in the July 2018 Divorce Decree gives the Debtor, or the
Discretionary Trust, a release with respect to matters arising *after* the Divorce Decree.

27.     Second, the Debtor completely misses the point here.   Carlye never
contended that the assets allocated to the Debtor or the Discretionary Trust in the divorce
are worth *more* than the Debtor said they were in 2018, and that she is therefore entitled
to more than she received in the divorce.  Rather, Carlye's argument is that the Debtor is
attempting to shortchange his creditors by claiming that the values of his assets, now that

9

he is in bankruptcy, are substantially less than he declared in his 2018 FDD.

28.    Third, even if the Divorce Decree somehow did preclude Carlye from asserting claims against, or seeking to recover assets from, the Discretionary Trust, that would not matter.    Now that the Debtor is in bankruptcy, any claims against the Discretionary Trust, whether for recovery of prepetition fraudulent or preferential transfers to that trust, objections to the Discretionary Trust's $7 million claim against the Debtor, or for substantive consolidation of the Discretionary Trust into the Debtor's bankruptcy estate, would be brought on behalf of the estate (either by a trustee or a creditor with standing) for the benefit of all creditors, rather than by Carlye individually.

29.    <u>False Claim #10</u>: The Opposition states that "*Since the filing of the petition, Samatas has actively marketed the Tanager Property,*" but "*The appointment of a Chapter 7 Trustee will delay, by at least four months, the sale of the Tanager Property.*"  Opposition at 24, 28.  As a threshold matter, it must be noted that at the First 341a, the Debtor said he had multiple written offers for the Tanager Property, and said he would provide them to counsel, but never did.  *See* First 341a Transcript (Dkt. #37-3 at 16:11-12).   At the second Section 341(a) meeting, the Debtor again said he had multiple written offers for the property and would share those offers but he never did. *See* Second 341a Transcript (Dkt. #37-4 at 42:18-19).   And now, in the Opposition, the Debtor again says he has written offers but again fails to provide any documents to support this assertion.  The Debtor's claim is even more dubious given the fact that the Debtor attached to his Opposition 6 different exhibits, totaling 97 pages, but was apparently unable to attach a copy of any of these supposed offers.  The fact is that the Debtor has failed to produce or submit evidence of *any* offers for Tanager.

30.    Even if there were real offers for Tanager, this Debtor simply cannot be relied upon to bring them to fruition.  Since filing bankruptcy last September, the Debtor claims to have been actively marketing Tanager and to possess written offers that merely need to be "finalized."  But almost 6 months have passed, and the Debtor has not even filed an application to employ a broker or a motion to approve a sale[2], let alone produced a single written offer.  A trustee could hardly do worse.

**B.    Carlye Has Met Her Burden to Establish Cause for Conversion.**

31.    With the field cleared of the counterfactual nonsense in the Opposition, the focus shifts to the applicable legal standard.  Following its amendment in 2005 (ignored in the Opposition), Section 1112(b) now <u>mandates</u> conversion or dismissal where the movant meets its burden to establish "cause."  The Debtor can argue that some of the grounds alleged to constitute "cause" pose factual issues that might, in theory, benefit from an evidentiary hearing.  But <u>such a hearing is unnecessary here because there are multiple grounds on which the Court can find cause based on the undisputed facts</u>.

32.    First, there is no dispute that there exists "continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" here because the Debtor's admitted income ($0) is dwarfed by his admitted monthly expenses ($57,050).[3]  This means that the estate is significantly diminished every month, and that the Debtor lacks the income to fund a plan.  These undisputed facts constitute "cause" per Section 1112(b)(4)(A).

---

[2] Notably, the Debtor's need to seek the Bankruptcy Court's approval to employ a broker was discussed at the first Section 341(a) meeting.  *See* First 341a Transcript (Dkt. #37-3 at 16: 7-8).  Despite the passage of more than 4 months since that meeting and the Debtor's subsequent retention of bankruptcy counsel, the Debtor still has not filed any such application or motion.

[3] As high as this figure is, it is actually understated because in calculating it, the Debtor conveniently omitted the mortgage payments and real estate taxes for Tanager, which exceed $30,000 per month.

11

33.     Second, there is no dispute that the Debtor failed to timely file his Schedules and MORs on time, and that when he did file them, they contained materially false statements and omissions.  These facts constitute "cause" per Section 1112(b)(4)(F).

34.     Third, there is no dispute that following the Petition Date, the Debtor has not made any of the Court-ordered spousal support payments owed to Carlye.  This fact alone constitutes "cause" per Section 1112(b)(4)(P), thus justifying conversion.

35.     To be clear, there are additional, serious bases through which the Court may find "cause," including the Debtor's bad faith, false statements in and material omissions from the Schedules, and unauthorized post-petition transfers.  *See* Motion at 4-16.  While those issues may be subject to factual dispute, the diminution/rehabilitation, late-filed Schedules & MORs, and failure to pay spousal support issues are not.

36.     Here, with respect to these three independent issues, Carlye has met her burden to demonstrate that "cause" exists to convert this case.  Under Section 1112(b), the burden shifts to the Debtor to establish the applicability of the exceptions in Section 1112(b)(2).    First, the Debtor must *specifically* identify "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(2).  Second, the Debtor must prove (1) that a plan is reasonably likely to be confirmed within the required time, 11 U.S.C. § 1121(b)(2)(A); and (2) that it had a "reasonable justification" for the act or omission constituting "cause" for conversion, and that the act or omission will be cured within a "reasonable time," 11 U.S.C. § 1121(b)(2)(B) (i), (ii).  Here, the Debtor has failed to make any such showing.

37.     Regarding Section 1112(b)(4)(A), the facts here are stark.  The Debtor has zero income, and monthly expenses of at least $57,050.  Every day the Debtor remains in chapter 11 results in further diminution of the estate, as creditors are forced to finance

WEST\293319069.2

the Debtor's profligate lifestyle.  Even if the Debtor wanted to confirm a plan (and he

testified at his 341a that he has no such intention), he could not because he has no

income, let alone the regular income that would be necessary to fund a feasible plan.

38.    The Debtor's only responses on this point are that (1) he hopes to get some

money if he wins his malpractice lawsuit against Cohen & Lord (but there is no evidence

that such a result is likely, let alone imminent, and the Debtor also ignores that he owes

Cohen & Lord about $3 million); (2) he hopes to get a few hundred thousand dollars when

he sells Tanager (even though he has been saying that for more than a year, and can't

even produce a single written offer); and (3) he hopes to start receiving an income of at

least $35,000 per month when the family nursing home business is sold[4].  These

responses are based on the Debtor's *expectations* of what may occur in the future, in

support of which he has provided absolutely no evidence.

39.    One of the key requirements for confirming a plan is that the debtor

demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation,

or the need for further financial reorganization, of the debtor or any successor to the

debtor under the plan . . . ."  11 U.S.C. § 1129(a)(11); this is known as the "feasibility"

requirement.  *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill.

2012).  To demonstrate feasibility, the debtor must give a "reasonable assurance of

commercial viability."  *In re Repurchase Corp., 332 B.R. 336 at 342* (Bankr. N.D. Ill. 2005),

*aff'd Repurchase Corp. v. Bodenstein*, No. 05 C 7075, 2008 WL 4379035 (N.D. Ill 2008).

The Debtor's vague and unsubstantiated claims about winning lawsuits, selling the family

business, and selling Tanager are more fantasy than reality, and fall short of the feasibility

---

[4] Significantly, there is no evidence that any such sale is in prospect, and even if it were, $35,000/month would not even cover the Debtor's monthly expenses, let alone payments on his more than $10 million of unsecured debt

WEST\293319069.2

standard.   A debtor facing a motion under Section 1112(b) must show that a reorganization is plausible and not "a mere financial pipe dream." *In re Rammreddy*, 440 B.R. 103, 114 (Bankr. E.D. Pa. 2009).  This Debtor can't confirm a plan, and his claims to the contrary fall far short of what is required to meet his burden under § 1112(b)(2).

40.      With respect to the Schedules and MORs, the Debtor in its Opposition tries to minimize the importance of these items and tries to exaggerate the difficulty of doing these things accurately or timely, but that is, quite frankly, hogwash.  Accurate and timely schedules are the *sine qua non* of bankruptcy; without them creditors and the Court have no ability to assess a debtor's financial situation.  MORs "are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it do something." *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991).  MORs are "the life blood" of chapter 11, enabling creditors to keep tabs on the debtor's post-petition operations.  *Id.*

41.      Notwithstanding the importance of the schedules and MORs, the Debtor here has made no attempt to satisfy his burden under Section 1112(b)(2) to show that there was a "reasonable justification" for his failure to timely file these items.  Nothing in the Opposition demonstrates with specificity any "unusual circumstances" to show why conversion is not in the best interests of creditors.  Nothing in the Opposition shows that the Debtor can (or even wants to) confirm a plan in a reasonable time, or that there was a "reasonable justification" for his failure to timely file his schedules and MORs.  Every day, debtors working minimum wage jobs in fast food restaurants manage to file their schedules accurately and timely.  Why should the Court excuse a wealthy, unemployed lawyer with 2 mansions and a multimillion-dollar paperweight collection from doing what everyone else can do?  The unexcused failure to file required documents like schedules and MORs is "cause" warranting conversion or dismissal.  *See In re All Denominational*

14

*New Church*, 268 B.R. 536, 538 (B.A.P. 8th Cir. 2001)

42.     Regarding the spousal support and Section 1112(b)(4)(P), it's an open and shut case.   A court order (the Divorce Decree) requires the Debtor to make these payments; the Debtor failed to make a single post-petition payment; and the Opposition is devoid of any explanation, let alone justification, as to why the Debtor failed to make them.  The Court can convert the Debtor's case to chapter 7 on this basis alone.

43.     The only remaining question is whether the Debtor's case should be converted or dismissed.  Whether a chapter 11 case should be dismissed or converted depends on what is "in the best interest of creditors and the estate."   11 U.S.C. § 1112(b)(1).  In deciding what will best serve those interests, courts often consider a long list of factors.  *See, e.g., In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017).  But better than a multi-factor test is a simple general principle: creditors are generally "best served by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time."  *In re Rey*, 2006 WL 2457435, at *9 (Bankr. N.D. Ill. Aug. 21, 2006).

44.     Here, the answer is clear: creditors have the best chance of being paid the largest amount of money in the shortest amount of time if the case is converted.  If the case is dismissed, creditors will be forced to chase this highly litigious debtor in state courts in Illinois and California and won't have access to the powerful and efficient remedies available to them, and a trustee, in bankruptcy.  In contrast, converting the case to chapter 7 and appointing a trustee will allow the Debtor's assets to be sold quickly; will permit a thorough investigation of the Debtor's assets and liabilities (including with respect to the Discretionary Trust); and will provide the means for the potential recovery of millions of dollars that the Debtor admits he transferred to insiders prior to the Petition Date.

15

WEST\293319069.2

## III.
## CONCLUSION

For all the forgoing reasons, Carlye respectfully requests that the Court grant the

Motion; convert the Debtor's case to chapter 7; and grant such further relief as the Court

deems just and proper.

RESPECTFULLY SUBMITTED,
Carlye Goldberg Samatas, creditor

Dated:  February 22, 2021

BY: *Eric. D. Goldberg*
Eric D. Goldberg
DLA Piper LLP (US)
2000 Avenue of the Stars, Suite 400N
Los Angeles, CA 90067
310/595-3085
eric.goldberg@dlapiper.com
*Admitted pro hac vice*